**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No. 2:14-CR-00022 |
| | * | |
| PETER M. HOFFMAN, | * | |
| MICHAEL P. ARATA, and | * | |
| SUSAN HOFFMAN | * | |
| Defendants | * | |


**MEMORANDUM IN SUPPORT OF PETER AND SUSAN HOFFMAN'S**
**MOTION TO DISMISS THE SECOND SUPERSEDING INDICTMENT**

### <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................................. 1

FACTUAL ALLEGATIONS AND BACKGROUND ................................................... 3

      A.    Louisiana's Film Tax Credit Statute Permitted Taxpayers To Obtain Tax Credits For Developing Certain Infrastructure Projects. ....................................... 3

      B.    The Hoffmans And Arata Were Affiliated With A Company That Made Investments The State Of Louisiana Concluded Were Eligible For Tax Credits. ...................................................................................................................... 4

      C.    The Fraud And Conspiracy Charges In This Case Are Largely Based On Expenses The State of Louisiana Certified Were Made Or Tax Credits That Were Never Issued. ...................................................................................................... 7

SUMMARY OF ARGUMENT .................................................................................... 10

ARGUMENT .................................................................................................................. 13

I.    Counts One Through Twenty-One Of The Second Superseding Indictment Fail To Allege A Cognizable Violation Of The Wire Fraud And Mail Fraud Statutes. .............. 13

      A.    Tax Credits Are Not "Money Or Property" Under the Wire and Mail Fraud Statutes. ................................................................................................................ 13

      B.    The Lack Of Authoritative Guidance Disallowing The Expenses Claimed In SAPLA's Applications For Tax Credits Conclusively Negates Any Fraud. ................................................................................................................... 18

            1.    The scope of the Film Tax Credit Statute in 2008 and 2009 was unclear. ................................................................................................. 19

            2.    In 2003, the Revenue Department ruled that money earmarked for expenditures, even if not paid until later, qualified for tax credits. ......... 22

            3.    Only in January 2010 did Louisiana attempt to specify that expenses must be paid to qualify under the Film Tax Credit Statute, and only in July 2012 did Louisiana attempt to specify what related party expenditures could be disallowed. ............................ 22

            4.    A defendant cannot be punished for violating a law that does not clearly prohibit his conduct. .................................................................. 24

5. The Hoffmans could not have defrauded the State of Louisiana by claiming a tax credit based on expenditures that were not clearly excluded under then-existing law. ........................................... 28

6. There can be no fraud because the disputed expenditures were properly included under general tax law principles. ............................... 30

C. The Government Does Not And Cannot Allege An Intent To Harm Because Louisiana Received The Benefits It Contemplated Under The Film Tax Credit Statute. ......................................................................... 33

D. The Government's Attempt To Utilize The Wire And Mail Fraud Statutes To Prosecute A Purported Violation Of Louisiana Tax Law Impermissibly Upsets The Balance Between Federal And State Authority. ............................... 36

E. The Government Fails To Allege Any Basis For Claiming That The Hoffmans Schemed To Defraud The State of Louisiana Through "Active Fraud." ............................................................................................... 38

II. Dismissal Of The Wire And Mail Fraud Counts Requires Dismissal Of The Conspiracy Charge in Count One. ................................................................. 39

CONCLUSION .............................................................................................. 40

PRAYER ......................................................................................................... 40

# TABLE OF AUTHORITIES

**Page**

*CASES*

*Cheek v. United States*,
    498 U.S. 192 (1991)..................................................................................18

*Cleveland v. United States*,
    531 U.S. 12 (2000)......................................................12, 14, 15, 18, 36, 37

*Compaq Computer Corp. v. Comm'r*,
    277 F.3d 778 (5th Cir. 2001) .................................................................31

*Dombrowski v. Pfister*,
    380 U.S. 479 (1965)..................................................................................25

*Fountain v. United States*,
    357 F.3d 250 (2d Cir. 2004), *cert. denied*,
    544 U.S. 1017 (2005)..............................................................................15

*Frank Lyon Co. v. United States*,
    435 U.S. 561 (1978)..............................................................................30, 31

*Jackson v. Comm'r*,
    915 F.2d 832 (2d Cir. 1992)....................................................................31

*James v. United States*,
    366 U.S. 213 (1961)..................................................................................24

*Jones v. United States*,
    529 U.S. 848 (2000)..................................................................................18

*Langford v. Rite Aid of Ala., Inc.*,
    231 F.3d 1308 (11th Cir. 2000) ...........................................................38, 39

*McBoyle v. United States*,
    283 U.S. 25 (1931)....................................................................................25

*McMillan Bloedel Ltd. v. Flintkote Co.*,
    760 F.2d 580 (5th Cir. 1985) ...................................................................7

*McNally v. United States*,
    483 U.S. 350 (1987)..................................................................................14

*Miller v. Comm'r*,
    T.C. Memo 2006-125 (June 15, 2006)...................................................31

*Neder v. United States,*
    527 U.S. 1 (1999) ........................................................................................38

*Parr v. United States,*
    363 U.S. 370 (1960) ....................................................................................40

*Red Stick Studio Dev., L.L.C. v. Louisiana,*
    56 So.3d 181 (La. 2011) ...............................................................................1

*Seven Arts Pictures La., L.L.C. v. La. Dep't of Economic Dev.,*
    No. C624211 (19th Jud. Dist. Ct., E. Baton Rouge, La.) .........................7

*United States v. Ballard,*
    663 F.2d 534 (5th Cir. 1981) .......................................................................38

*United States v. Brown,*
    459 F.3d 509 (5th Cir. 2006) .......................................................................39

*United States v. Carlton,*
    512 U.S. 26 (1994) ......................................................................................31

*United States v. Critzer,*
    498 F.2d 1160 (4th Cir. 1974) ..............................................24, 25, 26, 27, 30

*United States v. Czurbinski,*
    106 F.3d 1069 (1st Cir. 1997) .....................................................................14

*United States v. Dahlstrom,*
    713 F.2d 1423 (9th Cir. 1979) ...............................................26, 27, 28, 32

*United States v. Foshee,*
    569 F.2d 401 (5th Cir.)*, amended on reh'g,*
    578 F.2d 629 (5th Cir. 1978) .......................................................................18

*United States v. Freeman,*
    434 F.3d 369 (5th Cir. 2005) .......................................................................34

*United States v. Garber,*
    607 F.2d 92 (5th Cir. 1979) (en banc) ...................................25, 26, 27, 28, 30, 32

*United States v. Griffin,*
    324 F.3d 330 (5th Cir. 2003) ...............................10, 15, 16, 17, 18, 37

*United States v. Harris,*
    942 F.2d 1125 (7th Cir. 1991) .............................................................26, 30

*United States v. Herron,*
    825 F. 2d 50 (5th Cir. 1987) .......................................................................14

*United States v. Kyle,*
    257 F.2d 559 (2d Cir. 1958).................................................................18

*United States v. Lake,*
    472 F.3d 1247 (10th Cir. 2007) ...........................................................38

*United States v. Mallas,*
    762 F.2d 361 (4th Cir. 1985) .............................25, 26, 27, 28, 30, 32

*United States v. Novak,*
    443 F.3d 150 (2d Cir. 2006)...........................................................33, 34

*United States v. Pasquantino,*
    544 U.S. 349 (2005)..............................................................................14

*United States v. Pirro,*
    212 F.3d 86 (2d Cir. 2000)...................................................................27

*United States v. Powell,*
    955 F.2d 1206 (9th Cir. 1991) .............................................................18

*United States v. Ratcliff,*
    488 F.3d 639 (5th Cir. 2007) ...............................................................13

*United States v. Regent Office Supply Co.,*
    421 F.2d 1174 (2d Cir. 1970)...............................................................34

*United States v. Richards,*
    204 F.3d 177 (5th Cir. 2000), *overruled on other grounds by*
    *United States v. Cotton,* 535 U.S. 625 (2002)....................................34

*United States v. Shellef,*
    507 F.3d 82 (2d Cir. 2007)...................................................................34

*United States v. Starr,*
    816 F.2d 94 (2d Cir. 1987)...................................................................34

*United States v. Steffen,*
    687 F.3d 1104 (8th Cir. 2012) .............................................................38

*United States v. Tavoularis,*
    515 F.2d 1070 (2d Cir. 1975)...............................................................40

*United States v. Vontsteen,*
    872 F.2d 626 (5th Cir. 1989) ...............................................................13

*United States v. Whiteside,*
    285 F.3d 1345 (11th Cir. 2002) .....................................................27, 29

*STATUTES*

18 U.S.C. § 371 ..................................................................................................10

18 U.S.C. § 1341 ..............................................................................10, 13, 15, 16

18 U.S.C. §1343 ........................................................................................10, 13

18 U.S.C. §1346 ......................................................................................................14

2005 La. Sess. Law Serv., Act 456 § 1(eff. Dec. 31, 2005) .............................19

2007 La. Sess. Law Serv., Act 456, § 2 (eff. July 1, 2007) ..........................19

2009 La. Sess. Law Serv., Act 478, § 1 (eff. July 9, 2009) ...........................19

La. Acts 2007, No. 456 (eff. July 1, 2007), *codified as*
    LA. REV. STAT. ANN. § 47:6007 (2007), *amended by*
    La. Acts 2009, No. 478, *amended by*
    La. Acts 2010, No. 633, *amended by*
    La. Acts 2013, Nos. 178 and 418..........................................................1

LA. REV. STAT. ANN. § 47:6007 (2007) ............................................. passim

LA. REV. STAT. ANN. § 47:6109 (2002), *as amended by*
    La. Acts 2011, No. 409 ...................................................................29

Senate Bill No. 157, Act No. 530 (2009) ......................................................22

*RULES*

FED. R. EVID. 201(b) .........................................................................................7

*REGULATIONS*

26 C.F.R. § 1.48-12(c)(3)(ii)........................................................................29

LA. ADMIN. CODE tit. 61, § 1605 (2010).....................................................23

LA. ADMIN. CODE tit. 61, § 1613 (2010).................................................5, 11

*OTHER AUTHORITIES*

Katherine Sayre, *Movie Producers Renovating Mansion for*
    *"Hollywood South" Accused of Tax Credit Fraud*,
    NEW ORLEANS TIMES-PICAYUNE, Mar. 11, 2014 ..................................35

Louisiana Dep't of Economic Dev., *Motion Picture Incentives:
   Audit Guidelines—Related Party Transactions, available at*
   http://www.louisianaentertainment.gov/
   docs/film/00_Audit_Guidelines-July2012.pdf.......................................................24

Louisiana Dep't of Revenue, Revenue Information Bulletin
   No. 14-007 (Feb. 26, 2014), *available at* http://rev.louisiana.gov/
   forms/lawspolicies/RIB%2014-007.pdf.................................................................29

Louisiana Private Letter Ruling No. 03-006 (April 17, 2003),
   *available at* http://revenue.louisiana.gov/forms/
   lawspolicies/PLR03006.pdf.............................................................................22, 28

## INTRODUCTION

States provide tax incentives to encourage specific actions, such as creating employment, stimulating the local economy, or incentivizing businesses to relocate to the state.  In particular, the State of Louisiana sought to encourage the establishment and growth of a local television and motion picture industry that would generate long-term investment in the state.  To accomplish this objective, Louisiana enacted the Film Tax Credit Statute,[1] with its near term objectives of: (i) attracting private investment for the production of motion pictures in Louisiana; and (ii) developing an infrastructure that encouraged private investment, including tax credits to encourage investment in state-certificated production and infrastructure projects.  These tax incentives have successfully led to the development of a thriving television and motion picture industry in Louisiana (aka "Hollywood on the Bayou"), which ranks behind only California and New York as a site for the production of movies and television programs.

Defendants Peter Hoffman and Susan Hoffman, through Seven Arts Pictures Louisiana LLC ("SAPLA"), fulfilled the *quid pro quo* for seeking infrastructure tax credits under Louisiana law by making substantial investments to restore a run-down property in Louisiana and creating a production and post-production facility—the French Quarter Film House ("Film House")—that has been operating since July, 2012.[2]  Having received exactly what it bargained for under the Film Tax Credit Statute, and with knowledge of the investigation that led to the Indictment in

---

[1] La. Acts 2007, No. 456 (eff. July 1, 2007) (attached as Exhibit 1), *codified as* LA. REV. STAT. ANN. § 47:6007 (2007) (relevant version), *amended by* La. Acts 2009, No. 478, *amended by* La. Acts 2010, No. 633, *amended by* La. Acts 2013, Nos. 178 and 418.  For a discussion of the history of Louisiana's Motion Picture Tax Credit Program, *see Red Stick Studio Development, L.L.C. v. Louisiana*, 56 So.3d 181, 186-87 (La. 2011).  The Film Tax Credit Statute includes *both* the film infrastructure tax credits at issue in this proceeding (repealed in 2009) and film production tax credits, which continue in effect.

[2] A copy of the brochure for the Film House is attached as Exhibit 2.

this case, the State of Louisiana, through its Department of Economic Development ("LED"), and after conducting a forensic audit, affirmed (re-certified) SAPLA's payment of $6,531,202 of qualifying infrastructure expenditures that entitled SAPLA to transfer approximately $1,132,480.80 in tax credits.

Yet the federal government has chosen to ignore the State of Louisiana's judgment regarding its own tax credit program by attempting to criminally prosecute the Hoffmans under federal wire fraud, mail fraud, and conspiracy statutes, in part for seeking *state tax credits that the State of Louisiana has expressly allowed*, and that no Louisiana agency has taken steps to disallow under any of the avenues prescribed by state law after confirming those credits were properly granted.

In addition to improperly usurping Louisiana's authority, the government ignores binding authority foreclosing its theories of fraud as a matter of law.  Under Fifth Circuit precedent, statements made in applications for tax credits fall outside the scope of the wire and mail fraud statutes because such credits do not constitute "money or property" in the hands of the applicable state agency.  Moreover, a long line of authority holds that the conduct alleged in the Second Superseding Indictment, is not fraudulent and could not, as a matter of law, have been committed with the requisite fraudulent intent because no authoritative construction of the Film Tax Credit Statute or clearly relevant precedent explicitly barred SAPLA from seeking the tax credits underlying this case.

Indeed, the government fails to allege how seeking tax credits for expenditures that SAPLA was contractually obligated to pay, and that a Louisiana state agency expressly certified were made, could conceivably amount to fraud.  The law does not permit the government to impose criminal liability on the Hoffmans by relying on its own, after-the-fact interpretation of

Louisiana tax statutes or the form of the underlying transactions.  For these and other reasons discussed below, all charges against the Hoffmans should be dismissed.

## FACTUAL ALLEGATIONS AND BACKGROUND

### A. *Louisiana's Film Tax Credit Statute Permitted Taxpayers To Obtain Tax Credits For Developing Certain Infrastructure Projects.*

During the relevant times, the Film Tax Credit Statute provided a transferrable income tax credit, useable by certain Louisiana taxpayers, in connection with the development of a state-certified infrastructure project (the "Infrastructure Tax Credit").[3]   An infrastructure project included a film, video, television, and digital production and postproduction facility, the movable and immovable equipment related to such facility, and other equipment and property that supports or is a necessary component of the facility (the "Project").[4]   A state-certified infrastructure project included a Project approved by the office and secretary of LED and the division of administration (a "Certified Project").[5]

Under the Film Tax Credit Statute, a taxpayer could obtain Infrastructure Tax Credits equal to 40% of the taxpayer's expenditures on a Certified Project.[6]   Before any Infrastructure Tax Credit could be granted, the applicant was required to furnish a report delineating the costs that were included in the applicant's calculation of base investment in a Certified Project.  The report had to be audited and certified by an independent accountant.[7]   LED could then conduct a

---

[3] LA. REV. STAT. ANN. § 47:6007(B)(12) (2007), now repealed.

[4] *Id.*

[5] *Id.*

[6] *Id.* § 47:6007(C)(2)(a).

[7] *Id.* § 47:6007(D)(2) (audits); *id.* § 47:6007(E) & (F) (denial, recapture, or recovery of tax credits).

forensic audit of such a report, and the Louisiana Department of Revenue ("Revenue Department") has the right to deny, recapture or recover any Infrastructure Tax Credits certified by LED.[8]

**B.**     ***The Hoffmans And Arata Were Affiliated With A Company That Made Investments The State Of Louisiana Concluded Were Eligible For Tax Credits.***

During the relevant period, Defendants Peter and Susan Hoffman, and Michael Arata, were indirectly members of or performed services on behalf of, a Louisiana limited liability company, SAPLA,[9] that planned to develop a project.  The specific project related to the restoration of a historic property owned by SAPLA located at 807 Esplanade Avenue, New Orleans, Louisiana, to create the Film House.  SAPLA filed an initial application for Infrastructure Tax Credits on October 10, 2007 with respect to the Film House, which was approved by LED with an "initial certification" on May 29, 2008 (the "Pre-Certification").[10] SAPLA then retained Malcolm M. Dienes, LLC (the "Auditors") as its auditor because the Film Tax Credit Statute required that a certified audit report accompany an application for Infrastructure Tax Credits.  The application was submitted to LED on February 26, 2009 ("First Application"), and a corresponding Audit Report dated February 16, 2009 was issued by the Auditors (the "First Audit Report").[11]  On June 19, 2009, LED issued a certification ("LED

---

[8] *Id.* §§ 47:6007(D)(7) and (E); s*ee also id.* § 47:6007(F).

[9] During the relevant period, 60% of the membership interests of SAPLA were owned indirectly by the Hoffmans, and 40% of such membership interest was owned by Voodoo Studios LLC, in which Defendant Arata had an interest.  Hoffman acted as an agent and attorney for SAPLA to enable the Property to be completed and ultimately operated as a film production and post-production facility by an affiliate of Seven Arts Pictures plc, now Seven Arts Entertainment Inc. ("SAE"), of which he was Chief Executive Officer.

[10] Attached as Exhibit 3.

[11] Attached as Exhibit 4.

Certification") stating that $6,531,202 of qualifying "base investment" in qualifying film infrastructure expenditures had been made by SAPLA that entitled SAPLA to Infrastructure Tax Credits with respect to those expenditures.[12]   LED reviewed the First Application, but it did not require any further audit before issuing the LED Certification.

The Film Tax Credit Statute provided that any Infrastructure Tax Credit "not previously claimed by any taxpayer may be transferred or sold to another Louisiana taxpayer," subject to various conditions.[13]   The LED Certification authorized SAPLA to transfer a portion of the Infrastructure Tax Credits awarded with respect to such base investment before the Film House was completed.  As of June 17, 2009, SAPLA sold $1,132,480.80 of Infrastructure Tax Credits to LEAP Film Fund II LLC ("LEAP"), a film tax credit arranger, that Defendant Arata provided legal services to and was a direct or indirect member of, for approximately $900,000.

On January 20, 2010, SAPLA submitted a second Application to LED reflecting $5,980,838 in further qualifying film infrastructure expenditures with respect to the Film House (the "Second Application"), along with a second audit report by the Auditors (the "Second Audit Report").[14]   LED ordered a forensic audit of the Second Audit Report and the First Audit Report, which resulted in the decision by the Auditors to withdraw both reports on May 10, 2010.  LED thereafter cancelled the original LED Certification and, after appeal by SAPLA, affirmed its decision in a letter dated January 25, 2011.

---

[12] Attached as Exhibit 5.

[13] LA. REV. STAT. ANN. § 47:6007C(5)(c), (e) (2007).  The rules and the procedures are described in later-issued regulations, which also provide for later "allocation" of such credits to the owner of the "allocating entity."  LA. ADMIN. CODE tit. 61, § 1613(A)(2), (A)(3), (B) (2010).

[14] Attached as Exhibit 6.

SAPLA nonetheless proceeded to complete the renovation of the Film House, which was finished in late June 2012.  In July, SAPLA began operating the Film House and continues to operate a production/post-production facility there.[15]  SAPLA had previously engaged another auditing firm, Silva Gurtner & Abney, LLC ("Silva Firm"), to re-audit all qualifying film infrastructure expenditures on the Film House and to review each item of expenditures with SAPLA's lender.  The Silva Firm issued a new audit report dated July 3, 2012 ("Silva Audit Report"), reflecting $11,785,934 of "base investment" or qualifying film infrastructure expenditures involving the Film House.  The $11,785,934 total included the $6,531,202 of expenditures claimed in the First Application, as well as the $5,254,732 of additional base investment in film infrastructure expenditures.  SAPLA submitted the Silva Audit Report with yet another application for tax credit certifications to LED, on or about July 3, 2012 ("Final LED Application").[16]

LED again elected to require a forensic audit of the Silva Audit Report.  After the forensic audit was completed, LED *re-issued* the LED Certification on September 4, 2012 ("Re-Issued LED Certification").[17]  In doing so, LED re-certified the original $6,531,202 of base investment in qualifying film infrastructure expenditures involving the Film House and authorized the transfer of the $1,132,480.80 of Infrastructure Tax Credits previously transferred by SAPLA.  However, LED restricted the "transfer" of any further Infrastructure Tax Credits

---

[15] Since it opened in 2012, the Film House has operated as a joint venture of sixteen/19, a New York post-production company, and Seven Arts Filmed Entertainment Louisiana LLC ("SAFELA"), whose membership interests are owned 60% by SAE (SAPX:OTCQB), a publicly-held company, and 40% by Palm Finance Inc., a lender to SAPLA and SAFELA.

[16] Attached as Exhibit 7.

[17] Attached as Exhibit 8.

related to those approved film infrastructure expenditures, and also did not certify that the additional $5,254,732 of base investment in film infrastructure expenditures set forth in the Silva Audit Report qualified for tax credits. LED's restriction of further transfers and refusal to certify SAPLA's additional expenditures is the subject of ongoing litigation in Louisiana district court.[18] In that litigation, SAPLA disputes LED's purported justifications for its determination.

LED has not sought to cancel or rescind the Infrastructure Tax Credits granted in the LED Certification or the Re-Issued LED Certification, but has neither certified nor authorized the transfer of any Infrastructure Tax Credits associated with the Property or Film House other than the $1,132,480.00 of Infrastructure Tax Credits certified as transferable in the Re-Issued LED Certification. The Revenue Department has not at any time exercised its authority to deny, recapture or recover these Infrastructure Tax Credits.

**C.    *The Fraud And Conspiracy Charges In This Case Are Largely Based On Expenses The State of Louisiana Certified Were Made Or Tax Credits That Were Never Issued.***

Counts One through Twenty-One of the Second Superseding Indictment claim that the Hoffmans and Arata committed or conspired to commit wire and mail fraud by allegedly deceiving the Auditors, the Silva Firm, and LED in connection with both SAPLA's First, Second and Final LED Applications for tax benefits under the Film Tax Credit Statute, and the First Audit Report, Second Audit Report, and Silva Audit Report on which these Applications were based. (Dkt. 78 at 4-15).

---

[18] *See Seven Arts Pictures La., L.L.C. v. La. Dep't of Economic Dev.*, No. C624211 (19th Jud. Dist. Ct., E. Baton Rouge, La.). This Court may take judicial notice of the pending suit and any pleadings filed therein. FED. R. EVID. 201(b); *see also, e.g., McMillan Bloedel Ltd. v. Flintkote Co.*, 760 F.2d 580, 587 (5th Cir. 1985) (affirming district court's judgment based on that court's judicial notice of pleadings, files, and proceedings in a separate matter).

The government alleges that two items of "base investment" or qualifying film infrastructure expenditures included in the First Application were based on fraudulent claims of expenditures by SAPLA: (i) approximately $1,027,090 as the cost of certain sound mixing equipment owned by SAPLA's then post-production venture partner, Departure Studios NOLA LLC ("Departure") (the "Film Equipment Expenditures") and (ii) approximately $2,002,480 of construction costs to be incurred in completion of the renovation of the Film House (the "Construction Expenditures").   (*See* Dkt. 78 at 6-16 ("overt acts" and Wire Fraud Counts 2 through 6)).

The government also alleges that certain items of "base investment" or qualifying film infrastructure expenditures in the Second Application were based on fraudulent claims of expenditures by SAPLA; specifically: (i) claims of interest paid on an inter-company loan between New Moon Pictures, LLC later novated with SAFELA, and SAPLA dated November 10, 2007 ("SAPLA/SAFELA Loan"); (ii) claims of supervisory fee and development fees payable to an entity controlled by Mrs. Hoffman, Leeway Properties Inc.; (iii) additional construction expenditures payable to the contractor on the Film House; (iv) office rental for payments to Leeway Properties for offices at 900 Royal St. that the contractor used; (v) legal fees paid to SAFELA on account of the legal services of Hoffman and Arata and (vi) the claim of equipment expense from SAPLA to SAFELA on equipment contracted but not delivered by an English vendor (such expenses collectively, the "Related Party Expenditures").   (*See id.* (Wire Fraud Counts 7 through 18 and Mail Fraud Count 21)).

Two additional Counts (19 and 20) of wire fraud relate to "developer's fees and yearly interest" of about $4,500,000 (additional Related Party Expenditures) set forth in the Final LED Application and the Silva Audit Report.   (*See id.* at 13-14).

All these allegations appear to take issue with SAPLA's alleged "circular" method of funding certain expenditures claimed in SAPLA's First, Second and Final LED Applications, (*see e.g.*, *id.* at 6-8). The expenditures alleged as "fraudulent" in the Indictment (Counts 2-6) involved transferring money from accounts maintained by SAPLA or other affiliated entities to other accounts that were earmarked for construction costs involving the Film House and sound equipment that would be delivered and installed in the Film House. Those accounts were maintained in the name of Departure and the contractor working on the Film House. The funds transferred to those accounts were then transferred back to a bank account controlled by SAPLA on the same day. The same process was followed with the Related Party Expenditures claimed in the Second and Final LED Application. The other Related Party Expenditures involved transfers from SAFELA or its affiliates to SAPLA through the SAPLA/SAFELA Loan and an immediate payment by SAPLA of the related party interest, rent, construction costs, attorney fees and interest to SAFELA.

The government also appears to allege that these expenses did not qualify for tax credits merely because money had not been paid when the expenses were claimed by SAPLA. (*See* Dkt. 78 at 2 (alleging that "all funds had to be expended" to qualify for tax credits); *id.* at 6-10 (claiming various invoices for various services, fees, and equipment, and other supporting documentation were "false and misleading")). Yet it is undisputed that SAPLA did *incur* these expenditures because SAPLA had executed agreements or accepted invoices obligating it to pay for the underlying services, equipment, and the Related Party Expenditures. The government nowhere alleges that any of the amounts in issue are unreasonable in amount (if between related parties) or would not generally qualify as "base investment" that generates tax credits if paid in a

manner that the government believes was appropriate. Rather, the government's fraud theory hinges on how the payments were structured.

## SUMMARY OF ARGUMENT

This Court should dismiss all charges against the Hoffmans. As a matter of law, the Second Superseding Indictment does not sufficiently allege offenses under the federal Wire Fraud Statute, 18 U.S.C. §1343, the Mail Fraud Statute, 18 U.S.C. § 1341, or the Conspiracy Statute, 18 U.S.C. § 371, with respect to SAPLA's requests for tax credits under the Film Tax Credit Statute, for several reasons.

*First*, the Second Superseding Indictment fails to allege that the Hoffmans sought to obtain "money or property" in the hands of LED in SAPLA's First, Second, and Final LED Applications for Infrastructure Tax Credits, an essential element of the wire and mail fraud charges in Counts Two through Twenty-One, 18 U.S.C. §§ 1341, 1343, and also a requirement to establish a conspiracy to commit fraud as charged in Count One.

The Fifth Circuit in *United States v. Griffin,* 324 F.3d 330, 353-55 (5th Cir. 2003), held, on virtually identical facts, that an application for tax credits allocated or certified to the defendants by a state agency does *not* represent a "money or property" right in the hands of the agency within the scope of the Wire Fraud and Mail Fraud Statutes. *Griffin* forecloses the government's attempt to base its wire and mail fraud charges on SAPLA's Applications for Infrastructure Tax Credits, as a matter of law.

*Second*, under a long line of authorities, the Hoffmans could not as a matter of law have had the requisite intent to defraud, and could not have committed any fraud, because they lacked fair warning that the Film Tax Credit Statute required any particular form of payment for properly-incurred and qualifying "base investment." The Statute *did not so provide*, and no

-10-

authoritative interpretation of the Statute prohibited the payment methods that SAPLA used to claim such base investment.

Not until January 20, 2010, did Louisiana adopt regulations specifying that an "actual payment of cash or cash equivalent" was required.[19]  But those regulations were issued long after the First Application was submitted in 2009, and only were issued on the same day of the Second Application.  The Hoffmans cannot be penalized under regulations enacted after-the-fact, and that they lacked fair notice of when the First and Second Applications were filed.

Further, those regulations did not prohibit the payment of the Related Party Expenses of "developer's fees and yearly interest" through the disclosed SAPLA/SAFELA Loan, as charged in the only two Counts (19 and 20) related to the Final LED Application.  Louisiana did not issue substantive guidance involving related party expenses until July 2012, *after* filing of the Final LED Application, and the guidance that was issued did not prohibit the *form of payment* used by SAPLA for the Related Party Expenditures.  This argument, too, requires dismissal of all Counts against the Hoffmans.

*Third*, the government cannot use the Wire and Mail Fraud Statutes to prosecute the Hoffmans for allegedly seeking improper tax credits under Louisiana law, when policing that conduct is the exclusive province of the State of Louisiana, and Louisiana has already exercised that authority by *expressly approving* the bulk of the expenses that were submitted for certification and that the federal government now asserts were fraudulent, even after the State knew about the federal investigation.  Louisiana's Film Tax Credit Statute prescribes several remedies that the State can pursue, including disallowing the $6,531,202 of base investment

---

[19] La. Admin. Code tit. 61, § 1613(A)(2) (2010).  The complete set of regulations is attached as Exhibit 9.

expenditures that were approved by LED and recapturing the Infrastructure Tax Credits that were authorized with respect to those expenditures, none of which has occurred.  In the face of these state-law remedies, the Supreme Court's decision in *Cleveland v. United States*, 531 U.S. 12 (2000), prohibits the federal government's attempted use of federal fraud statutes to usurp Louisiana's authority with respect to the expenses underlying Counts One through Twenty-One and all such Counts should therefore be dismissed.

*Fourth*, the government has not and cannot allege that the Hoffmans intended to harm LED by seeking tax credits based on its claimed "base investment," which is a required element of wire and mail fraud.  Merely alleging an intent to deceive is insufficient as a matter of law. Indeed, Louisiana received exactly what it bargained for when the Film House was completed, and—despite knowing of the government's position—even re-issued the LED Certification related to the initial $6,531,202 of base investment in the Film House, after two forensic audits by LED and a new audit by SAPLA, the Silva Audit Report.  The government should not be permitted to ignore the judgment of the State of Louisiana through LED by prosecuting conduct based on state-law tax credits that LED has upheld, or other expenses related to investments that were, in fact, made.  Accordingly, all charges against the Hoffmans should be dismissed.

*Fifth*, the Second Superseding Indictment is also fatally flawed because it fails to allege any legal basis for asserting that the Hoffmans had a legal duty to disclose the so-called "circular" funding structure of SAPLA's expenditures.  As a result, the Second Superseding Indictment is legally insufficient to state an offense of wire or mail fraud statutes, therefore warranting dismissal of all Counts against the Hoffmans.

*Finally*, the government's failure to allege any cognizable fraud offense requires dismissal of the conspiracy charge in Count One. There can be no actionable conspiracy when the underlying conduct was not proscribed by law.

## ARGUMENT

I. **Counts One Through Twenty-One Of The Second Superseding Indictment Fail To Allege A Cognizable Violation Of The Wire Fraud And Mail Fraud Statutes.**

    A. ***The Wire And Mail Fraud Statutes Must Be Interpreted Narrowly.***

In order to properly allege and prove a violation of the Wire Fraud Statute or the Mail Fraud Statute, the United States must allege and prove: (i) the defendants engaged in a "scheme or artifice to defraud" that was "by means of false or fraudulent pretenses, representations promises" (ii) and intended to obtain "money or property" (iii) by means of "interstate wire communications." 18 U.S.C. § 1343. The Mail Fraud Statute includes the same elements, except that the last element instead requires that the U.S. Mail be used to execute the fraud. 18 U.S.C. § 1341. *See United States v. Ratcliff*, 488 F.3d 639, 643-44 (5th Cir. 2007). These requirements are narrowly construed because, absent judicial constraint, the Wire and Mail Fraud Statutes would in effect federalize virtually every state or local crime or perversely require that every "run-of-the-mill [local] crime case" be brought into federal court. *United States v. Vontsteen*, 872 F.2d 626, 629 (5th Cir. 1989) (internal quotation marks omitted; alteration in original).

    A. ***Tax Credits Are Not "Money Or Property" Under the Wire and Mail Fraud Statutes.***

The wire and mail fraud charges in the Second Superseding Indictment rest on legally insufficient allegations that SAPLA's application for tax credits wrongfully sought to deprive LED of "money or property." (Dkt. 78 at 11-15). This theory improperly disregards the narrow interpretation of the "money or property" requirement, as reflected in longstanding case law.

In *McNally v. United States*, 483 U.S. 350, 352, 358-60 (1987), the Supreme Court held that the Mail Fraud Statute, the companion to the Wire Fraud Statute,[20] is "limited in scope to the protection of property rights" and hence did not apply to a "self-dealing patronage scheme," or so-called honest services fraud.[21]   Courts thereafter continued to limit the definition of "money or property" for purposes of the mail and wire fraud statutes.   *See, e.g.*, *United States v. Czurbinski*, 106 F.3d 1069, 1078-79 (1st Cir. 1997) (unauthorized viewing of IRS taxpayer information was not obtaining money or property); *United States v. Herron*, 825 F. 2d 50, 57-58 (5th Cir. 1987) (avoidance of regulatory reporting requirements did not satisfy "money or property" requirement).

Highlighting the limited scope of the money or property requirement, the Supreme Court has declared, "it does not suffice, we clarify, that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute the thing obtained must be property *in the hands of the victim*."  *Cleveland*, 531 U.S. at 15 (emphasis added).  In *Cleveland*, the Court held that Louisiana video poker licenses, as other governmental licenses, "[are] not 'property' in the government regulator's hands."  *Id.* at 20.  The Court further explained that "'[i]f Congress desires to go further, it must speak more clearly than it has.'"  *Id.* (quoting *McNally*, 483 U.S. at 360).  The Court noted:

> We resist the Government's reading of [the Mail Fraud Statute] as well because it invites us to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement from Congress.  Equating issuance of licenses or permits with deprivation of property would subject to federal mail fraud

---

[20]  Courts interpret the Mail Fraud and Wire Fraud Statutes identically, and cases construing both are used interchangeably herein.  *United States v. Pasquantino*, 544 U.S. 349, 355 n.2 (2005).

[21]  Congress later amended the Wire Fraud Statute to encompass such "corruption" type wire fraud claims by adding 18 U.S.C. §1346.

prosecution a wide range of conduct traditionally regulated by state and local authorities. . . . [T]o the extent that the word "property" is ambiguous as placed in § 1341, we have instructed that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."

*Id.* at 24-25 (internal quotation marks and citation omitted).

This judicial reluctance to move beyond a literal definition of "money or property" is reflected in *Griffin*, where the court refused to construe an unissued tax credit as "property," and on virtually the same facts as in this case.  324 F.3d at 353-55.  In *Griffin*, the defendants were charged with violating the Mail Fraud Statute by mailing a false "pre-application notification" to the Texas Department of Housing and Community Affairs ("TDHCA") to obtain federal tax credits for two low-income housing developments.  *Id.* at 352.  The government did not try to claim that the tax credits qualified as "money," and indeed, other courts have held that they are not.  *See Fountain v. United States*, 357 F.3d 250, 259-60 (2d Cir. 2004), *cert. denied*, 544 U.S. 1017 (2005) (observing that "receiv[ing] a tax credit by fraudulent means" would not "deprive the State of its revenues," *i.e.*¸ money).

Instead, in *Griffin*, the government contended the tax credits were a valuable commodity and an economic incentive that were tantamount to "property" in the state's hands.  324 F.3d at 352.  The court disagreed and reversed the mail fraud conviction, reasoning as follows:

We conclude that *Cleveland* is controlling in this case.  Unissued tax credits have zero intrinsic value.  Therefore, tax credits are not property <u>when they are in TDHCA's possession</u>.  As a result, Section 1341 [the Mail Fraud Statute] <u>does not reach fraud in obtaining the allocation of tax credits in this case</u>. . . . Each year, state and local agencies are granted low-income housing credits by the United States Treasury Department.  Local entities [like TDHCA] then reallocate these tax credits to qualified low-income projects. . . . If the tax credits cannot be used because the property to which they were allocated does not become a low-income residence, <u>the federal government reclaims the tax credits</u>. . . . Once the tax credits have been issued on a property, the owner can sell limited partnership interests in the property so that investors can take advantage of the tax credits allocated to that project.

-15-

In sum, the only property interest the State has in the tax credits is purely <u>abstract</u> or <u>theoretical</u>, <u>even after the entire transaction between the State and the developers is completed</u>.   Unissued tax credits, therefore, do not amount to economic property as completed by section 1341 <u>while they are in the TDHCA's possession</u>.

*Id.* at 353-55 (emphasis added).[22]

Under *Griffin*'s holding, the Infrastructure Tax Credits are not "money or property" in the hands of LED.  First, LED's certification of "base investment" in the LED Certification and Re-Issued LED Certification, and its denial of certification of "base investment" in response to the Second Application, did not entitle LED to collect or receive any "money" from SAPLA or the Hoffmans.

Second, *Griffin* makes clear that the infrastructure tax credits sought by SAPLA, whether they were available for transfer or not, do not constitute "property" of the State.  The credits that Louisiana permitted SAPLA to claim or to transfer (in connection with the First Application) are no less "abstract and theoretical" than the low-income house tax credits "allocated" by the TDHCA in *Griffin*.  As in *Griffin*, those credits are usable only when an investor advances cash for them, properly makes a transfer filing with the Revenue Department that permits the Infrastructure Tax Credits to be claimed by a purchaser on their Louisiana income tax return, and the Revenue Department accepts the transfer.[23]  Like the tax credits in *Griffin*, the Infrastructure Tax Credits had no value when SAPLA sought them from LED, whether through the First,

---

[22] The *Griffin* court reached this conclusion despite the fact that TDHCA had already approved an allocation of low-income housing credits to one of the low-income housing developments managed by two of the defendants.  324 F.3d at 340.  At that point, the only requirements to claim these tax credits was to complete construction, have the units placed in service and allocate the tax credits to investors for them to claim on their federal income tax return.   Yet the *Griffin* court categorically rejected the characterization of tax credits as "property" within the scope of the Mail Fraud Statute.  *Id.* at 354-55.

[23] LA. REV. STAT. ANN. § 47:6007(C)(2)(d)(5).

Second, or Final LED Application.  Even the tax credits that were available for transfer upon certification merely represented the right to a *potential* future tax benefit in the form of the Infrastructure Tax Credits that were conditioned on the completion of the Film House or the certification of base investment expenditures, and in all cases subject to disallowance or recapture by the Revenue Department.  *Griffin* instructs that such *potential* benefits do not amount to a "property" right within the scope of the Wire and Mail Fraud Statutes.[24]

There is also no meaningful distinction between the "application" submitted by the defendants in *Griffin* and SAPLA's three Applications, or between TDHCA's "allocation" of low-income housing credits in *Griffin* and the LED Certification (allowing credits sought in the First Application) and the Second or Final LED Applications.  Like the application in *Griffin*, the Pre-Certification for the Project specifically provided that no tax credits could be transferred until the Film House was rehabilitated and placed in service in its new use as a film facility.  And the Second Application sought approval for expenses that would generate additional tax credits, but because such approval was never provided to SAPLA, no related tax credits were claimed. Similarly, no new Infrastructure Tax Credits were awarded as a result of the Final LED Application.   Under *Griffin*, potential Infrastructure Tax Credits arising from the "base investment" claimed on the Applications are not "property" in the hands of LED.

Nor is there any suggestion that the Infrastructure Tax Credits actually transferred by SAPLA, as permitted by the Re-Issued LED Certification, are based on the disputed Construction Expenditures, Film Equipment Expenditures or Related Party Expenditures.  The qualified film infrastructure expenditures that generated the Infrastructure Tax Credits were

---

[24] To the extent the government appears to claim there was a scheme to defraud  "the auditors" of money or property, that too must fail.  (*See, e.g.*, Dkt. 78 at 12-14).  Tax credits are not "money or property" of the auditors, and no authority suggests otherwise.

fungible and could be and were traced to later actual "cash" payments not disputed by the government.  The Re-Issued LED Certification confirmed that sufficient "base investment" or qualifying film infrastructure expenditures were incurred to support the $1,132,480.80 in Infrastructure Tax Credits transferred to LEAP.  Indeed, LED's own forensic audit concluded that SAPLA had sufficient "base investment" in the Property to generate the Infrastructure Tax Credits that the government improperly seeks to forfeit here.  (*See* Dkt. 78 at 16 ¶ 2a).

At best, the Infrastructure Tax Credits granted or requested represent a "purely abstract or theoretical" property interest of Louisiana regardless of whether the credits are transferred.  *Griffin*, 324 F.3d at 355.  If the government's interpretation of "money or property" were allowed to encompass these tax credits, it would impermissibly expand the scope of the Wire and Mail Fraud Statutes without clear Congressional authorization.  *Id.* at 354-55 (citing *Cleveland* and *Jones v. United States*, 529 U.S. 848, 858 (2000)).  This Court should therefore dismiss all counts of the Second Superseding Indictment as a matter of law.

**B.**      ***The Lack Of Authoritative Guidance Disallowing The Expenses Claimed In SAPLA's Applications For Tax Credits Conclusively Negates Any Fraud.***

To establish wire or mail fraud, the government must allege and prove beyond a reasonable doubt that the Hoffmans possessed a "conscious knowing intent to defraud."  *United States v. Kyle*, 257 F.2d 559, 564 (2d Cir. 1958).[25]  As a matter of law, the Hoffmans could not have such a *mens rea* when SAPLA's claims for qualified film infrastructure expenditures were

---

[25] The *mens rea* requirement for "wire fraud" requires the United States to prove beyond a reasonable doubt that each of the Hoffmans did not have a good faith belief that his or her conduct was legal or, alternatively, his or her actions were a "voluntary, intentional violation of a known duty."  *Cheek v. United States*, 498 U.S. 192, 201 (1991); *see also, e.g.*, *United States v. Foshee*, 569 F.2d 401 (5th Cir.)*, amended on reh'g*, 578 F.2d 629 (5th Cir. 1978).  The Hoffmans' belief need not be "objectively reasonable" if it was held subjectively in "good faith."  *United States v. Powell*, 955 F.2d 1206, 1212 (9th Cir. 1991).

not clearly forbidden by the applicable tax law, by any authoritative construction of that law, or by any clearly relevant precedent interpreting that law.  Absent such authority, the Second Superseding Indictment fails to allege that the Hoffmans violated any known legal duty, and thus negates any allegation of fraud or conspiracy to commit fraud.

In essence, the government claims that the Construction Expenditures, Film Equipment Expenditure and Related Party Expenditures are not "real" economic transactions because of the "circular" nature of the payments between bank accounts maintained for Departure, the contractor, SAPLA and SAFELA, and because the structure of such payments was not properly disclosed.  The government alleges those expenditures do not qualify for tax credits because the construction services were not complete, the equipment had yet to be delivered when SAPLA claimed the Expenditures in the LED Certification, and that interest, rent and other charges due were paid to related parties.  However, these expenditures were based on arms-length terms, had real economic substance, and were made in connection with the goal of operating a for-profit postproduction film facility.  The Film Tax Credit Statute—particularly during the relevant period—did not specify that payment in any form had to be made in order for expenditures to be included in the taxpayer's "base investment."  Thus, the government cannot subject the Hoffmans to prosecution when they had no fair notice that SAPLA's applications for Infrastructure Tax Credits could later be construed as illegal.

1.    *The scope of the Film Tax Credit Statute in 2008 and 2009 was unclear.*

The current Louisiana Motion Picture Tax Credit Program was enacted in 2005, and was twice amended during the periods at issue, in 2007 and 2009.[26]  The 2007 version is the version

---

[26] 2005 La. Sess. Law Serv., Act 456, § 1 (eff. Dec. 31, 2005); 2007 La. Sess. Law Serv., Act 456, § 2 (eff. July 1, 2007); 2009 La. Sess. Law Serv., Act 478, § 1 (eff. July 9, 2009).

applicable to the Infrastructure Tax Credits that are the subject of this Indictment.  The 2007 version authorized LED to issue regulations implementing the Motion Picture Investor Tax Credit Program, but these regulations were not issued until January 20, 2010 ("Film Tax Credit Regulations").  *See infra* Part I.B.3.

Under the 2007 version, the Film Tax Credit Statute authorized an Infrastructure Tax Credit for 40% of the "base investment expended in state" on a Project.[27]  "Base investment" at the time was defined as actual investment made and expended on a Certified Project, and "expended in the state" meant that such investment was with respect to property or services procured or performed in the state.[28]  That is, the Infrastructure Tax Credits were calculated based on amounts a taxpayer intended to spend in Louisiana in connection with the construction and development of a Project.  The Film Tax Credit Statute provided that prior to the grant of any Infrastructure Tax Credit, the applicant must furnish a report delineating the costs included in the calculation of base investment in a Project.  The report had to be audited and certified by an independent accountant.  The Film Tax Credit Statute required the applicant to file an application for "initial certification" as an eligible infrastructure project, set forth the criteria for approval, and obtain an initial certification from LED that the statutory requirements are met.[29] The Film Tax Credit Statute then provided that the applicant for any "final certification" of the base investment that is expended in the state shall submit a cost report audited and certified by such an accountant and authorized LED to audit any cost report so submitted.[30]

---

[27] LA. REV. STAT. ANN. § 47:6007(C)(2)(a) (2007).

[28] *Id.* § 47:6007(B)(1) and (3).

[29] *Id.* § 47:6007(D)(2)(c).

[30] *Id.* § 47:6007(D)(2)(d).

The Film Tax Credit Statute provided that Infrastructure Tax Credits were not earned with respect to a multiuse Project until the Project was complete.[31]  The Statute stated that, for purposes of claiming those Credits against Louisiana income taxes or transferring Credits that were certified, the Credits were only earned at the time the expenditures were made, all requirements under the Film Tax Credit Statute satisfied and the Credits certified.[32]

Because the Film Tax Credit Statute defined base investment as actual investment made and expended in the development of a Certified Project, it appeared on its face to only require that the property or services be "acquired" or "procured" from sources in the state at some time.[33]  In other words, the expenditures merely had to be incurred rather than immediately paid in cash to be included in the calculation of the base investment associated with a Certified Project that was a precursor to obtaining Infrastructure Tax Credits.  The specific terms used in the Film Tax Credit Statute for determining base investment—"investment" and "expended"— were also not defined when the LED Application was submitted, and the only guidance about the meaning of these terms is described below.  There was no authoritative guidance interpreting the Statute on these or any other issues.   As a result, there was no clear indication of what expenditures or agreements were included (or excluded) as base expenditures.[34]

---

[31] *Id.* § 47:6007(C)(ii)(bb).

[32] *Id.* § 47:6007(C)(v).

[33] *Id.* § 47:6007(C).  Notably the Film Tax Credit Statute as applicable to film investment tax credits during the relevant periods provided that a "production expenditure" qualified for that tax credit if *"incurred"* in the state," with *no* reference to actual cash payment.  *Id.* § 47:6007(B)(9) (emphasis added).

[34] Indeed, during the relevant period, the Louisiana legislature amended the Film Tax Credit Statute to allow the issuance of a promissory note, the economic equivalent of an IOU, in exchange for property as creating an expenditure that would be included in a taxpayer's

2.     *In 2003, the Revenue Department ruled that money earmarked for expenditures, even if not paid until later, qualified for tax credits.*

The only source of guidance when SAPLA submitted its LED Application was contained in Louisiana Private Letter Ruling No. 03-006 (April 17, 2003) (the "Ruling"), *available at* http://revenue.louisiana.gov/forms/lawspolicies/PLR03006.pdf, and attached as Exhibit 11.  In the Ruling, a taxpayer asked the Revenue Department when the tax credits involving a television or motion picture production (the "Production Credit") would be earned.  *Id.* at 2.  The taxpayer inquired whether the Production Credit is earned: (i) in the year the motion picture has been state-certified and is completed, (ii) the year in which a company transfers funds to its Louisiana affiliate to be expended on production expenses at a later date, or (iii) when the funds transferred to the affiliate are actually expended.  *Id.*  The Revenue Department concluded that the Production Credits were earned in the year in which the funds are transferred to the Louisiana affiliate, irrespective of when the affiliate spent the money.  *Id.* at 4.  Under this reasoning, the mere transfer of money earmarked for use in a television or motion picture production certified by LED is included in the calculation of a taxpayer's base investment, even if the actual funds are not spent until later.

3.     *Only in January 2010 did Louisiana attempt to specify that expenses must be paid to qualify under the Film Tax Credit Statute, and only in July 2012 did Louisiana attempt to specify what related party expenditures could be disallowed.*

As discussed above, the Film Tax Credit Statue authorized the Revenue Department to issue regulations interpreting the terms of the statute, and that could be relied upon by taxpayers in structuring their projects eligible for Infrastructure Tax Credits.  The Revenue Department did

---

calculation of its base investment in a Project.  Senate Bill No. 157, La. Acts 2009, No. 530, attached as Exhibit 10.

not issue such regulations until January 20, 2010, nearly two-and-a-half years *after* SAPLA submitted its disputed First Application that included the Film Equipment Expenditures, the Construction Expenditures, and most  Related Party Expenditures, and only on the *same day* as SAPLA's second Application.

In its 2010 Film Tax Credit Regulations, the Revenue Department added a requirement of an actual cash payment, but "as evidenced by an invoice, receipt or other such document"—and nothing more.[35]   The new Regulations did not require proof of a bank transfer, or that the payment be reflected in bank records.  Even after adopting these Regulations, Louisiana has not definitively stated that "circular" methods of cash payment of otherwise economically "incurred" expenditures—like those underlying the Second Superseding Indictment—must be excluded from a taxpayer's "base investment" or as qualifying expenditures, particularly when the amount subject to such circular flow of funds is eventually spent on property or services within the State.

Nor were the expenses described in the two Counts related to the Final LED Application in (19 and 20) prohibited by the Film Tax Credit Regulations.  These Counts related solely to payment of Related Party Expenses that were reflected in the Silva Audit Report.  The Film Tax Credit Statute specifically recognizes that "legitimate related party expenditures often occur as production expenditures"[36] and authorized LED to issue guidance to prevent "abuse of the purpose and intent of the program."  Such intent was to encourage the development of a sustainable entertainment industry and not direct the manner or form in which payments involving qualified film infrastructure expenses were made.  LED did not issue the applicable

---

[35] LA. ADMIN. CODE tit. 61, § 1605 (2010).

[36] LA. REV. STAT. ANN. § 47:6007(D)(9) (relating to film production, as opposed to infrastructure expenses).

guidance about related party expenses until July 2012.[37]   However, the guidelines involving related party expenses provide that auditors use generally accepted accounting principles to evaluate related party expenses and do not prohibit payment of related party expenditures by any particular method.  Rather, those guidelines require the auditors to determine if the *amount* of the claimed related party expenditures is reasonable based on an arms-length price, the same standard actually applied by the Silva Firm in the Silva Audit Report.

> 4. *A defendant cannot be punished for violating a law that does not clearly prohibit his conduct.*

A long line of authority establishes that the absence of statutory language or regulatory guidance as of 2009—or even now—specifically prohibiting SAPLA from claiming infrastructure tax credits without an actual cash transfer with respect to a base investment expenditure negates both an intent to defraud and the existence of any false representations essential to establish fraud.  "It is settled that when the law is vague or highly debatable, a defendant—actually or imputedly—lacks the requisite intent to violate it."  *United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir. 1974); *see also James v. United States*, 366 U.S. 213, 221-22 (1961) (plurality op.) (Warren, C.J.) (dismissal of indictment for tax fraud was required when "the statute contained the gloss placed upon it by [relevant precedent] at the time the alleged

---

[37] *See* Louisiana Dep't of Economic Dev., *Motion Picture Incentives: Audit Guidelines—Related Party Transactions*, at 3-5*, available at* http://www.louisianaentertainment.gov/docs/film/00_Audit_Guidelines-July2012.pdf, and attached as Exhibit 12.  These guidelines limited the amount of related party expenditures in several cases and referred auditors to guidance provided by general accepted accounting principles.  On a *prospective* basis only, these guidelines prohibited related party interest payments such as claimed by SAPLA, but which did not apply to SAPLA's Final LED Application.  Instead, the Film Tax Credit Regulations provided the only parameters about what related party expenses were allowed at the time of the Final LED Application and authorized a forensic audit if related party expenses exceed 20% of the production expenses claimed.  Thus, such regulations suggested that related party expenses were permitted expenditures and if a significant amount of such expenditures were made, LED could audit the expenses to ensure the claimed expenses were valid.

crime was committed"); *United States v. Garber*, 607 F.2d 92, 98-100 (5th Cir. 1979) (en banc) (adopting rationale in *Critzer*). Indeed, "[c]riminal prosecution for the violation of an unclear duty itself violates the clear constitutional duty of the government to warn citizens whether particular conduct is legal or illegal." *United States v. Mallas*, 762 F.2d 361, 363 (4th Cir. 1985).

In *Mallas*, the court held that the defendants' lack of "fair warning" that the tax deductions they claimed were not permissible conclusively negated the requisite *mens rea* for tax evasion. *Id.* at 363-65. The government claimed that the use of loans to fund "advance" payments—a "circular" movement of cash—constituted "an economic transaction in form but not in substance" and hence the "royalties had not been paid in 'cash or its equivalent.'" *Id.* at 362-63. But the *Mallas* court found that the applicable law "does not address the issue" of whether these advance royalties were deductible. *Id.* at 364. The court agreed that "potential liability might alternatively be announced by 'authoritative constructions sufficiently illuminating the contours of an otherwise vague prohibition' [or]. . . by the authoritative force of common sense."[38] *Id.* (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 490-91 (1965)). In *Mallas*, however, both the government and the defense offered "plausible support" for their positions. *Id.* at 364. For this reason, the Court held:

> We merely find that there has been no "fair warning . . . given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.). . . . [W]ithout that fair warning, the government may not institute criminal proceedings.

---

[38] Sadly, there is little of the "authoritative force of common sense" in the rules and practices applicable to federal and state tax laws.

*Id.* at 364-65; *see also, e.g.¸ United States v. Harris*, 942 F.2d 1125, 1131 (7th Cir. 1991) (reversing tax fraud conviction because "new points of tax law may not be the basis of criminal convictions").

In *Critzer*, the court held that the defendant could not have the requisite intent to willfully evade and defeat taxes on her income when the taxability of the income was so uncertain. 498 F.2d at 1162. The defendant, when filing her tax return, failed to include rental income from a business located on federal Indian lands because it was unclear whether taxes were owed on that income. The court did not question that the defendant may eventually be liable for the taxes in question, but stated that the determination of whether the defendant owed income taxes was appropriate for a civil, not criminal, suit. *Id.* at 1163. The court concluded that the appropriate vehicle to establish whether the defendants owed the income taxes was an administrative tax proceeding or a suit in civil court, not a criminal court with the "attendant potential loss of freedom." *Id.* at 1164.

The Fifth Circuit has also adopted this rationale to reverse a tax-evasion conviction. *See United States v. Garber*, 607 F.2d 92 (5th Cir. 1979). In *Garber*, the court concluded that the underlying tax statute was unclear as to whether the defendant was required to report, as taxable income, funds that she received from selling her blood plasma. *Id.* at 99. As the *Garber* court explained:

> The proof also showed that those with whom [the defendant] dealt advised her that they thought the proceeds were taxable. Nevertheless, the tax question was completely novel and unsettled by any clearly relevant precedent. A criminal proceeding. . . is an inappropriate vehicle for pioneering interpretations of the tax law.

*Id.* at 100.

*United States v. Dahlstrom*, 713 F.2d 1423, 1427-28 (9th Cir. 1979), is also on-point because it reversed a conviction involving a tax shelter program whose legality was "completely

unsettled by any clearly relevant precedent on the dates alleged in the indictment." The defendant had promoted a program that essentially "converted" taxable income into non-taxable gifts without any real change of economic position, by funneling taxable income through foreign trusts that would then transfer it back to the taxpayer as tax-exempt "gifts." *Id.* at 1425-26. The IRS had published a position paper denying benefits for this type of tax shelter based on the "sham transaction" doctrine, and had also successfully challenged this kind of program in a civil case. *Id.* at 1427-28. Citing *Garber* and *Critzer*, the *Dahlstrom* court found that even if the defendant was negligent in believing that the tax-shelter program was legal, he still could not have the required criminal intent, noting that the IRS's position paper and the civil case that the IRS cited were not issued until after defendant's challenged actions occurred. *Id.*

For similar reasons, courts have overturned convictions when "reasonable people could differ" as to whether the defendant's interpretation of law was valid. *See United States v. Whiteside*, 285 F.3d 1345, 1351-53 (11th Cir. 2002). In *Whiteside*, the court reversed three defendants' convictions for making allegedly false statements in a Medicare/Medicaid reimbursement cost report. *Id.* Relying in part on *Mallas*, the court held that the government could not prove "actual falsity as a matter of law" because no regulation, administrative ruling, or judicial decision specifically required interest expense to be reported in accordance with the original purpose of the loan. *Id.* at 1352-53; *see also United States v. Pirro*, 212 F.3d 86, 90-92 (2d Cir. 2000) (affirming dismissal of tax fraud charge when the law provided the defendant "no notice" that failure to report a person's ownership interest was criminal). Because the Second Superseding Indictment fails to allege a violation of a known legal duty, this Court should dismiss all Counts against the Hoffmans. *See Pirro*, 212 F.3d at 90-92.

5.    *The Hoffmans could not have defrauded the State of Louisiana by claiming a tax credit based on expenditures that were not clearly excluded under then-existing law.*

Like the statutes at issue in the foregoing cases, the Film Tax Credit Statute did not expressly prohibit the expenses that SAPLA claimed, and there was no "authoritative construction[ ]," *Mallas*, 762 F.2d at 364, or "clearly relevant precedent," *Dahlstrom*, 713 F.2d at 1428, as of 2009 or mid-January 2010 indicating that "base investment" or an "expenditure" <u>excluded</u> contractual obligations to invest or expend funds where the money had yet to change hands.  What comprised "base investment" at the time of the First Application was a completely novel question.  *See Garber*, 607 F.2d at 99.  Not until January 20, 2010 did Louisiana issue regulations purporting to require actual tender of cash, *see supra* at 23, but that was only the same day as when the Second Application was submitted, and long after the First Application that included the Film Equipment Expenditures and Construction Expenditures was filed.  *See, e.g.*, *Dahlstrom*, 713 F.2d at 1427 (Due Process Clause does not permit a defendant to be penalized based on interpretations of law adopted after his conduct occurred).

When the 2009 and 2010 LED Applications were filed, the only authoritative guidance issued by the Revenue Department supported SAPLA's inclusion of the disputed expenditures. The Revenue Department's 2003 Ruling concluded in a related context that the mere transfer of funds constitutes a valid "expenditure" even though the funds transferred would not be actually spent until a subsequent tax year.  *See* Louisiana Private Letter Ruling No. 03-006 (April 17, 2003), attached as Exhibit 11.  Such prepayment of expenses is economically indistinguishable from SAPLA's prepayment of the Construction Expenditures, the Film Equipment Expenditures and Related Party Expenditures because each reflected a future payment obligation rather than a current expenditure.  Based on this authority, it was reasonable of SAPLA to believe that all these Expenditures were properly included in SAPLA's "base investment" calculation because

-28-

the transfers fixed the liability and amount due, and SAPLA had binding legal agreements or invoices obligating SAPLA to pay for the property or services involving those expenditures once the property was transferred to SAPLA's possession and the construction services were completed. *See, e.g.*, *Whiteside*, 285 F.3d at 1352-53.

Nor are Counts 19 and 20 relating to the claims of Related Party Expenditures in the Silva Audit Report supported by impermissible expenses contained in the Final LED Application. As discussed above, the guidelines involving related party expenses were not issued by LED until July 2012, and did *not* require review of the manner of payment among affiliates or whether a loan from one affiliate to another was used to pay related party expenditures to other affiliates, and did not prohibit the inclusion of the interest payable on such a loan. Instead, the guidelines required only a review of the arms-length pricing for the claimed production expenditures, *not* review of how payment of the expenditures was made.

SAPLA's position is further bolstered by the regulations for a similar program for federal and state historic rehabilitation tax credits that is administered in Louisiana by the State Historic Preservation Office. In that program, merely incurring an expense is sufficient to qualify as an "expenditure" for tax credits.[39] Thus, then-existing authority supported SAPLA's view that the

---

[39] *See* 26 C.F.R. § 1.48-12(c)(3)(ii); Louisiana Dep't of Revenue, Revenue Information Bulletin No. 14-007 (Feb. 26, 2014), *available at* http://rev.louisiana.gov/forms/lawspolicies/RIB%2014-007.pdf (citing LA. REV. STAT. ANN. § 47:6109A(1)(a)), and attached as Exhibit 13. For periods on or before June 13, 2013, Louisiana law defined "eligible costs and expenses" for purposes of obtaining Louisiana historic rehabilitation credits as "qualified rehabilitation expenditures" as defined by the federal tax code. LA. REV. STAT. ANN. § 47:6109(B)(1)(c), (2) (2002), *as amended by* La. Acts 2011, No. 409, attached as Exhibit 14. The statute further provided that terms not specifically defined by Louisiana tax law for these purposes had the same meaning as under federal tax law. *Id.* § 47:6109(B)(2). SAPLA has claimed such federal and state historic rehabilitation tax credits with respect to the Film House based on a separate compilation by the Silva Firm, and received on January 2, 2014 a Part III Certificate from Louisiana's Historic Preservation Office confirming the award of those credits.

formal step of making a cash payment was not material to obtain the initial benefits of the Film Tax Credit Statute.  And there was absolutely no indication that an immediate cash payment was essential to the Statute's purpose, *i.e.*, to develop an infrastructure of production and post-production facilities in Louisiana to support employment and economic growth derived from increased film production activities.  Once the proposed facility was completed and the business opened—as it was here—then the Statute's objective was fulfilled.

Because the Hoffmans lacked "fair warning" that the tax credits could be subject to later challenge, the government's fraud claims fail as a matter of law.  *Mallas*, 762 F.2d at 364-65 (internal quotation marks omitted).  The government's attempted use of a federal criminal fraud statute as a "vehicle for pioneering" its after-the-fact interpretation of Louisiana tax law is improper.  *Gerber*, 607 F.2d at 100; *see also Harris*, 942 F.2d at 1135.  Instead, the appropriate forums for debating whether the transactions that generated the tax credits were allowable are state administrative tax proceedings and Louisiana civil courts.  *See Critzer*, 498 F.2d at 1164.

> 6.   *There can be no fraud because the disputed expenditures were properly included under general tax law principles.*

The government also claims that SAPLA's alleged "circular" movements of cash or prepayments of expenses through funding accounts, without more, were tantamount to fraud. (*See, e.g.*, Dkt. 78 at 6-8).  But even in the *civil* context, such factors are only *one* indicia that a transaction did not fulfill a business purpose.  The actual tax characterization of a transaction is *not* determined by such formal steps, but instead by whether the transaction has a subjective business purpose and an objective non-tax economic profit or risk regardless of how the transaction is structured.  *See Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84 (1978).  As the Supreme Court has explained, when "a genuine multi-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with

-30-

tax-independent considerations, and is not shaped *solely by tax avoidance features* that have meaningless labels attached," the form should be respected. *Id.* (emphasis added).[40] This is because "[a]ny one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury . . . .  Therefore, if what was done here was what was intended by [the statute] it is of no consequence that it was an elaborate scheme to get out of . . . taxes." *United States v. Carlton*, 512 U.S. 26, 36 (1994) (O'Connor, J., concurring) (internal quotation marks and citation omitted).

In this case, the purposes and provisions of the Film Tax Credit Statute do not suggest that the particular formal steps or "deal" chosen by an applicant, to realize the goal of creating an operating film production or post-production facility, were precluded as a matter of Louisiana law.   Rather, the objectives of the Film Tax Credit Statute were satisfied by SAPLA's completion of the Film House, the operation of the facility for business, and the attendant

---

[40] Or as *Frank Lyon* stated: "In applying the doctrine of substance over form, the Court has looked to the objective economic realities of the transaction rather than to the particular form the parties employed." 435 U.S. at 573.

The circular flow of funds is not an uncommon tax planning technique.  For example, in *Miller v. Commissioner*, T.C. Memo 2006-125 (June 15, 2006), the court upheld back-to-back loans that involved the circular flow of funds and permitted the taxpayer to increase his tax basis in his corporate stock because the loans were bona fide indebtedness and obligated the taxpayer to repay the loan proceeds to the third-party lender.  To the same effect, *see Jackson v. Comm'r*, 915 F.2d 832 (2d Cir. 1992) (similar "circular" sale/leaseback transaction in a motion picture).  There is no dispute here that SAPLA had binding agreements obligating it to pay the expenditures subject to the Second Superseding Indictment.  Rather, the government seems to object to the form and timing of the payment arrangements.

Along the same lines, the Fifth Circuit rejected the IRS's *civil* challenge to a transaction involving twenty-three purchases and re-sales by Compaq *within a one-hour period* of American depository receipts that were structured to generate a capital loss on the "sale" and "dividend income" for the short time the depository receipt was held.  *Compaq Computer Corp. v. Comm'r*, 277 F.3d 778, 779-80, 788 (5th Cir. 2001).  The *Compaq* court rejected the Service's contention that the back-to-back planned purchase and sale or the depositary receipts (and circular cash flows) lacked economic substance.  *Id.* at 787-88.

-31-

generation of revenues for the State, which has nothing to do with the payment structure for the expenditures that led to the Film House's completion and operation.

The Film Tax Credit Statute provided no indication to the Hoffmans that the funding structure SAPLA used was impermissible.  Yet the law requires the government to identify an "authoritative construction[ ]" of the law, *Mallas*, 762 F.2d at 364 (internal quotation marks omitted), or point to some "clearly relevant precedent" expressly disallowing a claim of Infrastructure Tax Credits that  are attributable to the alleged "circular" movements of cash. *Garber*, 607 F.2d at 100.  And the government must prove that the Hoffmans were aware of such authority, *Dahlstrom*, 713 F.2d at 1428 (internal quotation marks omitted).  No such authority existed at the time of any of the First Application, the Second Application, or Final LED Application.

There is no dispute that purchasing the sound mixing equipment or paying the construction expenditures under a binding contract, for example, would, in fact, generate base investment on which Infrastructure Tax Credits could be claimed.  The Second Superseding Indictment, however, does not allege that SAPLA's binding agreement with the contractor, including pre-payment of the contractor's estimated costs to complete, was a transaction that lacked either a subjective business purpose or an objective expectation of profit or risk independent of tax benefits.  To the contrary, SAPLA undertook an unconditional obligation to pay the full estimated cost of construction, and owed the contractor's funding account the monies deposited when he needed it for construction.  SAPLA assumed the economic risk the Film House would never be completed or utilized for its intended purpose and will incur the financial loss if the Film House does not generate sufficient income to repay SAPLA's investment.  There

is nothing sinister about cash pre-payments of an expense for any expected tax benefit when there is a fixed expectation the payments will eventually be made.

Rather, at the time the First, Second and Final LED Applications were made, based on the language of the Pre-Certification, SAPLA had no expectation that the payment would accelerate the receipt of Infrastructure Tax Credits since the Pre-Certification and conditions contained in the Film Tax Credit Statute required completion of construction as a condition to transfer of the Infrastructure Tax Credits.  The prepayments thus only set the amount of and established the liability for the relevant expenditure.  It was eminently reasonable of SAPLA to believe that its method of funding the claimed expenditures was irrelevant or immaterial to its entitlement to obtain tax credits, and there certainly was no "authoritative construction" or "clearly relevant precedent" giving the Hoffmans "fair warning" that this structure was illegal. As such, the government cannot prosecute the Hoffmans for wire or mail fraud based on the form of payment chosen by SAPLA.

### C.   *The Government Does Not And Cannot Allege An Intent To Harm Because Louisiana Received The Benefits It Contemplated Under The Film Tax Credit Statute.*

Alternatively, the wire and mail fraud charges should be dismissed because the government fails to allege facts which, if true, would prove that the Hoffmans' alleged failure to disclose to the Auditors and LED the alleged "circular" flow of funds associated with the Construction Expenditures, the Film Equipment Expenditures and Related Party Expenditures, or that the expenses had not yet been "paid" in some acceptable form, was intended to harm LED. The Second Superseding Indictment does not allege that there was a "discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver."  *United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006) (internal quotation marks and citation omitted).

-33-

To establish a violation of the Wire Fraud and Mail Fraud Statutes, the government must allege and prove that the alleged false representation or intentional concealment of a material fact was "intended to harm" the recipient of the misrepresentation or concealment, not that the concealment merely "intended to deceive." *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970). To meet its burden, the government "'must, at a minimum, prove that defendants *contemplated* some actual harm or injury to this victim.'" *Novak*, 443 F.3d at 156 (quoting *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987)).

In *Regent*, the Second Circuit reversed a mail fraud conviction when the defendants' false statements to customers would not have "tended to mislead the purchaser, or prospective purchaser, as to the quality or effectiveness of the thing being sold, or to mislead him with regard to the advantages of the bargain." 421 F.2d at 1180. The *Regent* court upheld the district court's conclusion that, although the defendants' conduct may be questionable, they did not intend to get "something for nothing." *Id.* at 1177, 1182.[41] The court stated the purpose of the scheme must be to injure or harm, and where there was only an intent to deceive, the government could not establish an "intent to defraud." *Id.* at 1182; *see also United States v. Shelef*, 507 F.3d 82, 108-09 (2d Cir. 2007).[42]

---

[41] The district court also noted that no customer testified that he felt he was cheated by the deception. *See Regent Office Supply Co.*, 421 F.2d at 1176-78. And here, the State of Louisiana publicly confirmed that the disputed credits were supported by actual project spending on the Film House and consequently does not believe the State was cheated on account of the nature of the circular payments of certain expenses. *See infra* at 35 n. 43.

[42] *See also United States v. Freeman*, 434 F.3d 369, 377 (5th Cir. 2005); *United States v. Richards*, 204 F.3d 177, 207 (5th Cir. 2000), *overruled on other grounds by United States v. Cotton*, 535 U.S. 625 (2002) (intent to harm the alleged victim is a requisite element under the Wire Fraud and Mail Fraud Statutes).

Here, the government does not and cannot allege that SAPLA lacked an intent to complete the Film House when SAPLA sought the tax credits in 2009 and 2010, when SAPLA did open the Film House in 2012.  The government does not and cannot allege that "circular" funding account pre-payments with respect to the Construction Expenditures, Film Equipment Expenditures and Related Party Expenditures were *not* all made pursuant SAPLA's intent to place the Film House in service, pursuant to written agreements that obligated SAPLA to purchase the film equipment, pay for construction costs or provide for the services necessary to complete this substantial project.  These "base investments" satisfied the *quid pro quo* for receiving tax credits under the Film Credit Statute because SAPLA intended to deliver to LED what LED bargained for in the Pre-Certification.

Instead, the government objects to the form of the payment of "base investment" giving rise to SAPLA's claim for Infrastructure Tax Credits.  Thus, even if the government were correct (it is not) that that method of funding the disputed expenditures was somehow improper, or that the Film Credit Statute required those expenses to be paid in cash to qualify for infrastructure tax credits, the Hoffmans could not have intended any harm to LED because they always intended to complete the Film House—as they did.

Indeed, LED itself re-issued the LED Certification in September 2012 and did not contest any of the $6,531,202 "base investment," part of which underlies the Infrastructure Tax Credits that were granted.[43]  There is no basis for claiming that the Hoffmans' alleged failure to disclose the nature of the Construction Expenditures, Film Equipment Expenditures, and Related Party

---

[43] Indeed, the LED has publicly confirmed that the disputed credits are supported by actual project spending.  Katherine Sayre, *Movie Producers Renovating Mansion for "Hollywood South" Accused of Tax Credit Fraud*, NEW ORLEANS TIMES-PICAYUNE, Mar. 11, 2014, at A1.

Expenditures was material to LED because the construction involving the Film House was completed, equipment was installed to operate a post-production facility, and the Film House was opened for business.  LED received what it bargained for under the Film Tax Credit Statute in the Pre-Certification by authorizing Infrastructure Tax Credits to SAPLA for investments that were actually made.  For this additional reason, the wire and mail fraud charges in Counts Two through Twenty-One should be dismissed.

### D. *The Government's Attempt To Utilize The Wire And Mail Fraud Statutes To Prosecute A Purported Violation Of Louisiana Tax Law Impermissibly Upsets The Balance Between Federal And State Authority.*

The government's attempted application of the Wire and Mail Fraud Statutes to conduct involving alleged violations of Louisiana state tax law, particularly for *actual expenses that Louisiana has expressly concluded were made*, amounts to an improper usurpation of state power.  In *Cleveland*, the Supreme Court disapproved such a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress.  531 U.S. at 25-27.  The Court stated that equating issuance of licenses or permits with deprivation of property would subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities.  *Id.* at 27.  The Court noted that Louisiana's video poker statute prescribes criminal penalties for making false statements on license applications, and stressed that enforcing such penalties traditionally lies within the state's domain.  *Id.* at 23-25.

*Cleveland* similarly forecloses the government's attempt to usurp the State of Louisiana's authority to police state tax matters.  Like the video poker statute in *Cleveland*, the Film Tax Credit Statute vests the State of Louisiana with authority to impose penalties related to the Infrastructure Tax Credits.  If a taxpayer received Infrastructure Tax Credits for funds invested and expended, but that were not spent in the required period of time, the Revenue Department could assess additional Louisiana income tax against the applicant for the amount of

expenditures that were claimed, but not spent.[44]   In other words, for each dollar of expenses claimed as a component of the tax credit that was not spent, the Revenue Department could assesses against the applicant an additional dollar of taxable income.   The Film Tax Credit Statute also provides the Revenue Department with additional remedies to offset Infrastructure Tax Credits that were previously granted to a taxpayer.[45]   If the Infrastructure Tax Credits were later disallowed, the Revenue Department could use its discretion to assess tax against the taxpayer (or the officers and directors of the taxpayer) or bring a claim in state tax court to recover to tax credits granted.[46]   The State could also enforce its own criminal penalties.[47]

The Second Superseding Indictment seeks to circumvent the authority of the State of Louisiana to impose penalties under the Film Tax Credit Statute—which the State has chosen not to exercise—and instead transform a state-law issue into federal wire and mail fraud offenses. Congress has not expressly authorized the government's use of the Wire Fraud and Mail Fraud Statute to litigate the determination of a state's tax incentive policies, and allowing the government to utilize the Wire or Mail Fraud Statute in this way would result in the same, improper expansion of the Wire Fraud Statue that *Cleveland* and *Griffin* disapproved.

Instead, it is the State of Louisiana's prerogative to police any misstatements of the base expenditures contained in the First, Second or Final LED Applications related to the Construction Expenditures, Film Equipment Expenditures and Related Party Expenditures if the State believes that any misstatements were made.   Yet the Revenue Department has not

---

[44] LA. REV. STAT. ANN. § 47:6007(E) (2007).

[45] *Id.* § 47:6007(F).

[46] *Id.*

[47] *Id.*

challenged these Expenditures claimed by SAPLA or brought an action to disallow the tax credits awarded and, in fact, *affirmatively reauthorized* the tax credits related to those expenditures after conducting an independent forensic audit.   Permitting the federal government's use of the Wire or Mail Fraud Statute to prosecute the Hoffmans would impermissibly usurp the considered judgment of the State of Louisiana.   This Court should dismiss the wire and mail fraud counts on this ground as well.

   **E.**   ***The Government Fails To Allege Any Basis For Claiming That The Hoffmans Schemed To Defraud The State of Louisiana Through "Active Fraud."***

   The Supreme Court has held that the Wire and Mail Fraud Statutes require proof that the defendants made "a misrepresentation or concealment of *material* fact."  *Neder v. United States*, 527 U.S. 1, 22 (1999).  The misrepresentation component of the Wire and Mail Fraud Statutes require proof of "active" and not "constructive" fraud.  *See United States v. Ballard*, 663 F.2d 534, 541 n.17 (5th Cir. 1981).   In other words, a mere failure to disclose is not "fraud" for purposes of the Wire Fraud Statute unless there is a duty to disclose the information subject to dispute.  As a result, an indictment under the Wire Fraud and Mail Fraud Statutes is legally insufficient if it alleges only "implied misrepresentation" or failure to disclose facts without allegations of a legal duty to disclose such facts.  *See United States v. Steffen*, 687 F.3d 1104, 1116 (8th Cir. 2012) (affirming dismissal of mail, wire, and bank fraud indictment when the indictment alleged only "implied misrepresentation" and failed to allege any basis for a duty to make disclosures); *see also United States v. Lake*, 472 F.3d 1247, 1258-60 (10th Cir. 2007) (reversing wire and security fraud conviction because the defendant had no duty to disclose his personal use of corporate aircraft).  Such a duty must be established by common law or imposed by statute.  *See Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1313-14 (11th Cir. 2000) (concluding retailer had no obligation to disclose pricing structure to customers).

The allegations of the government of twenty-one counts of wire, mail fraud and conspiracy are each and all critically and materially based on the alleged failure of the Hoffmans to disclose to the Auditors that actual transfers of cash in payment of certain expenses were allegedly "circular" in that cash was transferred into the recipient's bank account in several installments and then that day transferred back to SAPLA or SAFELA (as the case may be) in matching intrabank transfers.  However, the circular nature of the payments was not hidden from anyone because they were reflected on SAPLA's bank statements.  The Second Superseding Indictment fails to allege that the Hoffmans had a duty to disclose that the "base investment" involving the Film Equipment Expenditures, the Construction Expenditures, or Related Party Expenditures were for expenses that would be paid after the First, Second or Final LED Applications were filed, or any duty to disclose how the payment of those Expenditures was structured.  As *Langford* recognizes, a duty to disclose a fact to a particular party generally requires a common-law or statutory basis, but none of these grounds are alleged in the indictment or supported by any language in the Film Tax Credit Statute.  231 F.3d at 1313-14.  To the extent that the Second Superseding Indictment is premised on a duty to disclose, it should be dismissed as legally insufficient.

## II.    Dismissal Of The Wire And Mail Fraud Counts Requires Dismissal Of The Conspiracy Charge in Count One.

The Second Superseding Indictment fails to allege that the Hoffmans conspired to commit violations of the Wire or Mail Fraud Statutes because, as discussed above, the alleged conduct does not violate either Statute.  *See United States v. Brown*, 459 F.3d 509, 523 (5th Cir. 2006) (conspiracy conviction reversed alongside wire fraud conviction because the wire fraud theory was not legally cognizable).  SAPLA's Applications for tax credits do not involve a deprivation of "money or property," do not involve any misrepresentations, and in any event,

cannot be parlayed into a federal mail or wire fraud offense.  Further, the government's failure to allege, and its inability to establish, the requisite *mens rea* also bars any conviction for conspiracy to commit wire fraud. *See United States v. Tavoularis*, 515 F.2d 1070, 1074 (2d Cir. 1975) ("Where the substantive offense underlying the conspiracy requires specific knowledge, failure to establish that specific knowledge for the substantive offense precludes conviction on the conspiracy count."); *cf. Parr v. United States*, 363 U.S. 370, 393 (1960) (failure to establish essential element of fraud underlying a conspiracy charge required reversal of conviction on conspiracy).  Count One should also be dismissed.

## CONCLUSION

This Court should reject the government's attempt to prosecute the Hoffmans for conduct involving requests for tax credits that are not "money or property" subject to the Wire and Mail Fraud Statutes.  Additionally, the Hoffmans were not provided fair notice that their actions were remotely criminal and those actions involved obtaining tax credits that were expressly authorized by LED and consistent with the intent of the state statute.  Indeed, LED even independently audited the disputed expenses underlying the Second Superseding Indictment twice and still concluded that the bulk of the disputed tax credits were allowable.  The Second Superseding Indictment also fails to allege that any statements regarding SAPLA's expenses or their funding structure constitute misrepresentations, or that any interstate wires or mail was used in furtherance of any fraud.  Accordingly, all charges against the Hoffmans should be dismissed.

## PRAYER

For these reasons, Defendants Peter Hoffman and Susan Hoffman respectfully request that this Court dismiss all counts of the Second Superseding Indictment.  Defendants further pray for any additional relief to which they may be justly entitled.

Respectfully submitted,

/s/ *Don J. DeGabrielle*

DON J. DeGABRIELLE, NO. 04803
BRACEWELL & GIULIANI LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
Tel: (713) 221-1139
Facsimile: (800) 404-3970

JASON ROGERS WILLIAMS, NO. 25539
NICOLE E. BURDETT, NO. 32972
607 St. Charles Avenue, Suite 300
New Orleans, Louisiana 70130
Tel. (504) 585-1413
Facsimile: (504) 581-5588

COUNSEL FOR DEFENDANT
PETER HOFFMAN

/s/ *Patrick Fanning*

Patrick Fanning, No  #5441
238 Huey P. Long Ave.
Gretna, La.  70053
Tel : (504) 368-7888
pfanninglaw@aol.com

COUNSEL FOR DEFENDANT
SUSAN HOFFMAN

#4585042.3