UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


UNITED STATES OF AMERICA                    CRIMINAL ACTION

v.                                          NO. 14-022

PETER M. HOFFMAN,                           SECTION "F"
MICHAEL P. ARATA,
SUSAN HOFFMAN


<u>ORDER AND REASONS</u>

Before the Court are two motions to dismiss the mail fraud, wire fraud, and conspiracy charges contained in Counts 1 through 21 of the second superseding indictment: one filed jointly by Peter and Susan Hoffman and one filed by Michael Arata.  For the reasons that follow, the motions are DENIED.

## **Background**

Peter and Susan Hoffman and Michael Arata were partners in various movie-related business ventures.  One such venture was the purchase and renovation of a dilapidated mansion on Esplanade Avenue in New Orleans, which they turned into a post-production film editing facility.  This federal white collar criminal case arises from the government's allegations that -- in connection with the renovation project -- the Hoffmans and Mr. Arata (through companies they owned) committed, aided and abetted, and conspired to commit, mail and wire fraud by submitting false expense reports in order to deceive the State of Louisiana into issuing state tax

1

credits that they had not actually earned and were not entitled to receive.

The backdrop of this federal criminal case is a Louisiana state law tax credit program. In 1992, to encourage local development of a motion picture and television industry, the State of Louisiana enacted the Louisiana Motion Picture Incentive Act, La.R.S. § 47:6007.[1]  By law, the State provided incentives in the form of tax credits for State-certified infrastructure projects, as well as for production projects.[2]  Individuals and businesses making motion pictures were eligible to receive tax credits, which were calculated as a percentage of the companies' qualified expenditures in Louisiana. Infrastructure expenditures included the purchase, construction, and use of facilities that were directly

_____

[1]Considering that Louisiana is third in film production in the United States, it seems that this legislation has played a leading role in accomplishing its industry development objective.

[2]La.R.S. § 47:6007 has been amended several times. Act 456 of 2005 authorized income tax credits for State-certified infrastructure projects.  With respect to these infrastructure projects, Act 456 of 2005 provided that if the total base investment was greater than $300,000, each investor was allowed a tax credit of 25% of the base investment, and an additional 15% tax credit was allowed until January 1, 2008; the available tax credit totaled 40%.  The relevant version of the Act for the purposes of the criminal charges at issue in this case is the amendment accomplished by Act 456, effective July 1, 2007.  Act 456 provided for the infrastructure tax credits authorized by Act 456 of 2005 through January 1, 2009, but imposed limits on those tax credits for applications filed after August 1, 2007: a six-month deadline was imposed and a $25 million per project cap on the tax credits was also imposed. The film infrastructure tax credits at issue in this matter were repealed in 2009, but the film production tax credits remain in effect.

2

related to and utilized for motion picture production in Louisiana. To qualify for infrastructure tax credits, all funds had to be expended, and such expenditures had to be verified by an independent Louisiana Certified Public Accountant.

This tax credit program is administered by the Office of Entertainment Industry Development, an office within the Department of Economic Development. The administrative review and approval process was described by the Louisiana Supreme Court as follows: To receive an initial certification letter from the State approving a project as a State-certified infrastructure project, an applicant must file an application for motion picture investor tax credits with the OEID, and obtain approval of the project from the DED, OEID, and the Department of Administration. See Red Stick Studio Development, L.L.C. v. Louisiana, 56 So.3d 181, 183-84 (La. 2011) (citing La.R.S. 47:6007 (2005)). After an initial certification letter is issued, and accepted by the applicant, the applicant must then submit to those same agencies a cost report of infrastructure expenditures; the report must be audited and certified by an independent certified public accountant. Id. at 183 n.4. Based on the applicant's submission, the relevant state agencies determine whether those infrastructure expenditures qualify for tax credits; if so, those agencies will certify the tax credits based upon the approved infrastructure expenditures. Id. Once certified, tax credits could be applied to offset against the Louisiana taxpayer's

income tax liability, or they may be sold.  Id.

In renovating the property at 807 Esplanade Avenue[3] with the vision of turning it into a post-production film studio, Peter Hoffman,[4] Susan Hoffman,[5] and Michael Arata,[6] through their respective companies, availed themselves of the State film infrastructure tax credit program.  They submitted three applications and supporting documents to the State for tax credits. As statutorily required, the defendants first submitted the 807 Esplanade expenditures to auditors for verification.  To verify the expenditures, the auditors requested proof of payment such as invoices, bank transfers, bank statements, and other corporate

---

[3]The government alleges that Peter and Susan Hoffman and Michael Arata bought the mansion at 807 Esplanade Avenue on October 3, 2007.

[4]Peter M. Hoffman, the government alleges, was the CEO of Seven Arts Entertainment, Inc., a company involved in the motion picture and entertainment industry in California.  Mr. Hoffman was also an attorney and served as a executive in numerous financial and tax-preferred financings for over 25 years. He also owned, operated, and controlled numerous companies affiliated with Seven Arts Entertainment, Inc., including Seven Arts Pictures, Inc., Seven Arts Pictures Louisiana, LLC, Seven Arts Filmed Entertainment Louisiana, LLC, and Seven Arts Post, LLC.

[5]Susan Hoffman, the government alleges, was a California film producer who relocated to New Orleans.  Susan Hoffman also owned and operated several companies, including Leeway Properties, New Moon Pictures, LLC, and Seven Arts Pictures Louisiana, LLC.

[6]Michael P. Arata, it is alleged, was also a Louisiana attorney and businessman who owned and operated companies involved in the movie and entertainment industry, including Seven Arts Pictures Louisiana, LLC, Voodoo Production Services, LLC, Voodoo Studios, LLC, and LEAP Flim Fund II, LLC, which purchased, sold and brokered Louisiana film tax credits.

4

financial records. Based on this information, the auditors created audit reports detailing the defendants' claimed expenditures on 807 Esplanade. These audit reports were submitted as part of the February 26, 2009, January 20, 2010, and July 3, 2012 submissions to the State for film infrastructure tax credits.

On June 19, 2009 the State issued $1,132,480.80 in tax credits to Seven Arts Production Louisiana, LLC as a result of the first application, the February 26, 2009 submission. Mr. Arata paid cash to the partnership for these tax credits, at a discounted price, through his company LEAP Film Fund II, LLC, then, the government claims, sold the tax credits to local businesses and individuals for profit. The State did not issue tax credits based on the January 20, 2010 and July 3, 2012 applications.

On February 6, 2014 a grand jury returned a six-count indictment, charging Peter Hoffman and Michael Arata with conspiracy (Count 1), as well as aiding and abetting, and actually committing wire fraud (Counts 2 - 6), in violation of 18 U.S.C. §§§ 371, 2, 1343.[7]  After first superseding on April 3, 2014,[8] the

_____

[7]Peter Hoffman filed a motion for bill of particulars, which was denied by Magistrate Judge Knowles on April 28, 2014.

[8]This superseding indictment filed on April 3, 2014 charged Susan Hoffman for the first time, and added additional charges against the other defendants: conspiracy (Count 1), wire fraud and aiding and abetting against Peter Hoffman and Michael Arata (Counts 2 - 5), wire fraud and aiding and abetting against all three defendants (Counts 6 - 17), mail fraud and aiding and abetting against all three defendants (Count 18), and false statements against Michael Arata only (Counts 19 - 22).

5

government filed a 25-count second superseding indictment on May 15, 2014, charging the Hoffmans and Mr. Arata with conspiring to commit, committing, and aiding and abetting, wire and mail fraud, in violation of 18 U.S.C. §§§§ 371, 1343, 1341, and 2, and also charging Mr. Arata with making false statements to federal agents.[9]

With respect to Count 1, which alleges conspiracy to use the mail or wires in furtherance of the defendants' scheme to defraud, the government alleges 37 specific overt acts, and charges that the defendants accomplished their conspiracy, and took steps to conceal from the State their scheme, when they: 1). prepared and filed material false and misleading tax credit applications, fraudulently claiming that certain expenditures had been made to 807 Esplanade when those expenditures had not been made; 2). prepared and submitted to the auditors and to the State materially false and misleading internal accounting books and records and payment receipt certifications to make it appear as if certain expenditures had been made and certain items had been paid for and received when those expenditures had not been made and those items had not been paid for or received; 3). prepared and submitted to the auditors and the State materially false and misleading invoices in support of fraudulent expenditures; 4). conducted materially false and

_____

[9]Count 1 alleges conspiracy, Counts 2-5 allege wire fraud as against only Messrs. Hoffman and Arata, Counts 6-20 allege wire fraud against all three defendants, Count 21 alleges mail fraud, and Counts 22 - 25 charge only Michael Arata with making false statements to federal agents in violation of 18 U.S.C. § 1001.

misleading circuitous bank transfers of money to make it appear that certain items were paid for when those items had not been paid for; and 5). prepared and submitted to the auditors proofs of payment that were materially false and misleading in that only outgoing money transfers were disclosed to the auditors when the money had actually been immediately returned to the original bank account and those return money transfers were not disclosed to the auditors.

As to the wire fraud charges (Counts 2 - 5 against Peter Hoffman and Michael Arata and Counts 6 - 20 against all three defendants), the government alleges:

> Beginning on or about March 1, 2006, and continuing until on or about July 3, 2012, in the Eastern District of Louisiana and elsewhere, the defendants, Peter Hoffman, Michael Arata, Susan Hoffman ... did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises by submitting and causing to be submitted materially false, misleading and fraudulent information to the auditors and to the State of Louisiana for the purpose of obtaining infrastructure tax credits relative to 807 Esplanade.  All in violation of Title 18, United States Code, Sections 1343 and 2.

With respect to the mail fraud charge (Count 21), the government alleges:

> On or about February 3, 2010 ... the defendants, Peter Hoffman, Michael Arata, Susan Hoffman ... for the purpose of executing and attempting to execute, and in furtherance of, the scheme and artifice to defraud set forth in paragraph 2 of Counts 6 through 20 above, did knowingly send and cause to be sent, delivered, and moved by private commercial interstate carriers correspondence dated February 2, 2010, addressed to an auditor for the

State of Louisiana with attached exhibits, corporate agreements, and invoices for project management, equipment consulting, and office rent. All in violation of Title 18, United States Code, Sections 1341 and 2.

There is also a notice of fraud forfeiture in the second superseding indictment, in which the government seeks forfeiture of property, including "[a]t least $1,132,480.80 in United States Currency and all interest and proceeds traceable thereto." The defendants now seek dismissal of Counts 1 through 21 of the second superseding indictment, which charges them with conspiracy to commit mail and wire fraud, as well as committing and aiding and abetting mail and wire fraud.[10]

I.

*A.*

The defendants move to dismiss Counts 1 through 21 of the second superseding indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B) on the ground that the indictment fails as a matter of law to state offenses against the United States.

The Sixth Amendment of the U.S. Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation." U.S. CONST. amend. VI. This guarantee is implemented

———————————

[10]Michael Arata does not presently request dismissal of the false statement charges against him, contained in Counts 22 - 25 of the second superseding indictment.

8

by Rule 7 of the Federal Rules of Criminal Procedure[11] and by case literature.   The U.S. Court of Appeals for the Fifth Circuit instructs that:

> An indictment is legally sufficient if (1) each count contains the essential elements of the crime charged, (2) the elements are described with particularity, and (3) the indictment is specific enough to protect the defendant against a subsequent prosecution for the same offense.

United States v. Cooper, 714 F.3d 873, 877 (5th Cir. 2013) (internal quotations and citation omitted), cert. denied, 134 S.Ct. 313 (2013).[12]   Although each element of the charged offense must be alleged, "the law does not compel a ritual of words"; the sufficiency of an indictment "depends on practical, not technical, considerations."   United States v. Ratcliff, 488 F.3d 639, 643 (5th Cir. 2007)(citation omitted).

"[T]he propriety of granting a motion to dismiss an indictment ... by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact.   If a question of law is involved, then

---

[11]Rule 7(c)(1) provides that "[t]he indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government...."

[12]Stated differently, see also United States v. Cavalier, 17 F.3d 90, 92 (5th Cir. 1994)(citing United States v. Arlen, 947 F.2d 139, 144 (5th Cir. 1991), cert. denied, 503 U.S. 939 (1992)): "An indictment is sufficient if it contains the elements of the charged offense, fairly informs the defendant of the charges against him, and insures that there is no risk of future prosecution for the same offense."

consideration of the motion is generally proper." <u>United States v.</u>
<u>Fontenot</u>, 665 F.3d 640, 644 (5th Cir. 2011)(quoting <u>United States</u>
<u>v. Flores</u>, 404 F.3d 320, 324 (5th Cir. 2005)(internal quotation
marks and citations omitted)).  When defendants challenge an
indictment on the ground that it fails to state an offense, the
Fifth Circuit instructs that the Court must "take the allegations
of the indictment as true ... to determine whether an offense has
been stated." <u>Id.</u> (citations omitted).

*B.*

"The starting place for any determination of whether the
charged conduct [is] proscribed by [a criminal] statute is a
reading of the language of the charging instrument and the statute
itself." <u>Ratcliff</u>, 488 F.3d at 643 (citations omitted). The mail
and wire fraud statutes, 18 U.S.C. § 1341 and § 1343,[13] prohibit the

---

[13]The mail fraud statute, 18 U.S.C. § 1341, provides:

> Whoever, having devised or intending to devise any scheme
> or artifice to defraud, or for obtaining money or
> property by means of false or fraudulent pretenses,
> representations, or promises, ... for the purpose of
> executing such scheme or artifice or attempting to do so,
> [uses the mails or causes them to be used], shall be
> fined under this title or imprisoned not more than twenty
> years, or both.

The wire fraud statute, 18 U.S.C. § 1343, provides:

> Whoever, having devised or intending to devise any scheme
> or artifice to defraud, or for obtaining money or
> property by means of false or fraudulent pretenses,
> representations, or promises, transmits or causes to be
> transmitted by means of wire ... in interstate or foreign
> commerce, any writings, signs, signals, pictures, or

use of the mail (or use of wires) for "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." United States v. McMillan, 600 F.3d 434, 447 (5th Cir. 2010)(citation omitted), cert. denied, 131 S.Ct. 504 (2010).[14] "To sufficiently charge the offense of mail [or wire] fraud, the indictment must allege that (1) the defendant devised or intended to devise a scheme to defraud, (2) the mails [or wires] were used for the purpose of executing, or attempting to execute, the scheme, and (3) the falsehoods employed in the scheme were material." Id. (quoting Ratcliff, 488 F.3d at 643-44).

The second superseding indictment introduces the state infrastructure tax credit program and explains:

> Individuals and businesses that applied to the State for film infrastructure tax credits were entitled to receive an amount equal to 40% of their qualified and audited film infrastructure expenditures. Once this amount was certified by the State of Louisiana, the applicants could then sell the certification to local businesses and individuals, who would then use the tax credit certifications to offset taxes that the businesses and individuals would otherwise have owed to the State of Louisiana. Such sale of tax credits provided a significant source of cash for film-related taxes.

---

sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

[14]The mail and wire fraud statutes are, in relevant part, identical and, thus, analytically interchangeable. See Pasquantino v. United States, 544 U.S. 349, 355 n.2 (2005).

The government then alleges that, after the defendants purchased 807 Esplanade, they applied for infrastructure tax credits from the State; in so doing, they submitted their claimed expenditures on 807 Esplanade to auditors and then to the State.  After their first of three applications for tax credits, it is alleged that:

> On or about June 19, 2009, the State of Louisiana issued approximately $1,132,480.80 in tax credits as a result of the February 26, 2009 submission.  MICHAEL ARATA paid cash to the partnership for these tax credits, at a discounted price, through his company LEAP Film Fund II, LLC.  MICHAEL ARATA then sold the tax credits to local businesses and individuals for profit.  The State of Louisiana did not issue tax credits to the 807 Esplanade partnership as a result of the January 20, 2010 and July 3, 2012 submissions.

The wire and mail fraud scheme is set forth in Counts 1 through 21, which allege that the defendants:

> did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises by submitting and causing to be submitted materially false, misleading and fraudulent information to the auditors and to the State of Louisiana for the purpose of obtaining film infrastructure tax credits relative to 807 Esplanade.[15]

Although the first element of a mail or wire fraud charge may be charged by a variety of schemes, the key, indeed the central form of scheme alleged in this case is the deprivation of "money or property."  It is the government's accusation concerning

---

[15]This is the operative provision of the second superseding indictment; this scheme is articulated in paragraph 2 of Counts 6 through 20; Counts 1 and 21 expressly incorporate it.  Counts 2 through 5 allege the same scheme but allege it only with respect to Peter Hoffman and Michael Arata.

fraudulently getting "money or property" that the defendants target as legally insufficient.  At odds here is whether the film tax credits at issue are, in law, "money or property."  Or something else.  The case literature presents a challenge to common sense.

## II.

### A.

The defendants urge the Court to dismiss Counts 1 through 21 of the second superseding indictment on the ground that the government does not sufficiently allege offenses for wire fraud, mail fraud, or conspiracy to commit wire and mail fraud with respect to the defendants' applications for tax credits under the State's film infrastructure tax credit program.  In particular, the defendants contend that the alleged scheme to obtain tax credits from the State of Louisiana fails as a matter of law because it fails in law that the defendants sought to obtain "money or property" in the hands of the State; unissued tax credits, the defendants argue, are not "money or property" for the purpose of the mail and wire fraud statutes.  They invoke Cleveland v. United States, 531 U.S. 12, 26 (2000) and United States v. Griffin, 324 F.3d 330, 354 (5th Cir. 2003).

In Cleveland, the defendants were charged with a scheme that involved making false statements in applications to obtain video poker licenses from the State of Louisiana.  531 U.S. at 15. Considering whether "for purposes of the federal mail fraud

13

statute, a government regulator parts with 'property' when it issues a license[,]" the Supreme Court held that the mail fraud statute "does not reach fraud in obtaining a state or municipal license of the kind here involved, for such a license is not 'property' in the government regulator's hands." Id. at 20. "It does not suffice," the high court instructed, "that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." Id. at 15. Although the Supreme Court acknowledged that "Louisiana has a substantial economic stake in the video poker industry",[16] the Court nevertheless observed that "the State's core concern is regulatory", and that "the [g]overnment nowhere alleges that Cleveland defrauded the State of any money to which the State was entitled by law." Id. at 20-22, 24 (observing that "the State did not decide to venture into the video poker business; it decided typically to permit, regulate, and tax private operators of the games.").[17]

---

[16]Louisiana collected an upfront processing fee or renewal fee from applicants, as well as a device operation fee, and, most substantially, a fixed percentage of net revenue from each gaming device. Id. at 22.

[17]Notably, the Supreme Court also "resist[ed] the [g]overnment's reading of [the mail fraud statute] as well because it invites us to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress." Id. at 24 (noting that the state video poker statute imposes criminal penalties for making false statements on license applications).

14

Relying on Cleveland, the Fifth Circuit later held that, for the purpose of mail and wire fraud, unissued tax credits are not property of the state. United States v. Griffin, 324 F.3d 330, 354 (5th Cir. 2003). In Griffin, the Texas Department of Housing and Community Affairs was responsible for allocating potential federal tax credits as incentives for developers to build housing developments in which certain rental units were set aside for occupancy by low-income residents at a reduced rent. Id. The defendants were charged with violating the mail fraud statute by participating in an elaborate scheme that involved mailing a "pre-application notification" to a city in Texas, for the purpose of defrauding the Texas Department of Housing and Community Affairs, the State of Texas, United States, in order to obtain federal tax credits for two of these low-income housing developments. Id. at 354-55. Invoking Cleveland, defendant Griffin argued that "tax credits are like licenses in that they do not exist until they are issued." Id. at 352. The Fifth Circuit agreed, determining that "[u]nissued tax credits have zero intrinsic value. Therefore, tax credits are not property when they are in the TDHCA's possession. As a result, section 1342 does not reach fraud in obtaining the allocation of tax credits in this case." Id. at 354. Because the Hoffmans and Arata contend that Griffin condemns the mail and wire fraud charges against them, and the government counters that Griffin does not apply, the context of the scheme alleged in

15

Griffin is significant:

> The tax credits at issue derive from Congress' Tax Reform
> Act of 1986.  Each year, state and local agencies are
> granted low-income housing tax credits by the United
> States Treasury Department.  Local entities then
> reallocate these tax credits to qualified low-income
> projects.  TDHCA [the Texas Department of Housing and
> Community Affairs] is the only entity in the State of
> Texas with the authority to reallocate tax credits under
> this program. Once tax credits have been allocated, they
> cannot be transferred from the property to which they
> were allocated.  If the tax credits cannot be used
> because the property to which they were allocated does
> not become a low-income residence, the federal government
> reclaims the tax credits.  The tax credits are not
> actually issued on a project involving new construction,
> as was the case for the Golden Oaks project, until the
> rental units actually have been constructed and placed in
> service at reduced rent for low-income occupants.  Once
> the tax credits have been issued on a property, the owner
> can sell limited partnership interests in the property so
> that investors can take advantage of the tax credits
> allocated to that project.

Id. at 354.  The Fifth Circuit noted that, in administering the

program, the TDHCA collects upfront fees such as application and

commitment fees and that, after the tax credits have been issued,

monitoring fees are collected.  Id. at 355.  Nevertheless, the

Fifth Circuit recognized that "[b]eyond those fees ... TDHCA does

not derive any benefit, gain, or income from the tax credits while

it possesses them." Id.  Focusing on the state's regulatory power

to issue the tax credits, the Fifth Circuit observed:

> [T]he benefit that the State of Texas receives from those
> fees is minute compared to the benefit that is realized
> from the creation of affordable rental housing, which is
> the goal of the tax credit program.  Unquestionably, that
> benefit is not realized when the tax credits have been
> allocated to the State for distribution.  Rather, that
> benefit is realized only after the tax credits actually

16

have been issued into the developers' possession so they
can be sold to investors who can use them to offset their
federal income tax obligations.   In sum, the only
property the State has in the tax credits is purely
abstract or theoretical, even after the entire
transaction between the State and a developer is
completed.   Unissued tax credits, therefore, do not
amount to economic property as contemplated by section
1341 while they are in the TDHCA's possession.

Id.

Like the tax credits in Griffin, the defendants argue, the
unissued tax credits in the power of the State of Louisiana are not
property and, therefore cannot be the object of a mail or wire
fraud scheme.  Because the only object alleged by the government is
"obtaining film infrastructure tax credits relative to 807
Esplanade", the defendants urge the Court to dismiss Counts 1
through 21 for failure to state a federal offense.  The government
counters that the defendants sweepingly misapply Cleveland and
Griffin.  The Court agrees.

The government contends that, unlike the state interests in
Cleveland and Griffin, Louisiana's interest in the film
infrastructure tax credits is not merely regulatory; that the tax
credits here functionally implicate the tax revenue of the State of
Louisiana.  Moreover, the indictment alleges that, once the tax
credits were certified, they had an immediate cash value as they
were transferable and able to be sold on the open market.  Thus,
the government correctly submits, the object of the defendants'
scheme was entirely about "money or property", including the funds

17

of investors who would purchase the tax credits from the defendants and, ultimately, the revenue of the State of Louisiana.[18]

In support of its contention that the right to tax revenue is "property" for the purposes of the mail and wire fraud statutes, the government invokes the post-Cleveland (and Griffin) Supreme Court case of Pasquantino v. United States, 544 U.S. 349, 355 (2005). In Pasquantino, a case closer to the revenue stream in this case, the petitioners were indicted for and convicted of federal wire fraud for their scheme to smuggle liquor into Canada after pre-ordering it by telephone from the United States and failing to declare the goods to Canadian customs officials when crossing the border. 544 U.S. at 353. The Supreme Court opted to resolve a Circuit split regarding "whether a plot to defraud a foreign government of tax revenue violates the federal wire fraud statute." Id. at 354. In holding that the petitioner's conduct indeed fell within the literal terms of the wire fraud statute, the

---

[18]Finally, the government submits that the State of Louisiana is not the only possible victim; although the wire and mail fraud statutes require a victim, the victim need not be named in the indictment; and there is no requirement that the victim who loses money or property in a mail or wire fraud conspiracy must also be the party that was deceived the by the defendants' scheme. See, e.g., United States v. Hatch, 926 F.2d 387, 392 (5th Cir. 1991)("The focus of the mail fraud statute is upon the use of the mail to further a scheme to defraud, not upon any particular kind of victim"), cert. denied, 500 U.S. 943 (1991); accord United States v. Valencia, No. 04-515, 2006 WL 3716657, at *4 (S.D. Tex. Dec. 14, 2006), aff'd, 600 F.3d 389 (5th Cir. 2010); see also United States v. Howard, 619 F.3d 723, 727 (7th Cir. 2010)("even if an indictment names particular victims, the government need not prove intent to harm those named victims").

Supreme Court observed:

> Canada's right to uncollected excise taxes on the liquor
> petitioners imported into Canada is "property" in its
> hands.  This right is an entitlement to collect money
> from petitioners, the possession of which is "something
> of value" to the Government of Canada....  Valuable
> entitlements like these are "property" as that term
> ordinarily is employed.  Had petitioners complied with
> this legal obligation, they would have paid money to
> Canada.  Petitioners' tax evasion deprived Canada of that
> money, inflicting an economic injury no less than had
> they embezzled funds from the Canadian treasury.  The
> object of petitioner's scheme was to deprive Canada of
> money legally due, and their scheme thereby had as its
> object the deprivation of Canada's "property."

Id. at 355 (internal citations omitted).

Interestingly, the government also invokes United States v.

Leahy, 464 F.3d 773 (7th Cir. 2006), reh'g en banc denied, and cert.

denied, Duff v. United States, 552 U.S. 811 (2007). In Leahy, the

City of Chicago passed an ordinance to grant an advantage to select

businesses owned by minorities and women; the defendants obtained

Minority Business Entity status (MBE status) by submitting

fraudulent information on certification applications to the City of

Chicago.  464 F.3d at 778, 787.  The defendants were charged with

"hatch[ing] and execut[ing] a plan to obtain fraudulently over $100

million in contracts and subcontracts from the city of Chicago by

lying about [two companies'] ownership structure." Id. at 787.  In

rejecting the defendants' argument that certified MBE status was

like the licenses issued in Cleveland, the Seventh Circuit noted

that

19

> [T]he scheme precisely and directly targeted Chicago's coffers and its position as a contractual party...; here the fraud was committed both against Chicago as regulator and also against the city as property holder.  The certifications were necessary steps, but they were not the object of the long-ranging fraud.  That object was money, plain and simple, taken under false pretenses from the city in its role as purchaser of services.

Id. at 788.

By way of reply, the defendants argue that tax evasion cases like Pasquantino are distinguishable because the government here does not explicitly allege that the State was deprived of tax revenue.  And defendants suggest that Leahy in fact supports their position because the object of the fraud in that case was actual money by way of city contracts, not MBE status, which, like an intangible tax credit, is not property but something that is later parlayed into property.  The government's present allegations do not implicate Pasquantino, Fountain, and Leahy, the defendants insist, because the government only alleges as the object of the fraud the infrastructure tax credits.  The government seeks to impermissibly amend the indictment, the defendants' argument goes, by adding new, uncharged objects, namely defrauding investors who purchased tax credits and avoiding taxes and depriving the State of its tax revenue, bringing into play the Fifth Amendment to the Constitution.[19]

---

[19]After Griffin but before Pasquantino, the Second Circuit addressed whether taxes owed to the government constituted property for the purpose of the wire fraud statute.  Fountain v. United States, 357 F.3d 250, 257 (2d Cir. 2004), cert. denied, 544

20

*B.*

Having articulated the contours of the dispute and the pertinent case literature, the Court turns as it must to the allegations of the second superseding indictment and, in particular, the object of the fraud alleged by the government. The government alleges in the second superseding indictment that the defendants devised a scheme to defraud, and to obtain money and property, by means of false pretenses and representations, and using the mail and wires to execute the fraudulent scheme, "by submitting and causing to be submitted materially false, misleading and fraudulent information to the auditors and to the State of Louisiana for the purpose of obtaining infrastructure tax credits relative to 807 Esplanade."  The object of the defendants' mail and wire fraud and their conspiracy was to "obtain[] infrastructure tax credits."  These tax credits, it is alleged, had a cash value;

---

U.S. 1017 (2005). In <u>Fountain</u>, the defendant, an alleged participant in a cigarette-smuggling scheme to avoid Canada's high tobacco taxes, was charged with and convicted of conspiracy to launder the proceeds of the wire fraud scheme.  357 F.3d at 252. The Second Circuit held that "taxes owed to the government – even if not yet collected – are property in the hands of the government." <u>Id.</u> at 257. The Second Circuit distinguished <u>Griffin</u> as demonstrating that "tax credits are quite different from run-of-the-mill sales and income taxes." <u>Id.</u> at 259 (citing <u>United States v. Griffin</u>, 324 F.3d 330 (5th Cir. 2003), and noting that "[a]n entity that – even improperly – obtained the right to such tax credits would have to fulfill its obligations to the State and would not accrue a tax advantage without incurring a reciprocal duty.").  This Court sees no functional difference between tax revenues and tax credits, which also focus a government's revenue stream.

based on the defendants' first application seeking tax credits, "[t]he State issued $1,132,480.80 in tax credits." And, the government alleges: "MICHAEL ARATA paid cash to the partnership for these tax credits, at a discounted price, through his company LEAP Film Fund II, LLC.  MICHAEL ARATA then sold the tax credits to local businesses and individuals for profit."[20]

The Court finds that the mail and wire fraud statutes criminalize the defendants' alleged scheme to obtain infrastructure tax credits; those tax credits represent valuable economic entitlements, they are intimately intertwined with the State's tax revenue scheme, and are, therefore, property of the State. Pasquantino compels this conclusion.

Just like the plot to defraud Canada of its tax revenue, the defendants here are charged with scheming to defraud Louisiana[21] of tax credits, indisputably alleged by the government to be a valuable entitlement.  See Pasquantino, 544 U.S. at 355-56 ("This right is an entitlement to collect money from petitioners, the possession of which is 'something of value' to ... Canada").

_____

[20]To the extent the defendants urge the Court to consider in isolation the government's allegations that the object of the fraud was "to obtain tax credits," the Court must instead be mindful that the sufficiency of an indictment "depends on practical, not technical, considerations."  United States v. Ratcliff, 488 F.3d 639, 643 (5th Cir. 2007)(citation omitted).

[21]Clearly the fact that the alleged victim is the State is of no moment.  "The fact that the victim of the fraud happens to be the government, rather than a private party, does not lessen the injury."  Id. at 356.

"Valuable entitlements like these," the Supreme Court held, "are 'property' as that term ordinarily is employed." See id. at 356 (quoting Black's Law Dictionary definition of property as "extend[ing] to every species of valuable right and interest"). The Supreme Court's words are equally vital here:

> Had petitioners complied with this legal obligation, they would have paid money to Canada. Petitioners' tax evasion deprived Canada of that money, inflicting an economic injury no less than had they embezzled funds from the Canadian treasury. The object of petitioners' scheme was to deprive Canada of money legally due, and their scheme thereby had as its object the deprivation of Canada's "property."

Id. Looking to the ordinary meaning of "property" and to the common law, the Supreme Court embraced tax revenue as an entitlement to money, a property right, reasonably acknowledging "the economic equivalence between money in hand and money legally due." Id. at 357. Canada was deprived of its tax revenue. The Court sees no difference between that and a fraudulently acquired state tax credit that deprives a state of its revenue.

The defendants here are charged with making deceptive bank transfers and submitting fictitious infrastructure expenditures to swindle the State into ceding a valuable entitlement otherwise legally due to it. See id. Just like Canada's right to uncollected excise taxes is "property" in its hands, the State's entitlement with respect to tax credits is "a straightforward 'economic' interest." Again, the Court underscores that there is simply no functional difference between tax revenue (a direct source of

23

income gained through taxation) and tax credits (a cash-valued sum deducted from an amount otherwise owed to the state). As a practical matter, by reducing a taxpayer's tax liability, and creating an advantage in favor of a taxpayer, tax credits, if fraudulently obtained, wrongfully result in a corresponding loss of revenue for the State; revenue otherwise owed to the State. In (allegedly) fraudulently depriving the State of tax credits, then, the defendants "inflict[ed] an economic injury no less than had they embezzled funds from the [State] treasury." See id. at 356.

This result does not offend Cleveland. Indeed, Pasquantino clarifies Cleveland, reasonably observing that the State's interest in allocating a video poker license to applicants is far different from the quintessential economic interest a sovereign has in its entitlement to tax revenue. See id. at 356-57. So, too, here. While "[t]here was no suggestion in Cleveland that the defendant aimed at depriving the State of any money due...", here, the government alleges that the defendants cheated the State into issuing tax credits, thereby losing out on revenue to which it was otherwise legally entitled. See id. at 357.

Nor does Griffin condemn the government's allegations here. Putting aside that the panel in Griffin decided that case years before Pasquantino, the defendants' reliance on Griffin is undermined by the contextual factual dissimilarities to the case here. As explained above, Griffin involved misrepresentations

contained in a "pre-certification letter", in which defendants sought a right to later apply for federal tax credits; no tax credits could be issued until proof was submitted confirming that the housing was built and the units were rented to low-income individuals.  324 F.3d at 354-55.  The Texas agency was engaged in the merely ministerial administrative task of determining whether to allocate the federal low income housing tax credits; other than collecting some application and monitoring fees in performance of its regulatory power to issue the tax credits, the State's tax revenue was not implicated.  Id. at 355.  These realities of the federal fair housing tax credit program led the Fifth Circuit to conclude that the unissued tax credits were not property in the state agency's possession.  Id. at 354.  "As a result," the Fifth Circuit held, "section 1341 does not reach fraud in obtaining the allocation of tax credits in this case."  Id.[22]   The early stage

_____

[22]The Fifth Circuit recognized that "[b]eyond [certain nominal fees ... TDHCA does not derive any benefit, gain, or income from the tax credits while it possesses them."  Id. at 355. Other than perhaps a nod to Cleveland and its "in the victim's hands" gloss on the money-or-property requirement, the "while it possesses them" qualifying language used by the Fifth Circuit seems unnecessary. The State of Texas never stood to benefit, or lose, from allocating tax credits.  This is so because even when the entire tax credit program application ran its course from pre-application letter to completed project with low-income tenants, the tax credits were used to offset federal income tax obligations.  That is why "the only property interest the State [had]" in the tax credits in Griffin "[was] purely abstract or theoretical, even after the entire transaction between the State and a developer is completed." Id.  Not so here.  The State of Louisiana's revenue is directly vulnerable with respect to its own state infrastructure tax credits.

25

in the tax credit application process; the state agency's mere regulatory role in allocating federal tax credits; and, most notably, the fact that the tax credits were not directed at the revenue of the State of Texas are distinguishing features that make Griffin inapplicable to this case.

In conclusion, because the object of the alleged fraud -- infrastructure tax credits -- is indeed "property" in the hands of the State, Counts 1 through 21 of the second superseding indictment state an offense for mail and wire fraud.[23]   Accordingly, the defendants' motions to dismiss are DENIED.[24]

---

[23]The defendants also urge the Court to dismiss Count 1, the conspiracy count, in which the government alleges that the defendants conspired with each other to commit mail and wire fraud. Because the government has adequately alleged the offenses of wire and mail fraud, and because the defendants do not advance independent grounds for dismissing the conspiracy charge, it also stands.

[24]The Hoffmans advance a litany of other grounds for dismissing the second superseding indictment.  They contend that (a) they lacked fair notice that their conduct could later be construed as illegal; (b) the government cannot allege an intent to harm because Louisiana received the benefits contemplated under the Act, given that the defendants opened their post-production film studio; (c) the federal government's prosecution under the federal mail and wire fraud statutes usurps the State's authority to police its own tax matters and offends federalism principles; and (d) a mere failure to disclose is not fraud unless there is a duty to disclose the information subject to the dispute. The government counters that these arguments do not provide independent grounds for dismissing a federal indictment, and require the Court to examine factual matters outside the indictment, which is inappropriate on a motion to dismiss the indictment.  The Court agrees.  The second superseding indictment sufficiently alleges the elements of the charged offenses and fairly informs the defendants of the charges against them.  Nothing more is required.  These collateral issues

New Orleans, Louisiana, July 18, 2014

_____

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

raised by the Hoffmans are primarily fact-driven issues that are
premature and ill-suited for determination on a motion to dismiss
the indictment.

27