## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No. 2:14-CR-00022 |
| | * | |
| PETER M. HOFFMAN, | * | |
| MICHAEL P. ARATA, and | * | |
| SUSAN HOFFMAN | * | |
| Defendants | * | |

## MEMORANDUM OF PETER HOFFMAN IN RESPONSE TO GOVERNMENT'S CONSOLIDATED MOTION IN LIMINE TO EXCLUDE CERTAIN DEFENSE ARGUMENTS AND EVIDENCE

Defendant Peter Hoffman hereby generally opposes, but accedes in part, to the government's Consolidated Motions In Limine To Exclude Certain Defense Arguments And Evidence filed December 19, 2014 [Dkt. 251] ("Government In Limine Motion"). The Government In Limine Motion contains seven separate motions (designated "Government Motion No. 1," etc.), each of which is discussed below. Defined terms used herein and factual background are set forth in Mr. Hoffman's Motion In Limine To Determine Three Questions Of Law Re: Mens Rea [Dkt. 167] ("Mens Rea Motion"), in Mr. Hoffman's Reply [Dkt. 216] ("Reply") to the government Opposition to the Mens Rea Motion, and in Mr. Hoffman's Motion In Limine To Determine An Issue Of Law Re: Benefit Of The Bargain [Dkt. 230] ("Benefit of the Bargain Motion").

1

## I.

*Government Motion Nos. 1 And 4 Should Be Denied*

Mr. Hoffman discusses Government Motion Nos. 1 and 4 together as both raise common issues of fact and law.  Government Motion No. 4 seeks to preclude arguments that "the government must prove the State was actually defrauded," claiming that the Benefit of the Bargain Motion so argues. Government In Limine Motion at 7.  The Benefit of the Bargain Motion argues, as discussed below, that the government must prove an *intent to materially harm* LED, or an intent to deny the "benefit of the bargain" to LED, in order to prove "intent to defraud" under the Wire and Mail Fraud Statutes, *not* that the government must prove "the State was actually defrauded."

The Government Motion No. 1 seeks to exclude at least the following evidence from trial as occurring after July 3, 2012 (the date of the Final Audit Report), effectively showing LED in fact suffered no harm at all by Mr. Hoffman's conduct, and he took a substantial loss ("No Harm Evidence"):

A.      That LED re-issued after July, 2012 the only Infrastructure Tax Credits ever allowed on the Project with full knowledge of the government investigation and after a forensic audit by LED.  Neither LED nor Louisiana Department of Revenue ("DOR") have ever sought to recover those Infrastructure Tax Credits or otherwise sought penalties or sanctions against SAPLA or Mr. Hoffman.

B.      That the Silva Firm re-issued the Final Audit Report on November 5, 2013 after full disclosure to the Silva Firm by the government of its claims of "fraud."

C.      That SAPLA is entitled after July, 2012 to substantially more Infrastructure Tax Credits related to the Project than were previously granted.

D.     That the Project was completed, placed in service and generated economic activity substantially in conformity with the Pre-Certification.

E.     That SAPLA has made actual non-refundable cash payments for clearly permissible "base investment" under the Film Tax Credit Statute for amounts greater than those claimed in the First and Second Audit Report.

F.     That the Property itself has been beautifully renovated at great expense and is prime Exhibit No. 1 of Mr. Hoffman's intention to do what SAPLA promised in the Pre-Certification.

G.     SAPLA and Mr. Hoffman took genuine economic risks related to the Project which resulted in a disastrous financial loss on foreclosure by the principal lender.

The government seeks to exclude the No Harm Evidence on the theory that this evidence of "no harm, no foul" would be a "subtle call for jury nullification" which would "only serve to mislead the jury."  Government In Limine Motion at 3.  Such No Harm Evidence is directly probative of Mr. Hoffman's intention to do no harm, material or otherwise, to LED and his consequent good faith, which is a "complete defense" to the charges in this case.  The No Harm Evidence does not result from Mr. Hoffman's scheme being "thwarted" or "discovered" but rather results from his actions on behalf of SAPLA, even after the Infrastructure Tax Credits due to SAPLA were delayed, and he was investigated by the government, to ensure that SAPLA's commitments in the Pre-Certification were met in all material respects, as he always intended.

The best evidence of Mr. Hoffman's *lack* of an intention to cause material actual harm to LED is therefore that he did not cause material actual harm to LED by his own actions.  As the government may show proof of actual harm to show the required intention to do actual harm, so may the defendant offer proof of no actual harm to prove that he had no intention to do actual

3

harm.  See *United States v. Ethridge*, 948 F.2d 1215, 1217 (11th Cir. 1991) holding exclusion of such evidence was reversible error.  *Ethridge* follows the leading case *United States v. Foshee*, 569 F.2d 401, 403 (5th Cir.) *amended* 578 F.2d 629 (5th Cir. 1978) ("*Foshee*") discussed in the Reply, which also reversed a wire fraud conviction for exclusion of argument and improper jury instructions on this issue.  *Ethridge* reflects a "liberal policy as to the admission of evidence tending to prove intent in mail fraud cases," 948 F.2d at 1217, quoting *Foshee,* 569 F.2d at 403: "In determining intent it is clear the jury may consider that the banks were not defrauded because they suffered no financial loss."[1]

The No Harm Evidence is relevant to the requirement of the Wire and Mail Fraud Statutes as set forth in the Benefit of the Bargain Motion: that the government must prove *an intent to materially harm* LED, and deny LED the "benefit of the bargain" with SAPLA in the Pre-Certification, not merely to "deceive" LED.[2]  In the Benefit of the Bargain Motion, Mr.

_____

[1] To the same effect, *United States v. Thomas*, 32 F.3d 418, 420-21 (9th Cir. 1994), following *Foshee* and *Ethridge*.  Compare *United States v. D'Amato,* 39 F.3d 1249, 1257 (2d Cir. 1994) ("where the scheme does not cause injury to the alleged victim as its necessary result, the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent"); *United States v. Gay*, 967 F.2d 322, 329 (9th Cir. 1992). (Defendant's belief in the success of his plan is probative of good faith).

[2] This requirement is confirmed by the one case cited by the government, *United States v. Loney*, 959 F.2d 1332, 1337 (5th Cir. 1992), in the sentence immediately following the phrase quoted by the government, i.e.: ". . . it is enough to show that the defendants contemplated doing actual harm, that is, something more than merely deceiving the victim," quoting *United States v. Schwartz*, 924 F.2d 410, 420 (2d Cir. 1991), which in turn approved an instruction that "it is sufficient if the contemplated harm goes to some essential part of the bargain."  In the same year as *Loney*, the Fifth Circuit approved this Second Circuit "benefit of the bargain" line of authorities in *United States v. St. Gelais,* 952 F.2d 90, 95 (5th Cir. 1991) *cert. denied* 506 U.S. 965 (1992) ("*St. Gelais*") by following *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1981), although incorrectly identifying *Starr* as a Fifth Circuit decision.  The Fifth Circuit now regularly includes "intent to do actual harm" as a required element of proof under the Mail and Wire Fraud Statues.  E.g., *United States v. Jimenez*, 77 F.3d 95, 97 (5th Cir. 1996); cases cited in the Benefit of the Bargain Motion at 5 n. 5.  See also *United States v. Akpan*, 407 F.3d 360, 370 (5th Cir. 2005); *United States v. Blocker*, 104 F.3d 720, 732 (5th Cir. 1997), both following *Jimenez*.  The "material harm" standard was first stated in *United States v. Ballard*, 663 F.2d 534, 541 (5th Cir.

Hoffman asserts that an alleged intent to cause the three "harms" claimed by the government is not sufficient to meet the "intent to cause material actual harm" requirement: an alleged *timing* difference as to when certification of "base investment" could be requested, a change in expenditures from one type of qualified "base investment" to another, and re-investment of related party payments, at substantiated arms-length amounts, in the Project.  These alleged "harms" to LED are no harms at all, and do not violate the provisions of the Film Tax Credit Statute or regulations or practice under it.  Mr. Hoffman's alleged intent to cause these three "harms" is therefore insufficient under the Wire and Mail Fraud Statute, even if it could be proven he "deceived" anyone regarding his actions (which he did not).

The government claims that Mr. Hoffman argues that "any fraud in claiming the credits" (actually in seeking certification of "base investment") for the Project "leading up to that time," i.e. completion of the Project and placing it in service in July, 2012, "should be ignored."  Mr. Hoffman's argument is that any alleged *deception* "leading up to that time" *could not cause any material actual harm* to LED -- and hence Mr. Hoffman could have no *intent* to cause such material actual harm in the period "leading up to that time" -- *if* he always intended that SAPLA complete the Project, place it in service, and pay the expenses therefor at some point in time, as in fact all occurred.  As the Second Circuit stated in *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994) *cert. denied*, 513 U.S. 184 (1995) the alleged misrepresentation "must bear

---

1981) in the context of loss to an employer in an "honest services" services.  The Supreme Court later held that in all wire and mail fraud prosecutions, the false representation must be of a "material fact," citing very old authority on "fraud in the inducement": The "material" misrepresentation must go to an essential part of the bargain as would justify reliance in a civil context.  *United States v. Neder*, 527 U.S. 1, 22 & n.5 (1999).  A representation is thus "material" if it may be justifiably relied on by the counterparty as some essential part of the bargain, and thereby could cause "material actual harm" to that counterparty by denying it that essential part of the bargain.  See Restatement (Second) Torts, §§537, comment b, 538, comment a (1977), discussed in *United States v. Svete*, 556 F.3d 1157, 1164-65 (11th Cir. 2009) (*en banc*) (Pryor, J).

on the ultimate value of the transaction" to violate the Wire and Mail Fraud Statutes.   Accord *United States v. Frost*, 125 F.3d 346, 361 (6th Cir. 1999) ("*Frost*").

The No Harm Evidence thus is not misleading and is highly probative, if not dispositive, of the issue of Mr. Hoffman's good faith and whether Mr. Hoffman ever had an intention by deception to cause material actual harm to LED throughout the periods in issue.   The Second Circuit reversed a conviction based on confusing instructions on this issue.   The Court held that the required intent to harm meant intent to cause actual harm after all events had occurred, i.e. if the defendant thought the pension fund would *never* lose money based on his false statement of income, then he had stated a valid defense. *United States v. Rossomando*, 144 F.3d 197, 201-02 (2d Cir. 1998).[3]  Mr. Hoffman will offer evidence that a series of requests for certification of "base investment" for film infrastructure projects are common and expected to be amended as the project is taken to completion.   To require consideration of only early certification requests without regard to their amendment and supplementation through completion of a project finds no basis in law or common sense.   The entire course of Mr. Hoffman's conduct on the Project is relevant to his good faith and any claimed intent to cause material harm to LED.

---

[3] Followed in the model instruction on this issue.   See 2 Sand-Siffert-Loughlin-Reiss-Allen-Rakoff, *Modern Federal Jury Instructions* ¶44.01 Instruction 44-5 (2014) ("*Model Instructions*") ("for the purpose of causing some financial or property loss to another").   In *Rossomando*, the Court found "plain error" to give jury instructions that an intent to cause no "ultimate harm" is not a defense, since the defendant's intent that no harm would ever result from his actions was a defense to wire and mail fraud charges. Compare *United States v. Benns*, 740 F.3d 370, 375 (5th Cir. 2014) using similar logic to prohibit use of equivalent alleged illegal conduct in a pre-sentence report, as well as *Foshee*, which is based on similar reasoning.   Mr. Hoffman as in *Rossomando* "thought [LED] was never going to lose any money," as in fact it did not.   As made clear in *Foshee*, this claim is clearly distinct from the claim, often rejected in wire fraud cases, that the defendant, after taking the victim's money or property, intended to repay the monies or believed that "everything would work out ok."   In such cases, unlike the cases at bar, the actual material harm to the victim is admitted and the issue is whether later events, usually beyond the control of the defendant, might eliminate or mitigate the harm.   Here, the defense is that the victim would never lose any money or property in the first place and did not, by LED's own admission.

In addition, the government appears to allege that Mr. and Mrs. Hoffman did not provide sufficient services to justify the development fees charged to the Project in the Second and Final Audit Reports.  Mr. and Mrs. Hoffman must be able to show the results of this service in order to rebut these baseless charges.  The No Harm Evidence in fact is directly relevant to all the allegations of the Second Superseding Indictment.

## II.

### Government Motions Nos. 2 and No. 3 Should Be Denied In Part

Mr. Hoffman discusses Government Motion No. 2 and 3 together, as both raise common issues of law and fact as well.  Government Motion No. 1 requests the Court to "preclude evidence or argument concerning treatment of unrelated films or infrastructure projects by the State of Louisiana."  Government In Limine Motion at 3.  Government Motion No. 3 seeks to "preclude evidence or argument that the government must prove that charged statutes [sic] gave defendants 'fair warning' that this conduct was prohibited or that the government must prove that the defendants knew their conduct was illegal under state law or regulations."  Government In Limine Motion at 5.

As the government indicates, these issues are generally addressed in the Mens Rea Motion and the Reply thereto.  However, a few additional specific observations are necessary:

A.      Mr. Hoffman proposes no "mini trial" on what happened on other film infrastructure or investment credit applications, under some "selective prosecution" theory.  He proposes to introduce three specific film infrastructure applications approved by LED in public applications to demonstrate that regulations and practice under the Film Infrastructure Credit Statute were consistent with Mr. Hoffman's Challenged Conduct, as defined in the Mens Rea Motion.  The *only* relevant evidence, as this Court has already ruled, are the *public*

7

pronouncements of LED known to Mr. Hoffman at the time the three Audit Reports were submitted, i.e., the three certifications attached to the Mens Rea Motion as Exhibits A through D. It may be irrelevant what policy decisions by LED went into those certifications, but the published results which, like the Revenue Rulings cited in the Mens Rea Motion, are public statements of the permissible basis for requests for certification of base investment under the Film Tax Credit Statute, are relevant to Mr. Hoffman's good faith belief in the legality of his actions.

The Court should be aware that the evidence concerning the certification of the Film Factory application (INF:0001) – extensively investigated by the Federal government -- is particularly essential to Mr. Hoffman's defense.  That Film Factory certification was in fact the specific impetus for the First and Second Audit Reports.  LED has not only never retracted the $10,000,000 in base investment certified for Film Factory (on a project never completed) but defended its position before the Legislature, without adverse action.  The Film Factory application was in fact substantially similar to SAPLA's applications in the First and Second Audit Reports and widely known in the film community at the time granted, certainly strong probative if not dispositive evidence of Mr. Hoffman's good faith.

B.     Mr. Hoffman agrees that the "fair warning" issue is a question of law for the Court, but is also relevant to Mr. Hoffman's good faith in supporting SAPLA's application for Infrastructure Tax Credits in the three Audit Reports, as discussed in the Mens Rea Motion.  Mr. Hoffman may therefore introduce evidence (expert and otherwise) that the tax law was not clear and unambiguous, to counter the government's burden to prove beyond a reasonable doubt that Mr. Hoffman acted in bad faith with an intent to disobey or disregard the law.  This issue is discussed in more detail in Mr. Hoffman's Response ("Response") [Dkt. 271] to the

Government's Motion To Exclude Expert Testimony [Dkt. 259].  The government appears to be re-arguing the issues already resolved by this Court in its Order of November 19, 2014 [Dkt. 209] that the Film Tax Credit Statute and rules and practice under it are relevant to proof of *mens rea* or Mr. Hoffman's good faith belief in the legality of his conduct.

The government contends the issue of law for the Court is whether the Wire and Mail Fraud Statutes are unconstitutionally vague, but the issue argued in the Mens Rea Motion is this: whether the Applicable Law (the *tax* law as therein defined) gave *fair warning* through a "clearly relevant precedent" or "authoritative construction" that the specific "Challenged Conduct" was a *fraud on the revenue* under the *tax law*.  This "fair warning" issue is particular to the *mens rea* requirement for crimes against the revenue and other highly technical statutes (such as gun laws and health care filing requirements) *as applied*, and is not an "on its face" due process challenge for unconstitutional vagueness.

The "fair warning" rule holds that a defendant cannot as a matter of law form the required mens rea or "specific intent" to violate such statutes when the statute's *application* to the defendant's conduct is objectively ambiguous, under either the *Cheek* or the *Foshee* standards discussed in the Mens Rea Motion and Reply, not that the law itself is unconstitutionally vague. The Court will note that the Court in the principal authority relied on by the government finds no unconstitutional vagueness "on the face" of Section 1341 because the law "contains the requirement that the defendant acted willfully with a specific intent to defraud."  *Frost*, 125 F.3d at 370 quoting *United States v. Margiotta*, 688 F.2d 108, 129 (2d Cir. 1982).  This mens rea, defining the scope of the Wire and Mail Fraud Statutes, is enforced by the "fair warning" rule.

C.     The government seems to contend that the definition of "willfulness" or "good faith" in the jury instructions defining "intent to defraud," approved by the Fifth Circuit in many

cases, is *not* required, citing two inapplicable cases. Government In Limine Motion at 6.[4] However, as shown in the authorities cited in the Reply (at 11) and the Response (at 5-7), discussing these two cases, such a "willfulness," or a lack of "good faith," jury instruction in some form (i.e., the defendant acted with "bad purpose to disobey or disregard the law") *is* required in wire and mail fraud prosecutions under *Foshee* as well as *Cheek*, since "good faith" is an "absolute defense" to charges of wire and mail fraud, which are "specific intent" crimes.[5]

      D.    Despite the government's contention, no fair warning issue was raised in *United States v. Green*, 592 F.3d 1057, 1064-65 (9th Cir. 2010), which was a run-of-the-mill case of

---

[4] The third case cited by the government does not appear relevant to this issue, concerning itself with the level of evidence of knowledge to establish "aiding and abetting" liability under the Wire Fraud Statute. *United States v. Rivera*, 295 F.3d 461, 466 (5th Cir. 2002).

[5] See, in addition to *Foshee*, the many cases cited in *South Atlantic Ltd. Partnership v. Riese*, 284 F.3d 518, 531 (3d Cir. 2002). In *United States v. Hopkins*, 744 F.2d 716, 717 (10th Cir. 1984) (en banc) and *United States v. Casperson*, 773 F.2d 216, 222-23 (8th Cir. 1985), the Courts held failure to give a "good faith" instruction requested by the defendant for which there was sufficient evidence was grounds for reversal. The majority view is that expressed in *St. Gelais*, that the failure to give a "good faith" instruction is not reversible error per se if the jury is sufficiently charged on "willfulness." Similarly, a failure to charge on "willfulness" is not reversible error per se if the jury is sufficiently charged on "good faith," as in *United States v. Jobe*, 101 F.3d 1046, 1059 (5th Cir. 1996). The recommended course of action is to give *both* instructions, as discussed in *United States v. Gross*, 961 F.2d 1097, 1103 (3d Cir.) *cert. denied*, 506 U.S. 965 (1992), even if the failure to give either is not reversible error *per se*. In *United States v. Curry*, 681 F.2d 406, 416-18 (5th Cir. 1982) as in *Foshee*, the Court reversed for failure to give a "good faith" instruction. While the holding of mandatory reversal is likely overruled by *St. Gelais*, the statement that good faith is a complete defense to charges of mail and wire fraud remains valid, particularly when as in *Curry* the "intent to defraud" depends on the meaning of ambiguous terms in the statutes governing political contributions, or as in *Foshee* when it depends on whether a check was in fact legally valid under customary bank practices. The government appears to rely on the failure to include *both* a definition of "willfulness" *and* an instruction on "good faith" in the Fifth Circuit Pattern Jury Instructions (Criminal Cases), Instructions 2.59-.50, except in the case of crimes subject to *Cheek*, Instruction 1.38. This failure to include may mean no more than a specific "good faith" instruction must be requested and given if supported by the evidence. Further, the *Cheek* rule has been expanded well beyond charges of tax evasion under 26 U.S.C. §7201. See *Ratzlaf v. United States*, 510 U.S. 135, 149 (1994) and cases cited in the Mens Rea Motion and Reply. And "good faith" remains a "complete defense" to mail and wire fraud charges in the reported cases. This issue will be discussed in more detail in the annotated proposed Jury Instructions to be submitted by Mr. Hoffman, which will discuss the Pattern Instructions of the different Circuits on this issue.

inflating and rigging bids for government contracts.  The Court discussed what it said was an issue of first impression: whether a wire fraud conviction can occur when the conduct is not expressly forbidden by Federal regulations, finding no such requirement in the Wire Fraud Statute "where as here financial harm to the victim is part of the offense."  *Green* does not overrule or even cite the leading Ninth Circuit *Dahlstrom* opinion or any of the fair warning cases cited in the Mens Rea Motion, because the defendant did not contend she had no fair warning that inflating or rigging bids for government contracts, even with the best of intentions, was illegal behavior, whether or not expressly forbidden by Federal regulations.  The same logic does not apply to claims of fraud on the revenue under technical revenue statutes, by reason of formal tax planning steps innocent in themselves, to obtain a particular tax benefit under those statutes, as is at issue in this case.

### III.

### Mr. Hoffman Objects In Part To Government Motion No. 5

Government Motion No. 5 seeks to "preclude evidence and arguments that other individuals could have been charged with additional crimes but were not."  Government In Limine Motion at 7.  Mr. Hoffman has no objection to this Motion *as so phrased*, although as the evidence will show and the government seems to admit everyone in the Film Tax Credit Program, LED, the Auditors, the Silva Firm, other applicants and the government's own witnesses included, are equally "guilty" (if anyone is) of not administering this program in the manner the Federal government deems appropriate.  The government is in fact putting the entire Film Tax Credit Program on trial as discussed in Part V below.  Mr. Hoffman will not seek to introduce evidence or make arguments on selective prosecution, which in fact distracts from the issues of this case.

The government goes too far, however, in its argument that Mr. Hoffman be "precluded from arguing that [his] own conduct mirrored that of the film industry or other tax credit applicants in general."  Government In Limine Motion at 9.  As discussed in Part II above, this evidence and argument, if based on publicly known statements of parties, is directly relevant to Mr. Hoffman's "good faith" and the required *mens rea*.  This is not evidence of "everyone else is doing it" but evidence that LED government agency charged with administering this Program has permitted similar claims for certification of "base investment," strong evidence that Mr. Hoffman's similar conduct was not a fraud on LED revenue and was made in good faith.

*IV.*

*Government Motion No. 6 Should Be Denied With Respect To Specific Impeachment Evidence Against Probable Government Witnesses Duvernay, Martin, Matthew And Theriot*

Mr. Hoffman generally agrees that evidence of past "bad acts" must be used with caution under Rule 608(b) and only if there is a direct relevance to issues in the case and with a firm "more probably than not" foundation.  Mr. Hoffman will move to apply these criteria to any use against him by the government, as it has threatened, of alleged prior "acts of fraud and dishonesty" unrelated to this case, without proper foundation, as a means to attack Mr. Hoffman's credibility.  However, the specific impeachment proposed by Hoffman to which the government refers to in Government Motion No. 6 is not Rule 608(b) evidence on general credibility, but evidence that specifically impeaches the witnesses' expected testimony.  Mr. Hoffman discusses four specific witnesses below:

A.    *Leo Duvernay*.  Mr. Duvernay was the general contractor for the Project and was paid in excess of $3,750,000 in cash pursuant to the construction contact between SAPLA and his company.  The government may be asking Mr. Duvernay about his recollection of the

circumstances under which he executed the confirmation alleged as Count 3 of the Second Superseding Indictment [Dkt. 78] and of Mrs. Hoffman's role in supervising construction of the Project.  The government in fact threatened Mr. Duvernay with prosecution in order to obtain his testimony.  Mr. Hoffman expects Mr. Duvernay will claim that Mr. Hoffman promised Mr. Duvernay that this confirmation, *addressed* to the Auditors, would not be sent to the Auditors.

Mr. Hoffman intends to impeach Mr. Duvernay with testimony that he was improperly "double dipping" on his construction invoices by double charging overhead and employee fringe costs of sub-contractors and was afraid of prosecution for this fraudulent conduct in obtaining what he calls his "little money."  Further, Mr. Hoffman intends to establish that Mr. Duvernay's memory is highly selective and faulty based on several items of evidence, including Mr. Duvernay's alcohol, cocaine and methamphetamine use in the period, which also added to his fear of prosecution.  The government appears to admit that use of drug use to establish bias and failure of memory is appropriate, by citing *United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987).

B.  *Damon Martin*.  Mr. Martin was the owner of Departure Studios, a post-production sound business in Los Angeles, who sold its sound equipment to SAPLA and who was intended to be SAPLA's partner in its sound post-production business.  Mr. Martin negotiated to sell his entire business to an affiliate of SAPLA but instead entered into a venture with a company called Black Satellite owned by Ian Colhoun.  Mr. Colhoun then double-crossed Mr. Martin, ejected him from the business and ripped out the sound equipment for return to the lender.  An affiliate of SAPLA obtained a jury verdict against Black Satellite for this outrageous conduct, which remains unsatisfied, as well as a default judgment against Mr. Martin.

In the course of these events, Mr. Martin had a mental collapse and was involuntarily

committed to a mental facility under the California Lanterman-Petris-Short Act.  Mr. Martin's paranoid episode included a fear that the FBI was "after him."  These facts are relevant to Mr. Martin's memory of the events prior to his collapse, i.e. the equipment purchase claimed in the First Audit Report, and his own fear of prosecution, i.e. bias.

   C.   *Marcia Matthew.*  Ms. Mathew was a Vice-President-Finance for Seven Arts Pictures Inc. ("SAP") during preparation of the Second Audit Report.  The government may offer her testimony regarding submissions to the Auditors in connection with the Second Audit Report.  Ms. Matthew was fired by SAP for embezzlement of over $50,000 from SAP and Mrs. Hoffman, as established by a forensic examination by SAP's successor accountant, an investigation by City National Bank and a police report.  This evidence will be supplemented by evidence or mistakes made by Ms. Mathew, later corrected by SAPLA and the Auditors, which the government may seek to blame on Mr. Hoffman.  The evidence of embezzlement will be offered for bias, threat of prosecution and independent actions by Ms. Matthew unrelated to Mr. Hoffman, designed to hide her embezzlement.

   D.   *John Theriot.*  Mr. Theriot was the managing partner of Malcolm Dienes, the Auditors.  An affiliate of SAPLA has sued the Auditors for malpractice and professional negligence in connection with the audits of film investment tax credit expenditures on the motion pictures *Pool Boys* and *Autopsy*, at the request of the lending bank which lost over $1,000,000 by reason of the Auditors' malpractice.  Mr. Hoffman will not introduce any evidence of this unrelated civil action and agrees it is not relevant to this action.  SAPLA did not bring a malpractice action against the Auditors for the First and Second Audit Reports and the withdrawal thereof, based on legal advice that the government would view such a claim as threatening, or seeking to intimidate, witnesses.  However, Mr. Hoffman will introduce evidence

of the Auditor's mistakes and incompetence in the First and Second Audit Reports to demonstrate why these Audit Reports were withdrawn and to establish bias and false statements by Mr. Theriot in justifying his firm's malpractice.

The items of evidence set forth above are directly relevant to the issues in this case and will have clear foundation.  All such evidence should be admissible.

## V.

### Government Motion No. 7 Should Be Denied To The Extent Its Misconduct

### Is Relevant To The Issues At Trial

Government Motion No. 7 seeks to "preclude any potential argument that the government's prosecutors or investigators have acted inappropriately or unethically." Specifically, the government seeks to exclude from the trial evidence that government prosecutors or investigators either lied to or misled Mr. Arata that he would not be prosecuted if he cooperated with the government in their effort to obtain incriminating information, as he did. Mr. Hoffman can confirm that this was the state of mind of Mr. Arata and his counsel before filing of the Indictment [Dkt. 1] in this action.

However, the issue at trial will not be the "outrageous conduct" of the government as such, but rather the government's improper motivation for prosecuting the Defendants, the misrepresentations to Mr. Arata being only one of many examples of this improper motivation. This improper prosecutorial motivation is relevant to several issues in this case:  Mr. Hoffman's alleged *mens rea*, his alleged intent to cause material harm to LED, and the jurisdictional predicate of the Wire Fraud Statute, that the wires be made "in interstate commerce."

As discussed in the Mens Rea Motion, the government in this case is seeking to re-write the rules and practices applicable to claims of "base investment" under the Film Tax Credit

Statute through the Federal Wire and Mail Fraud Statutes, and violating our Federal principles of government in the process. This prosecution is therefore not intended to enforce the laws against commercial fraud "in interstate commerce" (the proper provenance of those Statutes), but to deter what the government believes are improper claims of Infrastructure Tax Credits under the Louisiana Film Tax Credit Statute through *in terroram*, "raised eyebrow" methods, designed to "make an example" and to frighten and deter other persons from what would otherwise be entirely legal conduct. The government has stated to at least one potential witness that it believes that applicants for Louisiana film tax credits are now more cautious in light of this prosecution.

The United States Attorney Manual in Title 9, *Principles of Federal Prosecution* Section 9-27.230A, requires that "prosecution should be denied" when "no substantial Federal interest would be served by prosecution." Section 9-27.240A expands on this requirement by requiring the government to weigh "the strength of the other jurisdiction's interest in prosecution" and the "other jurisdiction's ability and willingness to prosecute effectively." There is no evidence that the State of Louisiana's Department of Revenue ("DOR") does not have the ability or willingness to prosecute fraud on its revenue collection function as alleged by the Federal government in this case. The strength of DOR's interest in the Film Tax Credit Statute is substantially greater than that of the Federal government.

The reasons for the government's decision to prosecute this case is reasonably subject to criticism and comment at trial. The Federal government has spent millions of dollars in an investigation over two and one-half years to prosecute a case where there is no loss of revenue to the State of Louisiana, when the amounts of "base investment" claimed have been spent and when the project is complete and in operation. The Federal government has pursued this case

insisting that the Film Tax Credit Statute and practice and interpretation of it by agents of LED are irrelevant to the charges made.  The government as much as admits that it cannot show that these provisions of Louisiana law and actual practice under the law either made Mr. Hoffman's actions illegal or gave fair warning that his actions were a criminal fraud on Louisiana revenue.  The Federal government proffers adverse witnesses with a host of credibility issues and in the process seeks to exclude all evidence that the Project was completed substantially as promised and has earned substantially more tax credits than SAPLA has received.  Further, the government as much as admits that the Auditors, its own adverse witnesses, agents of LED and many others are equally culpable (if anyone is), but doesn't want that mentioned at trial either.

Mr. Hoffman may properly pose the question to the jury that every person knowledgeable regarding the case must ask: Why this aggressive, expensive and extensive prosecution for what is at best an "intent" crime for small sums of money involving a newly enacted vague revenue statute, and indeed, as the evidence will show, not even that.  The government seeks to put the Film Tax Credit Program on trial in this action.

The government can be expected to attack Mr. Hoffman at trial as an abrasive "Hollywood" operator out to "rip off" the taxpayers of Louisiana through some "giveaway" program that doesn't serve the taxpayers of Louisiana.  Mr. Hoffman should be able to counter such prejudicial misdirection by commenting on the government's violation of its own Manual and by reference to our Federal principles of government.

Mr. Hoffman will also seek a "defense theory" jury instruction that the jury may, in determining whether Mr. Hoffman acted in good faith, consider that the Federal government's motivation in bringing this prosecution is an improper attempt to interfere with the Louisiana administration of its Film Tax Credit Program, and to impose new standards of conduct and rules

17

under the Film Tax Credit Statute which were not known or knowable to Mr. Hoffman when he engaged in the actions charged by the Federal government.

*Conclusion.*   Peter Hoffman respectfully requests this Court to deny the Government In Limine Motion except as indicated above.

Respectfully submitted,

*s/Lance C. Unglesby*

_____

Lance Unglesby (#29690)
The Unglesby Law Firm
246 Napoleon Street
Baton Rouge, LA 70802
T: (225) 387-0120
F: (225) 336-4355
lance@unglesbylaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of January, 2015, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of the filing will be sent to all counsel of record, by operation of the court's electronic filing system.

*s/Lance C. Unglesby*

_____

Lance C. Unglesby