UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No. 2:14-CR-00022 |
| | * | |
| PETER M. HOFFMAN, | * | |
| MICHAEL P. ARATA, and | * | |
| SUSAN HOFFMAN | * | |
| Defendants | * | |

**DEFENDANTS PETER AND SUSAN HOFFMAN'S MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS SECOND SUPERSEDING INDICTMENT (F.R. Crim. P. 6(e)(3)(E)(ii) and 12(b)(3)(A)(v))**

*Introduction.* Defendants Peter and Susan Hoffman move to dismiss the Second Superseding Indictment [Dkt. 78] pursuant to Federal Rules of Criminal Procedure 12(b)(3)(A)(v)[1] and Rule 6(e)(3)(E)(ii). The government through testimony of an FBI agent presented to the grand jury materially erroneous instructions on the law, regulations, rulings and practices under the Film Tax Credit Statute in effect for the time period at issue in this case and on other matters. There are grave doubts that the decision of the grand jury to indict Mr. and

---

[1] Reflecting the 2014 amendments to Rule 12, this Motion alleges "a defect in instituting the prosecution, including: . . . an error in the grand jury proceeding." All defined terms and the factual background of the Indictment are set forth in Mr. and Mrs. Hoffman's Motion To Dismiss The Indictment [Dkt. 100] ("Motion To Dismiss") and Mr. Hoffman's Motion In Limine To Determine Three Issues Of Law Re: Mens Rea [Dkt. 167] ("Mens Rea Motion"). All references to the Film Tax Credit Statute are based on the 2007 version attached as Exhibit 1 to the Motion To Dismiss. The current version of the Film Tax Credit Statute, Act 178 signed into law on August 8, 2013, applies only to the film investment tax credit, as the Infrastructure Tax Credits were repealed in 2009 for projects not then certified. The current version of the Film Tax Credit Statute (2013) with marked changes may be found at www.legis.la.gov/legis/View/Document.aspx?d=85694.

-1-

Mrs. Hoffman was substantially influenced by these erroneous instructions, particularly when coupled with other false and misleading hearsay testimony placed before the grand jury by the government. Such grave doubts require the dismissal without prejudice of the Second Superseding Indictment.

    A.    *Misstatement Of Applicable Law As The Basis For Dismissal Of The Indictment.*

As held in *United States v. Stevens*, 771 F.Supp. 2d 556, 566-68 (D. Md. 2011) ("*Stevens*"), "where a prosecutor's legal instructions to the grand jury seemingly misstates the applicable law, the indictment is subject to dismissal if the misstatement casts 'grave doubt that the decision to indict was free from the substantial influence of the erroneous instruction.' *United States v. Peralta*, 763 F.Supp. 14, 21 (S.D.N.Y. 1999) ['*Peralta*'] (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) ['*Nova Scotia*'])."[2]

The government has no "duty" to present exculpatory information to the grand jury and may obtain an indictment on hearsay or other unreliable evidence.[3] However, as *Peralta* and

---

[2] The *Nova Scotia* "harmless error" test is whether the Court entertains "grave doubts" that erroneous information provided to the grand jury "substantially influenced the grand jury's decision to indict." This test is applied across the Circuits to determine whether the "error in the grand jury proceeding" is sufficiently material to warrant a dismissal of the indictment. *United States v. Caruto,* 663 F.3d 394, 399 (9th Cir. 2011); *United States v. Useni*, 516 F.3d 634, 656 (7th Cir. 2008); *United States v. Vallejo*, 297 F.3d 1154, 1165 (11th Cir. 2002).

[3] *United States v. Williams*, 504 U.S. 36, 51-52 (1992) ("*Williams*") which reaffirmed *Nova Scotia*, 487 U.S. at 261 and *Costello v. United States*, 350 U.S. 359 (1956), quoting *Nova Scotia*: "the mere fact that evidence is itself unreliable is not sufficient to dismiss an indictment." The same reasoning holds that the prosecutor has no "duty" to give specific legal instructions to the grand jury. *United States v. Lopez-Lopez*, 282 F.3d 1, 9 (1st Cir. 2002) (dicta; harmless error after conviction). A trial court's denial of a motion to dismiss is not an appealable order. *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799-800 (1989). As a result, indictments based on incorrect statements of the law are effectively not subject to appellant review. At least one Circuit has held that a later conviction by the petit jury makes "errors in the grand jury proceeding" harmless per se under *Nova Scotia*, an issue the Supreme Court left open in *Midland Asphalt*. *Lopez-Lopez*, as many appellate decisions refusing to overturn petit jury convictions by reason of alleged errors in grand jury proceedings, are in effect "harmless error" rulings and irrelevant to this Motion.

*Stevens* both hold, once the government purports to instruct the grand jury on a relevant issue of law, which "substantially influences the decision to indict," it must do so correctly.[4] Misleading, even false, hearsay testimony related to that issue of law, which may heighten a grand jury misunderstanding of that issue, provides additional bases for dismissal of an indictment so tainted, as was held in *Peralta*.[5]

Trial courts in the Federal system have a unique responsibility to supervise grand jury proceedings to ensure that the grand jury performs its historic role as the "protector of citizens against arbitrary and oppressive government action," *United States v. Calandra*, 441 U.S. 338, 343 (1974), and that prosecutors do not infringe "on the grand jury's ability to exercise independent judgment," *United States v. Costello*, 350 U.S. 359, 363 (1956). In *Peralta* and *Stevens*, the grand juries decided to indict for conduct which they believed was criminal based on an erroneous statement of the law by the government, but was not criminal based on a correct statement of the law.

Such erroneous instructions of law from the government prevent or interfere with the grand jury's exercise of "independent judgment" as to whether the accused should be charged

---

[4] See *United States v. Hogan*, 712 F.2d 757, 762 (2d Cir. 1982) following *United States v. Estepa*, 471 F.2d 1132, 1137 (2d Cir. 1972) (Friendly, C.J.), holding that while the government may use hearsay, even *only* hearsay, to obtain an indictment, the prosecutors must accurately identify the testimony as such. *Hogan*, 712 F.2d at 759-60, based its holding in part on the then effective version of the *ABA Standards for Criminal Justice: Prosecution Function* 3-3.5. See also *United States v. Samango*, 604 F.2d 877, 884 (9th Cir. 1979) ("The prosecution has a duty of good faith to the Court, the grand jury and the defendant").

[5] See *United States v. D'Alessio*, 844 F.Supp. 1134, 1143 (D.N.J. 1993) (Counts must be dismissed because the government's unsupported legal contentions mean that the grand jury "may have indicted" on a "false premise" which "tainted all the charges"); *United States v. Vetere*, 663 F.Supp. 381, 386-87 (S.D.N.Y. 1987) ("Reckless misleading of the grand jury as to an essential fact" results in dismissal). *United States v. Breslin*, 916 F.Supp. 438, 443, 445 (E.D.Pa. 1996) (Prosecution "improperly characterized the evidence" and misstated the grand jury's legal function resulting in dismissal). See also the unreported case of *United States v. Cerullo*, 2007 WL246211 (S.D.Cal. 2007), dismissing purely on a failure to give correct instructions on the law.

and are the essence of "arbitrary and oppressive government action." The obligation to present correct instructions of the law to the grand jury is a "legally compelled standard of prosecutorial conduct" and this Court's supervisory powers are "a means of enforcing or vindicating" that standard.[6] Mr. and Mrs. Hoffman request the Court to exercise this critical function to ensure the integrity of grand jury proceedings in this case.

> B.  *The Government's Misstatement Of The Law To The Grand Jury.*
>
> 1.  *Incorrect Instructions On A Requirement of Payment.* In this case, the

government placed before the grand jury the testimony of FBI Agent Robert Blythe in a series of leading questions constituting an incorrect instruction on, and hearsay testimony regarding, the law and practice under the Film Tax Credit Statute for the years at issue in this proceeding. Agent Blythe gave testimony on February 6, 2014, the day of the original Indictment [Dkt. 1] as the first substantive matter addressed, in response to leading questions by AUSA Kammer, as follows:[7]

---

[6] *Williams*, 504 U.S. at 46-47 (Scalia, J.). This supervisory power is now codified in the 2014 revisions to Rule 12 issued pursuant to the authority of the Supreme Court in the Rules Enabling Act, 28 U.S.C. §2072(a). The supervisory power of the federal courts is set forth generally in *United States v. Hastings*, 461 U.S. 499, 505 (1983) and *Nova Scotia*, 487 U.S. at 259-63 which assume a duty on the prosecution to present the evidence and law correctly to the grand jury. The Fourth Edition of the *ABA Standards for Criminal Justice: Prosecution Function* 3-4.5, *Relationship With A Grand Jury*, provides the prosecutor should (a) not "mislead the grand jury," (b) "appropriately explain the law" and (c) not "influence grand jury actions in a manner that would be impermissible at trial." Standard 3-1.4, *The Prosecutor's Heightened Duty of Candor*, also applies to grand jury proceedings. The Judicial Conference of the United States Model Grand Jury Charge 31 (2005) provides that the grand jury "can expect candor, honesty and good faith in matters presented by the government attorneys." www.uscourts.gov/FederalCourts/JuryService/ModelGrandJuryCharge.aspx.

[7] *See* Exhibit E, testimony of Robert Blythe, February 6, 2014, at 34-35. The government used Agent Blythe to explain the law and facts of this case to the grand jury through leading questions and conclusory answers in seven appearances. Agent Blythe's testimony included a number of highly contentious conclusions of guilt presented as facts, some of which are discussed below. Agent Blythe's testimony on these matters is hearsay or in some cases double hearsay and not identified as such. Each of these seven appearances are attached as exhibits

"Q. Okay. Explain to the grand jury what an expenditure is.

A. An expenditure is, is money actually permanently leaving the account of the payer and going to the payee's account. It's providing cash or cash equivalent for something of value in return.

Q. So the state wants to make sure that someone is actually disgorging themselves of the money --?

A. Yes.

Q. -- into the state of Louisiana, correct?

A. Correct.

Q. I mean, the idea here is to promote spending in the state of Louisiana causing jobs, bringing income to the state of Louisiana, is that correct?

A. That's correct.

Q. You don't get to say, I think I might spend some money next year, give me some tax credits?

A. No."

The government also placed before the grand jury Agent Blythe's testimony on August 8, 2013, in response to leading questions from AUSA Kammer. In this testimony, Agent Blythe incorrectly stated that an audit report required by the Film Tax Credit Statute to obtain Infrastructure Tax Credits must be "on a cash basis," an "accounting term" he proceeds to

---

hereto, and include testimony on August 8, 2013 (Exhibit A), August 15, 2013 (Exhibit B), October 10, 2013 (Exhibit C), October 24, 2013 (Exhibit D), February 6, 2014 (Exhibit E), April 3, 2014 (before the First Superseding Indictment)(Exhibit F), and May 15, 2014 (before the Second Superseding Indictment)(Exhibit G).

explain.[8] The government placed before the grand jury Agent Blythe's testimony on August 15, 2003, that based on his knowledge as a certified public accountant, formal cash transfers are a "transaction that lacks economic substance."[9] Agent Blythe was not qualified as an expert in the Film Tax Credit Statute, is not a lawyer and was not asked to give any basis for his statements in the Film Tax Credit Statute or regulations, rulings and practice under it ("Applicable Tax Law").[10]

The government's instructions, through Agent Blythe's testimony, on the meaning of "expenditure" under the Film Tax Credit Statute for claims of Infrastructure Tax Credits, are erroneous and directly contradicted by the language of the Statute, two published Revenue Rulings and a private bill passed by the Legislature, as briefed in the Mens Rea Motion at 10-12 & n. 11-13. The Film Tax Credit Statute, in fact, provided for Infrastructure Tax Credits as a percentage of "base investment expended in this state," not of "expenditures," a critical technical difference recognized in the Rulings but not by Agent Blythe and relevant to the proper *timing* of certification of "base investment" not "expenditure." LA.REV.STAT.ANN. §47:6007C(2)(a)

---

[8] *See* Exhibit A at 5. Notably in the August 8, 2013 testimony, Agent Blythe qualified his testimony at *that* time (but not on February 6, 2014) by stating his conclusion "To the best of my understanding."

[9] *See* Exhibit B at 7. Agent Blythe referred to the equipment purchase between SAPLA and Departure Studios Louisiana. He does not discuss the underlying facts or economic substance of that transaction in his testimony.

[10] Agent Blythe listed his qualifications as being a certified public accountant in Florida for 3 ½ years before becoming an FBI agent. (Ex. E at 34) Agent Blythe cited no training in Federal or state income tax law or practice. In earlier testimony, Agent Blythe stated: "I think that I'm not . . . extremely well-versed in the procedures of the state" in response to a grand juror who asked Agent Blythe to explain the difference between "base expenditures" and "total expenditures" for purpose of the Film Tax Credit Statute, neither of which terms are used in the Film Tax Credit Statute with respect to Infrastructure Tax Credits or otherwise. Agent Blythe said state officials would be better positioned to answer that question. (Ex. E at 31-32)

(2007).[11] Agent Blythe's testimony that expenditures for purpose of the Film Tax Credit Statute, as applicable to Infrastructure Tax Credits, must be made only with "money," as opposed to book set off or transfer of other property, is also clearly erroneous.[12]

The government's instructions through Agent Blythe's testimony were also erroneous in stating that the Film Tax Credit Statute requires audit reports to be prepared "on a cash basis." The Film Tax Credit Statute applicable to Infrastructure Tax Credits required application of "auditing standards generally accepted in the United States of America," not audit reports "on a cash basis." Generally accepted auditing standards require use of the accrual method of accounting.[13] Accounting for related party payments under the Film Tax Credit Statute, in

---

[11] The term "expended in this state" was defined as property "acquired" and services "procured." LA.REV.STAT.ANN. §47:6007B(3)(2007). The Statute at that time defined "production expenditures," relevant to film investment tax credits, as "incurred in the state." §47:6007B(9)(2007). The LED Regulations adopted after the First and Second Audit Reports did not require proof of payments by "money" or in "cash" but only "as evidenced by an invoice, receipt or other such document." LA.ADMIN.CODE. §61, ¶1605 (2010) attached as Exhibit 9 to the Motion To Dismiss. The *current* version of the Statute has a definition of "expenditure" for purposes of the film investment tax credit similar to that offered by Agent Blythe. LA.REV.STAT.ANN. §47:6007B(3)(2013). That definition, however, was not in effect in the years at issue in this case and could never have been intended to apply to Infrastructure Tax Credits, repealed in 2009 for projects not then certified.

[12] Delivery of property or book set-offs constitute "receipts" or "disbursement," as the case may be, even under the cash basis method of accounting for Federal income tax purposes. E.g., *McDougal v. Comm'r*, 62 T.C. 720, 728 (1974) acq. (property); *Rife v. Comm'r*, 356 F.2d 883, 889-90 (5th Cir. 1966) (set-off). Both these "old chestnuts," well known to tax practitioners, apply directly to the facts of this case.

[13] The Film Tax Credit Statute provided: "The audit shall be performed in accordance with auditing standards generally accepted in the United States of America and the auditors shall have sufficient knowledge of accounting principles generally recognized in the film and television industry." LA.REV.STAT.ANN. §47:6007D(2)(d)(v)(2007). Generally accepted accounting principles or "GAAP" in the United States are established in the Financial Accounting Standards Board, Accounting Standards Codification ("ASC") which requires use of the accrual method of accounting ("Accrual Method") and does not accept the cash receipts and disbursements method of accounting ("Cash Method") referred to by Agent Blythe. See FASB Notice to Constituents at 11, found at https://acs.fasb.org/imageRoot/10/5724610.pdf. For various reasons too detailed to explain here, SAPLA was not permitted to use and did not use the Cash Method for Federal income tax purposes and was required by 26 U.S.C. §§446(a) & 448(a)

particular, are governed by general accepted accounting principles and are not "on a cash basis."[14]  The government's instruction through Agent Blythe's testimony was also erroneous in stating that cash transfers "lacked economic substance" as a matter of tax accounting principle. The "substance over form" doctrine is directed to the economic substance of the underlying transaction, not the formal steps taken to obtain potential tax benefits, as briefed in the Mens Rea Motion at 14-15 & n 19-22.

The government, through Agent Blythe's testimony, also erroneously states or gives a misleading impression that certification of "base investment" as requested by SAPLA would immediately generate transferable Infrastructure Tax Credits.  However, LED under the Pre-Certification took the position that it had no obligation to allow transfer (as opposed to certification) of any Infrastructure Tax Credits as "earned" until completion of the Project and Infrastructure Tax Credits could be disallowed by the Louisiana Department of Revenue ("DOR").[15]  The government erroneously stated that the Pre-Certification is "not an agreement" to provide tax credits between LED and SAPLA.[16]   However, the Pre-Certification is

---

to use the Accrual Method. The statutory reference to "accounting principles generally recognized in the film and television industry" creates a number of ambiguities discussed in Mr. Hoffman's Memorandum In Response To Michael Arata's Motion In Limine [Dkt. 272], at 1-3, but do not in any event support Agent Blythe's erroneous testimony.

[14] The later Regulations by LED on related party transactions specifically refer to GAAP and ASC standards.  Exhibit 12 to Motion to Dismiss, at pages 3-5.

[15] The Pre-Certification provides: "No tax credits shall be earned on multiple-use facilities until the production or postproduction facility is complete." Exhibit 3 to the Motion To Dismiss, page 3.  The LED Certification on June 19, 2009 confirmed this requirement.  Exhibit 5 to the Motion To Dismiss at page 2.  DOR's powers are set forth in LA.REV.STAT.ANN. §47:6007E and F.  See Mr. Hoffman's Reply Memorandum ("Benefit of the Bargain Reply") [Dkt. 329], at 11-12 & n. 24-25 to Government's Opposition [Dkt. 313] to Peter Hoffman's Motion In Limine To Determine An Issue of Law Re: Benefit Of The Bargain [Dkt. 230] ("Benefit of the Bargain Motion").

[16] Testimony by AUSA Kammer in the form of a question.  (Ex. A at 28-29)  *See* Memorandum of Law filed in *Autopsy LLC v. Stephen Moret et al*, No. 618404 (19th Judicial Dist. June 7, 2013) at pp. 9-12, attached as Exhibit H hereto, citing *inter alia* La. Atty. Gen. Op.

enforceable as a contract under Louisiana law, creating a legally binding agreement on *when* Infrastructure Tax Credits are transferrable, as opposed to when "base investment" is certified. The SAPLA Applications were not a request to "give me some tax credits" but to obtain certification of "base investment" which would result in "earned" transferable Infrastructure Tax Credits only as determined by LED and DOR *or* on completion of the Project as provided in the Pre-Certification.[17]

The government has continually argued before this Court that the Applicable Tax Law is *irrelevant* to the charges in this case and that "this is not a tax case." The government did not offer authorities or argument to oppose Mr. Hoffman's citation of numerous authorities that final cash payment or completion of a project was *not* a requirement for *certification* of "base investment" under the Film Tax Credit Statute. The government argued instead that only the Mail and Wire Fraud Statutes should be applied by this Court.[18] Yet the government found its erroneous interpretation of the Film Tax Credit Statute sufficiently important to emphasize to the grand jury the false legal contentions that (a) payment of "money" and audit reports "on a cash basis" were clear requirements of the Statute and (b) SAPLA's submission to the Auditors prior to completion of the Project without such payment of "money" would result in issuance of "earned" transferable Infrastructure Tax Credits.

    2.  *Erroneous Instructions On The Purpose Of The Film Tax Credit Statute.*

The government's instructions, through Agent Blythe's testimony, concerning the *purpose* of the

---

No. 03-40046, 2003 WL295602, establishing that the Pre-Certification is a contract for the provision of Infrastructure Tax Credits.

[17] The Court may have noted that the LED Certification on June 19, 2009 specifically *did not* authorize transfer of all Infrastructure Tax Credits available by reason of the certification of $6,531,202 of base investment.

[18] See Mr. Hoffman's Reply Memorandum ("Mens Rea Reply") [Dkt. 216] at 12 to Government Opposition [Dkt. 206] to the Mens Rea Motion.

Film Tax Credit Statute, are also clearly erroneous as discussed in the Benefit of the Bargain Motion at 6-8 and Ex. A thereto. The purpose of the Film Tax Credit Statute, as it related to Infrastructure Tax Credits, is *not* to obtain cash expenditures in *creation* of the film infrastructure as Agent Blythe claims in response to a leading question from AUSA Kammer. Rather its purpose is to obtain *completed* operating film infrastructure, and the jobs and income generated by *that completed* project. LA.REV.STAT.ANN.§47:6007A (2007) stated its purpose is ". . . to encourage development in Louisiana of a strong capital and infrastructure base for motion picture film . . . production in order to achieve an independent, self-supporting industry" including as "(2) long term objectives" the "(c) . . . development of a Louisiana film . . . production and post-production infrastructure with state of the art facilities."

Only this statutory purpose can economically justify a 40% tax credit on "base investment" claimed by an applicant. This purpose is why "payment" in any form, acknowledged in writing by the vendor for service or equipment provided or to be provided, is acceptable and consistent with the purpose of the Film Tax Credit Statute. Agent Blythe's testimony appears directed to the purpose of the lower film investment tax credit for which only expenditure in the state would generate benefits to the state, not the purpose of Infrastructure Tax Credits for which such benefits arise from continuing operation of film infrastructure.

   C. *Grave Doubts That The Misstatement Of Applicable Tax Law Substantially Influenced The Decision To Indict.*

This Court should have "grave doubts" that the government's instruction on the law discussed above may have "substantially influenced" the grand jury's "decision to indict." This "influence" or prejudice is heightened by the apparent authority of Agent Blythe offered by the government as a purported knowledgeable expert on the Film Tax Credit Statute to properly

explain the Applicable Tax Law.  Agent Blythe, particularly in the testimony on the day of the original Indictment as the first substantive issue presented, expresses his opinion absolutely without qualification.  The grand jury was not told of the *later* promulgated Regulations, the two Revenue Rulings, the language of the Film Tax Credit Statute and the comparable provisions applicable to historic rehabilitation tax credits, to say nothing of LED's practice at the time of the First Audit Report.

   The government's misstatements of the Applicable Tax Law and its purpose also created a "grave doubt" that the grand jury misunderstood the "intent to harm" mens reas  required by the Mail and Wire Fraud Statutes, an element of the offenses not explained in the grand jury testimony provided to Mr. and Mrs. Hoffman.  The grand jury would surely presume without more that *both* Mr. and Mrs. Hoffman knew and accepted Agent Blythe's erroneous statement of purpose of the Applicable Tax Law.  Agent Blythe's testimony suggests Mr. Hoffman knew that payments of "money" were required by the Film Tax Credit Statute, that false representation of such payment would illegally generate transferable Infrastructure Tax Credits prior to completion of the Project and that the State would be denied the benefit of its bargain with SAPLA, i.e. be "harmed," without actual "money" payment.

   However, Mr. Hoffman's understanding could only have been based on the text of the Film Tax Credit Statute, the Revenue Rulings, LED's practice and the language of the Pre-Certification which were erroneously presented to the grand jury.  As held in *Stevens* and *Peralta*, the government cannot give false and misleading statements to the grand jury which result in a misleading impression that Mr. Hoffman should have known the state would be "harmed" by claims of "base investment" not paid with "money," and therefore had the mens rea required for the charged offense.

As was clear at the evidentiary hearing held on February 25, 2015 on the Government's Motion To Vitiate The Proffer [Dkt. 184] ("Motion To Vitiate Hearing"), the government's theory of the case is that "circular payments" (or formal cash transfers used to produce an "audit trail") *are* mail and wire fraud per se even if Mr. Hoffman intended to cause no harm to LED and made no affirmative false representations regarding such transfers. The government's legal premise is erroneous for many reasons.[19] Nevertheless, the government's theory of the case must depend principally, if not entirely, on the government's instructions on the Applicable Tax Law (set out in Agent Blythe's testimony) that (a) payments of "money" and accounting "on a cash basis" are *required* by the Film Tax Credit Statute to apply for certification of "base investment" giving rise to Infrastructure Tax Credits and (b) that such an application *ipso facto* would result in *immediately* transferable Infrastructure Tax Credits, before completion of the Project, despite the clear language of the Pre-Certification to the contrary.

Neither contention is correct. At best these contentions represent highly disputed, unsettled questions of *state* law and policy regarding tax assessment (not collection), at the times relevant to the charges in this case, properly resolved by LED and DOR, not by a prosecution under the Mail and Wire Fraud Statutes. The government's erroneous instructions on the Applicable Tax Law must have "substantially influenced" the grand jury's decision to indict, since these erroneous statements are material and critical to the government's theory of the case: if cash payment is not required by the Applicable Tax Law to apply for *certification* of base investment and *certification* does not mean any tax credits are *transferable*, then as a matter of logic such an application cannot be a fraud on LED's revenue collection function merely because

---

[19] See Mr. Hoffman's Reply Memorandum [Dkt. 330] *passim* to the Government's Opposition [Dkt. 310] to Mr. Hoffman's Motion In Limine To Exclude Evidence Of "Non-Disclosure" or "Implied Misrepresentation" Of Material Facts To Auditors And LED [Dkt. 236], as well as the Mens Rea Motion and the Benefit of the Bargain Motion.

no such cash payment was made in an application for certification of base investment.

The actual prejudice to Mr. and Mrs. Hoffman from the government's erroneous instructions on the Applicable Tax law is made grave by Agent Blythe's false and misleading hearsay testimony to the grand jury. Agent Blythe testified that SAPLA claimed as "base investment" in its Audit Reports, consulting fees payable to both Lou Sandoz and Richard Conway.[20] The best evidence of this assertion are the three Audit Reports which show *no such claim*.[21] The Silva Firm re-issued the Silva Audit Report with no change after Mr. Hoffman reminded Mr. Silva that no claim for fees on Mr. Sandoz were in the Silva Audit Report.[22] Agent Blythe knew or should have known of the contents of the three Audit Reports and the re-issuance of the Silva Audit Report.

Agent Blythe also misrepresented in hearsay testimony the written opinion of Mr. Sandoz supporting the fees payable for the service of Mrs. Hoffman. The best evidence is that opinion which speaks for itself and Mrs. Hoffman's own description to Mr. Duvernay of the hours she worked. Agent Blythe offered instead conclusory disparaging hearsay opinions of Mrs. Hoffman's work.[23] The best evidence of her work is the Project itself, which the government

---

[20] Ex. D at 12 and Ex. F at 28-29, 37. Agent Blythe exacerbated this false hearsay testimony by advising the grand jury that he had received denials from both Mr. Sandoz and Mr. Conway of receipt of any such fees, directly asserting a false allegation of fraud against Mr. Hoffman.

[21] Exhibits "4," "6," and "7" to the Motion To Dismiss, *passim*.

[22] Mens Rea Reply at 3-5 and Exs. 1-5.

[23] E.g. Ex. A at 53-54 and Ex. F at 11-13, 16. Agent Blythe substantially misrepresents Mrs. Hoffman's experience in managing productions budgets of $20-30 million or greater motion pictures and multi-million historic rehabilitation of 900-912 Royal Street in New Orleans. This erroneous double hearsay testimony by Agent Blythe is particularly offensive to Mrs. Hoffman who worked more than a thousand hours for almost five years reviewing and approving every single aspect of the Project from architectural drawings and construction decisions to discussions with investors to discussions with post-production sound personnel to designing and planting the garden. See documents included in Exhibit I attached hereto. Agent's Blythe's double hearsay testimony that Duvernay office including the adjacent courtyard, prime

seeks to suppress.

Agent Blythe gives conclusory hearsay testimony that SAPLA's claims for related party expenditures of interest, development fees and legal fees are improper under the Film Tax Credit Statute as not paid.[24] Agent Blythe did not present to the grand jury the best evidence on the fairness of the development fees claimed by SAPLA, the opinion of the Novogradic firm, one of the leading accounting firms in the nation, that the aggregate development fees (including Ms. Hoffman's fee) were customary and approved by the Internal Revenue Service for historic rehabilitation credits, were fully disclosed to the Auditors and the Silva Firm and were specifically authorized by the current version of the Film Tax Credit Statute and later enacted Regulations.[25] The government was aware of the views of Ms. Kuchler Davis, repeated in her testimony at the Motion To Vitiate Hearing at 188-89, that formal cash transfers to pay related party expenditures would be acceptable. The grand jury, from the transcripts available to Mr. and Mrs. Hoffman, was not informed that formal cash transfers for related party expenditures are uncontroversial and fully accepted by Ms. Kuchler Davis, as well as Craig Silva of the Silva Firm.

Perhaps the greatest prejudice to Mr. and Mrs. Hoffman was Agent Blythe's false hearsay statement to the grand jury that Mr. Arata had shown the Auditors only the "first half" of these cash transfers, testimony he repeated at the Motion To Vitiate Hearing.[26] In this testimony,

---

French Quarter realty, is a "utility closet" is also without any basis whatsoever, and the best evidence is the premises themselves. Ex. F at 23. Agent Blythe did not disclose the opinion of a leading French Quarter realtor that the rental was fair.

[24] Ex. F at 28-29 (development fees); 42-47, 95-96 (interest); 58-72 (legal fees); Ex. G at 30-34, 47; Ex. A at 51.

[25] LA.REV.STAT.ANN. §47:6007D(9)(2013); Mens Rea Motion at 12 n. 15. The Novogradic opinion is included in Exhibit B attached hereto.

[26] Ex. E at 72-76; Ex. F at 100-101. Michael Arata's Supplemental Opposition To The Government's Motion To Vacate Proffer Agreement ("Arata Supplement") [Dkt. 355] at 7,

Agent Blythe falsely stated that Mr. Hoffman had not provided to the Auditor all relevant SAPLA financial records regarding the periods under audit because he had allegedly not provided both "halves" of the formal cash transfer. As the Court saw, both "halves" were provided to the Auditor by Mr. Arata. The Silva Firm re-issued the Silva Audit Report after Agent Blythe made the same false hearsay charges to Mr. Silva.[27]

---

confirmed by the testimony of Katherine Dodge Hymel and Kate Kuchler Davis at the Motion To Vitiate Hearing, Tr. at 141-45, 161, 168, establishes that the Auditors had both "halves" of the formal cash transfers in issue.

Another serious hearsay misstatement by Agent Blythe in his 8/8/13 Testimony at 13 is that the Auditors withdrew the First and Second Audit Reports because "they had been provided with false information," in response to a leading question from AUSA Kammer after Agent Blythe had first correctly stated the anodyne reason for withdrawal. In fact, the Auditors withdrew because Ms. Kuchler Davis had made a material error in "double counting" construction expenses in the First Audit Report and SAPLA authorized the withdrawal since LED through Mr. Daigle appeared to object to any further requests for certification prior to completion. See the emails from John Theriot to Mr. Hoffman attached hereto as Exhibit J. The Auditors at no time stated orally or in writing to Mr. Hoffman that they "had been provided with false information."

Agent Blythe also erroneously stated in hearsay testimony to the grand jury that Mr. Duvernay "did not have access" to the funding account at Regions Bank established for Mr. Duvernay, when in fact Mr. Duvernay, as the Court saw at the Motion To Vitiate Hearing (Gov't Ex. 10), was an owner and signatory on that account. (Ex. E at 67-68)

[27] See Note 22 above. Also Mr. Duvernay testified at the Motion To Vitiate Hearing, Tr. at 88, that his confirmation (Gov't Ex. 7) "says I did $2 million dollars' worth of work" and AUSA Kammer confirmed this in his next question. But that confirmation did not state he "did" the "work" but rather: "Our records indicate that the invoices detailed above in the amount of $2,002,480.00 for services to [SAPLA] were [sic] paid to our company . . ." The confirmation is *addressed to the Auditors*, calling into question Mr. Duvernay's statement, Tr. at 88, presented by the government as true, that Mrs. Hoffman told him that the confirmation was only for Mr. Hoffman's "personal records."

The government also asked Mr. Duvernay if certain invoices for legal fees and interest were created by him or reflected payments to him, Tr. 93-95. The government well knows that Ms. Kuchler Davis noted this issue and when advised of it, Mr. Hoffman apologized for Marcia Matthew's drafting and changed the invoices. Ms. Matthew explained that she never meant for those invoices to be understood as from Mr. Duvernay (who of course was owed no interest or legal fees) but only related party invoices noting that Mr. Duvernay was the contractor for the project. The proof of payment provided with the invoices showed payment to SAFELA not to Mr. Duvernay. (*See* emails attached hereto as Exhibit K) Agent Blythe in part described the mistake to a grand juror in response to a question and then gave a misleading explanation. (Ex. F at 92-93)

*Conclusion.* As was stated by Mr. Hoffman in the Mens Rea Motion at 2-4, the government here refuses to engage with the Applicable Tax Law as written and is seeking through the Mail and Wire Fraud Statutes to re-write the Film Tax Credit Statute to its preferred specifications, confusing the former provisions of the Statute applicable to Infrastructure Tax Credits with current provisions of the Statute applicable to film investment tax credits.  The government's misapprehensions of the Applicable Tax Law and its erroneous instructions as to its meaning substantially influenced the grand jury's decision to indict.  This Court should therefore dismiss without prejudice the Second Superseding Indictment as these misapprehensions are critical to it.  The Second Superseding Indictment cannot stand without such an improper and incorrect interpretation of the Film Tax Credit Statute and the Applicable Tax Law.

Respectfully submitted,

*/s/ Lance C. Unglesby*

_____
Lance Unglesby (#29690)
The Unglesby Law Firm
246 Napoleon Street
Baton Rouge, LA 70802
T: (225) 387-0120
F: (225) 336-4355
lance@unglesbylaw.com


*/s/ Patrick Fanning*
Patrick Fanning, No  #5441
238 Huey P. Long Ave.
Gretna, La.  70053
Tel : (504) 368-7888
pfanninglaw@aol.com

-17-

## CERTIFICATE OF SERVICE

      I hereby certify that on this 16th day of March, 2015, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of the filing will be sent to all counsel of record, by operation of the court's electronic filing system.

                                      */s/ Lance C. Unglesby*
                                 _____
                                    Lance C. Unglesby