UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| v. | NO. 14-022 |
| PETER M. HOFFMAN,<br>MICHAEL P. ARATA,<br>SUSAN HOFFMAN | SECTION "F" |

ORDER AND REASONS

Before the Court is the defendants' motion to strike or dismiss Counts 2 through 16 and Counts 18 and 19, or to determine *in limine* questions of law concerning such counts.  For the reasons that follow, the motion is DENIED.

**Background**

In this white collar criminal case, the government charges Peter and Susan Hoffman and Michael Arata with wire fraud, mail fraud, conspiracy, aiding and abetting, and, as to Mr. Arata only, also charges false statements to federal agents.[1]

The backdrop of this federal criminal case is a Louisiana state law tax credit program. In 1992, to encourage local development of a motion picture and television industry, the State

---

[1]The facts giving rise to this criminal case are more completely summarized in the second superseding indictment, in this Court's Order and Reasons dated July 18, 2014.  See United States v. Hoffman, No. 14-22, 2014 WL 3589563, at *1-3 (E.D. La. July 18, 2014).

1

of Louisiana enacted the Louisiana Motion Picture Incentive Act, La.R.S. § 47:6007.  By law, the State provided incentives in the form of tax credits for State-certified infrastructure projects, as well as for production projects.[2]  Individuals and businesses making motion pictures were eligible to receive tax credits, which were calculated as a percentage of the companies' qualified expenditures in Louisiana. Infrastructure expenditures included the purchase, construction, and use of facilities that were directly related to and utilized for motion picture production in Louisiana. To qualify for infrastructure tax credits, all funds had to be expended, and such expenditures had to be verified by an independent Louisiana Certified Public Accountant.

This tax credit program is administered by the Office of Entertainment Industry Development, an office within the Department of Economic Development.  The administrative review and approval

---

[2]La.R.S. § 47:6007 has been amended several times. Act 456 of 2005 authorized income tax credits for State-certified infrastructure projects.  With respect to these infrastructure projects, Act 456 of 2005 provided that if the total base investment was greater than $300,000, each investor was allowed a tax credit of 25% of the base investment, and an additional 15% tax credit was allowed until January 1, 2008; the available tax credit totaled 40%.  The relevant version of the Act for the purposes of the criminal charges at issue in this case is the amendment accomplished by Act 456, effective July 1, 2007.  Act 456 provided for the infrastructure tax credits authorized by Act 456 of 2005 through January 1, 2009, but imposed limits on those tax credits for applications filed after August 1, 2007: a six-month deadline was imposed and a $25 million per project cap on the tax credits was also imposed. The film infrastructure tax credits at issue in this matter were repealed in 2009, but the film production tax credits remain in effect.

2

process was described by the Louisiana Supreme Court as follows: To receive an initial certification letter from the State approving a project as a State-certified infrastructure project, an applicant must file an application for motion picture investor tax credits with the OEID, and obtain approval of the project from the DED, OEID, and the Department of Administration. See <u>Red Stick Studio Development, L.L.C. v. Louisiana</u>, 56 So.3d 181, 183-84 (La. 2011) (citing La.R.S. 47:6007 (2005)). After an initial certification letter is issued, and accepted by the applicant, the applicant must then submit to those same agencies a cost report of infrastructure expenditures; the report must be audited and certified by an independent certified public accountant. <u>Id.</u> at 183 n.4. Based on the applicant's submission, the relevant state agencies determine whether those infrastructure expenditures qualify for tax credits; if so, those agencies will certify the tax credits based upon the approved infrastructure expenditures. <u>Id.</u> Once certified, tax credits could be applied to offset against the Louisiana taxpayer's income tax liability, or they may be sold. <u>Id.</u>

In renovating the property at 807 Esplanade Avenue with the vision of turning it into a post-production film studio, Peter Hoffman, Susan Hoffman, and Michael Arata, through their respective companies, availed themselves of the State film infrastructure tax

credit program.[3] They submitted three applications and supporting documents to the State for tax credits. As statutorily required, the defendants first submitted the 807 Esplanade expenditures to auditors for verification. To verify the expenditures, the auditors requested proof of payment such as invoices, bank transfers, bank statements, and other corporate financial records. Based on this information, the auditors created audit reports detailing the defendants' claimed expenditures on 807 Esplanade. These audit reports were submitted as part of the February 26, 2009, January 20, 2010, and July 3, 2012 submissions to the State for film infrastructure tax credits.

---

[3]On May 29, 2008, the State of Louisiana sent to Seven Arts Post an infrastructure project pre-certification letter in which the State lays out the initial terms of the tax credit program and agreement between the State and the developers of 807 Esplanade. The letter states:

> In order to qualify for these credits, all funds invested must actually be expended on the state-certified infrastructure project with accounting certification in accordance with Departmental guidelines for the claimed expenditures included. Again, as noted above, while your project indicates an anticipated total of $9,000,000, final certification and granting of tax credits under these provisions will be based on the following: the actual amount expended by the project, verification in the form of an audit conducted by an independent Louisiana Certified Public Accountant that these expenditures were made and meet the requirements of applicable law, and approval by DED, OIED and DOA.

In exchange for these expenditures submitted to the State, "[i]f the total base investment is greater than three hundred thousand dollars, each investor shall be allowed a tax credit of forty (40%) of the base investment made by that investor."

On June 19, 2009 the State issued $1,132,480.80 in tax credits to Seven Arts Production Louisiana, LLC as a result of the first application, the February 26, 2009 submission.  Mr. Arata paid cash to the partnership for these tax credits, at a discounted price, through his company LEAP Film Fund II, LLC, then, the government claims, sold the tax credits to local businesses and individuals for profit.  The State did not issue tax credits based on the January 20, 2010 and July 3, 2012 applications.

On February 6, 2014 a grand jury returned a six-count indictment, charging Peter Hoffman and Michael Arata with conspiracy (Count 1), as well as aiding and abetting, and actually committing wire fraud (Counts 2 - 6), in violation of 18 U.S.C. §§ 371, 2, 1343.  After first superseding on April 3, 2014,[4] the government filed a 25-count second superseding indictment on May 15, 2014, charging the Hoffmans and Mr. Arata with conspiring to commit, committing, and aiding and abetting, wire and mail fraud, in violation of 18 U.S.C. §§§§ 371, 1343, 1341, and 2, and also charging Mr. Arata with making false statements to federal agents.[5]

---

[4]This superseding indictment filed on April 3, 2014 charged Susan Hoffman for the first time, and added additional charges against the other defendants: conspiracy (Count 1), wire fraud and aiding and abetting against Peter Hoffman and Michael Arata (Counts 2 - 5), wire fraud and aiding and abetting against all three defendants (Counts 6 - 17), mail fraud and aiding and abetting against all three defendants (Count 18), and false statements against Michael Arata only (Counts 19 - 22).

[5]Count 1 alleges conspiracy, Counts 2-5 allege wire fraud as against only Messrs. Hoffman and Arata, Counts 6-20 allege wire

5

With respect to Count 1, which alleges conspiracy to use the mail or wires in furtherance of the defendants' scheme to defraud, the government alleges 37 specific overt acts, and charges that the defendants accomplished their conspiracy, and took steps to conceal from the State their scheme, when they: 1). prepared and filed material false and misleading tax credit applications, fraudulently claiming that certain expenditures had been made to 807 Esplanade when those expenditures had not been made; 2). prepared and submitted to the auditors and to the State materially false and misleading internal accounting books and records and payment receipt certifications to make it appear as if certain expenditures had been made and certain items had been paid for and received when those expenditures had not been made and those items had not been paid for or received; 3). prepared and submitted to the auditors and the State materially false and misleading invoices in support of fraudulent expenditures; 4). conducted materially false and misleading circuitous bank transfers of money to make it appear that certain items were paid for when those items had not been paid for; and 5). prepared and submitted to the auditors proofs of payment that were materially false and misleading in that only outgoing money transfers were disclosed to the auditors when the money had actually been immediately returned to the original bank

---

fraud against all three defendants, Count 21 alleges mail fraud, and Counts 22 - 25 charge only Michael Arata with making false statements to federal agents in violation of 18 U.S.C. § 1001.

account and those return money transfers were not disclosed to the auditors.

As to the wire fraud charges (Counts 2 - 5 against Peter Hoffman and Michael Arata and Counts 6 - 20 against all three defendants), the government alleges:

> Beginning on or about March 1, 2006, and continuing until on or about July 3, 2012, in the Eastern District of Louisiana and elsewhere, the defendants, Peter Hoffman, Michael Arata, Susan Hoffman ... did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises by submitting and causing to be submitted materially false, misleading and fraudulent information to the auditors and to the State of Louisiana for the purpose of obtaining infrastructure tax credits relative to 807 Esplanade. All in violation of Title 18, United States Code, Sections 1343 and 2.

With respect to the mail fraud charge (Count 21), the government alleges:

> On or about February 3, 2010 ... the defendants, Peter Hoffman, Michael Arata, Susan Hoffman ... for the purpose of executing and attempting to execute, and in furtherance of, the scheme and artifice to defraud set forth in paragraph 2 of Counts 6 through 20 above, did knowingly send and cause to be sent, delivered, and moved by private commercial interstate carriers correspondence dated February 2, 2010, addressed to an auditor for the State of Louisiana with attached exhibits, corporate agreements, and invoices for project management, equipment consulting, and office rent. All in violation of Title 18, United States Code, Sections 1341 and 2.

On July 18, 2014, the Court denied the defendants' motion to dismiss Counts 1 through 21 of the second superseding indictment. United States v. Hoffman, No. 14-22, 2014 WL 3589563, at *9-11 (E.D.La. July 18, 2014). After much motion practice, with the

7

trial approaching, the defendants now seek dismissal of, or rulings as a matter of law regarding, Counts 2 through 16 and 18 and 19.

I.

Federal Rule of Criminal Procedure 12(b)(2) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue."

II.

A.

The defendants ask the Court to strike all mail/wire fraud counts except 6, 17, and 20, or to determine issues of law concerning such counts. First, the defendants urge the Court to dismiss Counts 4 and 7 because they are not interstate wire communications. Second, the defendants urge the Court to dismiss Counts 2, 3, 4, 6,[6] and 7 because they concern irrelevant wire communications that were not integral to the alleged scheme. And, third, the defendants urge the Court to dismiss as multiplicitous Counts 5, 8 through 16, 18, and 19. The government urges the Court to deny the motion, countering that (1) Counts 4 and 7 were interstate wire communications; (2) the emails charged were incident to an essential part of the scheme to defraud; and (3) the wire fraud counts are not multiplicitous.

---

[6]In their reply papers, the defendants withdraw their motion to strike regarding Count 6.

*B.*

1.   Counts 4 and 7: Interstate or Intrastate?

The defendants urge the Court to dismiss or strike Counts 4 and 7 on the ground that these counts are based on intrastate wire communications. The government counters that, although the emails were between Louisiana residents, one of the email addresses is serviced by a provider that has no servers in the State of Louisiana and, thus, the wire communications crossed state lines. At this stage of the proceedings, the Court is not persuaded to strike these two counts for failure to satisfy the interstate nexus that the government must prove at trial.

The wire communication in Counts 4 and 7 are described in the indictment as:

> Count 4
> February 26, 2009
> Email transmitted between Louisiana and outside the State of Louisiana sending application for film infrastructure tax credits and supporting documents to the State of Louisiana.
>
> Count 7
> May 14, 2009
> Email transmitted between Louisiana and outside the State of Louisiana sending invoices and vendor payment certifications for $2,002,480.00 in construction and $1,027,090.00 in film equipment to the auditors and to the State of Louisiana.

On its face, the indictment sufficiently alleges interstate wire communications. However, the defendants suggest that both Count 4 and Count 7 are based on wire communications between residents of the same state, thereby failing the jurisdictional predicate of the

9

wire fraud statute.  But the government submits an affidavit of expected testimony from a custodian of records for Yahoo! Inc., who states that "[s]ince at least the year of 2008, any email communications sent or received by a Yahoo user located in the state of Louisiana, would necessarily transit a Yahoo server outside the state of Louisiana" because "Yahoo does not maintain, and has not maintained since at least 2008 servers" in Louisiana. The government suggests that this supports a finding that Mr. Arata's email, which is serviced by Yahoo, had to travel interstate.  The parties' factual dispute will be resolved by the trier of fact.  Insofar as the parties continue to dispute the contours of an interstate wire communication, the parties may submit any helpful briefing on the legal issue in advance of trial along with proposed jury instructions.[7]

2. Emails Incident to Essential Part of Scheme to Defraud?

The defendants next contend that the Court should dismiss Counts 2, 3, 4, 6, and 7 on the ground that the emails charged in

---

[7]The defendants insist that the wire communications "must literally cross state lines." But the government alleges that the emails in Count 4 and 7 did cross state lines; and, the government has provided an affidavit from a custodian to testify at trial that would tend to prove that, in fact, the Arata emails crossed stated lines.  Although the government fails to submit any authority that is on all fours with their position, making matters worse, the defendants appeal to policy and fail to meaningfully address the government's position; defendants advance the following standard as the only standard that would not impermissibly expand the wire fraud statute: "a communication that is intended to be and is read or received by human beings in at least two different states as part of a scheme to defraud human beings, not machines."

those counts were not integral to the alleged scheme to defraud. The government counters that the emails described in Counts 2, 3, 4, 6, and 7 were "incident to an essential part of the scheme" and, therefore, the Court should not dismiss or strike these counts. The Court finds that dismissing or striking these counts is premature.[8]

The Fifth Circuit instructs that the elements of mail or wire fraud that must be charged and proved by the government are: (1) the defendant devised or intended to devise a scheme to defraud, (2) the mails [or wires] were used for the purpose of executing, or attempting to execute, the scheme, and (3) the falsehoods employed in the scheme were material." United States v. McMillan, 600 F.3d 434, 447 (5th Cir. 2010).  "The use of wire communications 'need not be an essential element of [a scheme to defraud]' but may instead 'be incident to an essential part of the scheme, or a step in the plot.'" United States v. Dowl, 619 F.3d 494, 499 (5th Cir. 2010)(quoting Schmuck v. United States, 489 U.S. 705, 710-11 (1989)).  "To show that a [wire] is incident to an essential part

---

[8]As to Count 6, the defendants initially urged the Court to strike this count.  But the government in opposition noted that Count 6 is based on an email dated April 7, 2009 from a Seven Arts accountant to the State with attached copies of invoices for film equipment and construction, the parties initially disputed whether the email was for the purpose of executing the alleged scheme to defraud.  The defendants accordingly withdraw their request to strike this particular count, conceding that the email referenced by the government could meet the step in the plot test if the government proves a scheme to defraud.

of the scheme, the government must demonstrate that completion of the alleged scheme depended in some way on the information ... that passed through the [wire]." Id. (quoting United States v. Ingles, 445 F.3d 830, 835 (5th Cir. 2006)).

Relative to the scheme to defraud, the government charges in the second superseding indictment that from March 1, 2006 through July 3, 2012 the defendants:

> did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises by submitting and causing to be submitted materially false, misleading and fraudulent information to the auditors and to the State of Louisiana for the purpose of obtaining film infrastructure tax credits relative to 807 Esplanade.

The defendants fail to persuade the Court that, as a matter of law, each of the wires charged in the Counts 2, 3, 4, 6, and 7 are not steps in the plot charged by the government. Insofar as the resolution of this dispute turns on the parties' respective spin on evidence to be submitted at trial, this is patently an issue for trial.

As to Count 2, the parties dispute whether or not the February 2, 2009 email from Mr. Arata to an auditor attaching a $2,002,480 payment certification (signed by Mr. Arata and Duvernay, the 807 Esplanade contractor) is, as the government submits, "materially false and misleading" and "a step in the plot."

As to Count 3, the parties dispute whether or not a February 25, 2009 email (sent the day before the first application was

12

filed) from Mr. Arata to Mr. Hoffman attaching a general ledger of Seven Arts (a ledger which the indictment alleges contains "materially false and misleading" information) is, as the government submits, "a step in the plot."

As to Counts 4 and 7 (mentioned above), Mr. Arata sent emails to the State and to the auditor; he also copied Peter Hoffman on the emails (which the government suggests independently supports the interstate nature of the wire).  Here, the parties dispute whether the emails could be considered a step in the plot.  The government submits that Mr. Hoffman, co-conspirator and head of the 807 Esplanade project, was included on the email "to lend credence to the fraudulent first application and contractor payment certification being submitted to the State."  But the defendants contend that these emails are insufficiently related to the success of the scheme, citing United States v. Evans, 148 F.3d 477 (5th Cir. 1998)(reversing mail fraud convictions, finding that the defendant consummated the fraudulent scheme when supervisors approved falsified travel vouchers and before the vouchers were mailed to another office for reimbursement) and United States v. Strong, 371 F.3d 225 (5th Cir. 2004)(affirming district court's ruling setting aside the jury verdict convicting the defendant, finding that the government presented insufficient evidence linking the mailing to department of transportation headquarters from local department of transportation of CCO (certified copies of original title)

applications to the "title punching" fraud scheme where each fraudulent act was complete when the defendant obtained the CCOs from the local department of transportation office).[9]

The Court is ill-suited to resolve these issues, divorced as they are from the context of evidence submitted at trial.  If, after the government submits its evidence, the defendants believe that the evidence fails to link the various emails to the alleged scheme to defraud, the defendants should move for a judgment of acquittal.

3.   Counts 5, 8 - 16, 18, and 19: Multiplicitous?

The defendants contend that Counts 5, 8 through 16, 18, and 19 (which charge fraud in communications to the auditors) are multiplicitous to Counts 4, 7, 17, and 20 (which charge fraud in communications to the state agency).  The defendants submit that they cannot be charged twice for the same alleged false statement "ultimately directed to the same person."  The government counters that its indictment does not charge a single offense in separate counts; rather, all of the charged wirings are distinct in time, subject matter, and recipient, all that is required to survive the defendants' challenge.  The Court agrees.

The Fifth Amendment Double Jeopardy Clause protects against

---

[9] Distinguishing these cases, the government points out, correctly, that the mailings in Evans were conducted after the fraud was complete and the mailings in Strong were immaterial communications between non-participants in the scheme.

14

multiple prosecutions and multiple punishments for the same offense. See United States v. Reagan, 596 F.3d 251, 253 (5th Cir. 2010). "An indictment is multiplicitous if it charges a single offense in separate counts." United States v. Woerner, 709 F.3d 527, 538-39 (5th Cir. 2013)(citing United States v. Ogba, 526 F.3d 214, 232-33 (5th Cir. 2008). "The principal danger of a multiplicitous indictment," the Fifth Circuit has observed, "is that the defendant may receive multiple sentences for the same offense." United States v. Smith, 591 F.2d 1105, 1108 (5th Cir. 1979). The Court may address this danger at any time. Id. (citation omitted). For this reason, multiplicity is not fatal to an indictment and dismissal is not required even where the same offense is charged in more than one count; the dismissal or merger of multiplicitous counts after trial but before sentencing is an adequate remedy. See id.; see also United States v. Saks, 964 F.2d 1514, 1526 (5th Cir. 1992)(citation omitted)(where the jury is allowed to return convictions on multiplicitous counts, the remedy is to remand for resentencing, with the government dismissing the counts that create the multiplicity.").

Although there are two varieties of multiplicity challenges, only one is implicated here, where the defendants essentially submit that "charges for multiple violations of the same statute are predicated on arguably the same criminal conduct." Woerner,

15

709 F.3d at 539.[10]  When confronted with this particular challenge, the Court asks "whether separate and distinct prohibited acts, made punishable by law, have been committed."  See id.; see also United States v. Grant, 114 F.3d 323, 329 (1st Cir. 1997)(counts that are "distinct from one another in time, place or both" are not facially multiplicitous.  Notably, "[e]ach separate use of the interstate wire communications facilities in furtherance of a scheme to defraud by means of false or fraudulent pretenses, representations, or promises constitutes a separate offense."  See Fifth Circuit Pattern Jury Instructions § 2.60 (wire fraud); see also United States v. Blankenship, 746 F.2d 233, 236 (5th Cir. 1984)(mail fraud).

Applying these principles, each count challenged by the defendants here delineates a distinct and separate wire fraud offense. All of the wirings are distinct in time, subject matter, and recipient.  Thus, it was permissible for the government to charge each of these alleged separate uses of the wires in furtherance of the alleged scheme as separate offenses.

---

[10]The other multiplicity challenge "arises when a defendant is charged with violating two different statutes, one of which is arguably the lesser included offense of the other."  Id. (citing Blockburger v. United States, 284 U.S. 299 (1932)).  The Blockburger rule is: "[u]nless each offense requires proof of an element that the other does not, a defendant may not be charged with both."  Id.  Although the defendants appear to invoke Blockburger, it is inapplicable under the circumstances of this case.

Accordingly, the defendants' motion is DENIED.

New Orleans, Louisiana, April 1, 2015

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE