UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| v. | NO. 14-022 |
| PETER M. HOFFMAN,<br>MICHAEL P. ARATA,<br>SUSAN HOFFMAN | SECTION "F" |

ORDER AND REASONS

Before the Court are six motions: (1) Susan Hoffman's motion for judgment of acquittal; (2) Susan Hoffman's motion for new trial; (3) Michael Arata's motion for judgment of acquittal; (4) Michael Arata's motion for new trial; (5) Peter Hoffman's motion for judgment of acquittal; and (6) Peter Hoffman's motion for new trial.  For the reasons that follow, (1) Susan Hoffman's motion for judgment of acquittal and (2) motion for new trial are DENIED; (3) Michael Arata's motion for judgment of acquittal is GRANTED in part and DENIED in part, but (4) Michael Arata's motion for new trial is DENIED; (5) Peter Hoffman's motion for judgment of acquittal is GRANTED in part and DENIED in part; but (6) Peter Hoffman's motion for new trial is DENIED.

**Background**

A.   Introduction

This is not an ordinary fraud case.[1]

The government charged, and all three defendants, Peter Hoffman, Susan Hoffman, and Michael Arata, stand convicted of conspiracy to defraud and actually defrauding a State-administered tax credit program of more than $1 million in ill-gotten tax credits.   The property located at 807 Esplanade Avenue in New Orleans -- the film infrastructure project for which the defendants applied and received tax credits -- is an up and running post-production film studio and the project ultimately earned at least

_____

[1] Certain features that make this federal white collar fraud case unusual are worth noting at the outset. First, the defendants essentially concede the government's evidence.  For example, as for the first tax credit application, Mr. Hoffman and Mr. Arata concede that they used circular bank transactions and submitted payment confirmations to show payment for equipment and construction.  But the defendants submit that they presented these transactions this way consistent with their good faith reliance on the custom and practice of the film tax credit world where, to underscore another unusual feature of this case, there were few if any guiding rules as to how one must document an expenditure under the murky State regime.  In other words, the defendants advanced good faith defense theories that what they did and how they did it was fully consistent with the custom and practice undergirding the less than clear State tax credit regime such that they believed they were acting in compliance with the law.  A third feature of this fraud case that makes it unusual is that there is no dispute that the infrastructure project -- a multi-million dollar post-production film studio for which the defendants applied for tax credits from the State-administered tax program -- was actually completed and after-the-fact forensic audits confirm that tax credits released to the project were, in fact, ultimately earned.  The $1.1 million in tax credits issued by the State of Louisiana based on the first tax credit application was ultimately less than the project earned once it was completed years later.

2

the amount in tax credits that it received.[2]

There is no dispute about much of the evidence presented at trial. The State program that the defendants are convicted of defrauding entitled applicants who made expenditures on film infrastructure in Louisiana to receive an amount equal to 40% of their qualified and audited infrastructure expenditures. Although the program required "expenditures," what qualified as such was at best confusing under the newly-enacted infrastructure part of the law. Mr. Hoffman and Mr. Arata, both lawyers and businessmen, worked together on the first of three tax credit applications submitted for the project. Relative to the first application submitted on February 26, 2009, they represented in an independently audited cost report that certain expenditures for construction and film equipment qualified for tax credits. As presented, State administrators agreed. Several months after submitting the first application, the State of Louisiana issued $1,132,480.80 in tax credits. After suspecting that Mr. Hoffman was fabricating invoices on a different project, Mr. Arata withdrew from the 807 project and his representation of Mr. Hoffman in the summer of 2009. Thereafter, Mr. Hoffman worked with auditors to prepare two additional tax credit applications for the project, the

---

[2] Developers spent more than $5 million turning the dilapidated mansion at 807 Esplanade Avenue into a state-of-the-art post-production film studio (a studio that is in operation today and has serviced post-production needs for movies and television series).

second was submitted on January 20, 2010 and the third on July 3, 2012.[3]  Mr. Hoffman also responded to an inquiry by a forensic auditor hired by the State to investigate the first two tax credit applications, sending his responses regarding the second application to Michael Daigle on February 3, 2010.

*The Government's Theory*

According to the government's theory of prosecution, the defendants schemed to defraud the State by misleading independent auditors into including in cost reports, and misleading State administrators to accept as expenditures, certain transactions that did not qualify as expenditures under the State law.  The government's presentation indicated that, in the first application, Mr. Hoffman and Mr. Arata submitted to the auditors and the State payments for equipment and construction services when, in reality, there were only promises to pay, or intended contributions that lacked economic substance; and that transactions were presented to the auditors and to the State as cash disbursements for equipment or construction expenses when, in fact, money had not been expended, rather, only transferred around various Seven Arts-controlled[4] bank accounts to make it appear as if it had been

_____

[3] The State did not issue tax credits relative to these latter submissions.

[4] Peter Hoffman owned and operated several Seven Arts entitles: Seven Arts Entertainment, Inc., Seven Arts Pictures, Inc., Seven Arts Pictures Louisiana, LLC, Seven Arts Filmed Entertainment Louisiana, LLC, and Seven Arts Post, LLC.  Michael

spent.  The government submitted that the defendants participated in a scheme to defraud that involved, for example, lying about related parties and capital contributions and presenting false invoices and misleading payment confirmations.   Likewise, the government submitted at trial that the scheme continued when Mr. Hoffman claimed as qualified expenditures in the second and third applications (and in defense of the second application in response to the State forensic auditor's inquiries) transactions that did not qualify as expenditures or that were otherwise grossly inflated, including an attempt to characterize as an expenditure draws on a non-existent loan in order to claim phony interest payments as expenditures.

*The Defense Case*

In stark contrast to the government's black-and-white fraud theory, the State regime the defendants stand convicted of defrauding was at best gray; it would not be a stretch to note implementation under State scrutiny at best lacked coherent acumen. Infrastructure transactions involve complex financial events, not simple cash transactions like buying a t-shirt at Wal-Mart. Indeed, the defendants were informed by the State that "the administrative rules implementing the procedures and guidelines on

---

Arata and Susan Hoffman operated or were affiliated with Seven Arts Pictures Louisiana, LLC, which was the entity directly associated with the 807 Esplanade infrastructure project also called Seven Arts Post.

the tax credit program for State-certified infrastructure projects are in the process of promulgation in accordance with law."   In fact, no rules were implemented until 2010.   The evidence at trial showed that then-newly passed film infrastructure tax law was implemented haphazardly and in a manner rife with disorder. Whatever it might have forbidden in terms of qualifying "expenditures," the State program did not plainly require cash transactions; indeed, if it had, the requirement for an audited cost report likely would have been unnecessary.[5]

In defense of the charges, Mr. Hoffman and Mr. Arata, both lawyers experienced in tax and entertainment law, testified that they believed that the project's applications complied with the custom and practice of what the State film office accepted from other applicants and, at the very least, reasonable people can debate about whether or not certain of the submissions qualified as a permissible expenditure.

Susan Hoffman was scarcely mentioned during the trial and, although the government apparently had assumed in its investigation that she had signed all the documents that contained her purported

---

[5] The evidence at trial showed that in generating the cost report, the auditors must rely on documents, not what the applicants told them.   The government, if not the State, expected the defendants to alert the professional auditors to what was disclosed in the supporting documents they submitted for the audited cost report to be prepared by the independent auditor.   The testimony of one auditor in particular, Katie Kuchler, the auditor working on the first and second applications, seemed, in some ways, self-interested.

signature, that did not bear out at trial.  Mrs. Hoffman's theory of defense aligned with that of her co-defendants and there was some evidence that she relied on her husband, Mr. Hoffman, and would often sign whatever documents he asked her to sign.

> B.   The State Regime

Central to this fraud case is a State-administered Louisiana film infrastructure tax credit program.  Louisiana's Motion Picture Incentive Act was originally adopted in 2005 and extended in 2007, but it sunset at the end of 2008.  The purpose of the infrastructure component was to encourage development, to incentivize film infrastructure to be built to support the motion picture industry in the State.  Under the law, every dollar spent in Louisiana on film infrastructure earned the investor 40 cents in film infrastructure tax credits.

With respect to the film infrastructure tax credit program, two departments must jointly agree that certain submissions qualify for issuance of tax credits: the Louisiana Department of Economic Development and the Louisiana Division of Administration.[6]  The administrative review and approval process commences with an applicant filing an application seeking an initial certification letter from the State approving a project as a State-certified

---

[6] A third State agency plays a role as well: the Louisiana Department of Revenue collects taxes and accepts the credits to off-set tax liability.  The State law authorized the "recapture" of ill-gotten tax credits, but the State did not seek to recapture the tax credits issued in this case.

infrastructure project; the pre-certification letter set forth conditions, such as deadlines and minimum spending requirements, for the earning and disbursement of credits.  After an initial certification letter is issued, and accepted by the applicant, the applicant must then submit to those same agencies a cost report of infrastructure expenditures; the report must be audited and certified by an independent certified public accountant.  Based on the applicant's submission, the relevant State agencies determine whether those infrastructure expenditures qualify for tax credits; if so, those agencies will certify the tax credits based upon the approved infrastructure expenditures.  Once certified, tax credits could be applied to offset against the Louisiana taxpayer's income tax liability, or sold for cash.

Consistent with the statute, the mission of the State agencies implementing the infrastructure provision was to promote the film business and infrastructure projects in the State of Louisiana. The only guidance in implementing the infrastructure tax program in 2007 and 2008 was the statute itself; no rules or regulations were promulgated until 2010.  Concerning the contours of the infrastructure tax law, witnesses at trial agreed that the law, particularly at the beginning, was "confusing", "not so clear", had a lot of "gray areas", that it was "complicated enough to where it required an applicant to get an audit by a Louisiana CPA firm;" and that applicants, auditors, and administrators alike "struggled"

with it.  Applicants and auditors simply did their best to try to understand what was acceptable.  Absent binding rules, which State administrators failed to timely adopt, applicants often relied on what State administrators had accepted as valid expenditures in other projects.

### C.   Custom and Practice

To help develop the film industry the system encouraged infrastructure to be built, and it was the practice of the State administrators to be flexible to allow various types of expenditures so as to bring in more projects, and to incentivize infrastructure to create an in-state self-sufficient film industry. State administrators reviewed applications, cost reports, and supporting documentation; as "champions for the [film] industry," the administrators were "applicant-friendly" and therefore had "an open door policy" in which they worked with applicants to allow changes or substitutions of expenditures, or requested more information from the applicants to support submissions.  Along with what was gleaned from public records requests from other film infrastructure projects, applicants for infrastructure tax credits sometimes relied on the give-and-take and advice of the State administrators to glean an understanding of what the State might accept as an expenditure that would qualify for tax credits.[7]

---

[7] It was customary for applicants to consult administrators within the Department of Economic Development to seek out permissible interpretations of the Act.  Sometimes, if the

One of those State administrators was Chris Stelly, executive director of the Office of Entertainment Industry Development, an office within the Department of Economic Development.  Stelly reviewed audited cost reports to make sure that the expenditures submitted by applicants in support for their application for tax credits qualified as expenditures under the State law.  Government witnesses, including Stelly, testified that qualifying expenditures were not limited to cash-based transactions.[8]  And that the State

---

Department of Economic Development told the applicant "no", the applicant would then take up the issue with the Division of Administration in an effort to get the "no" changed to a "yes."

[8] In its opening statement, the government conceded that "you could get tax credits for things other than spending cash."
        During his direct examination, Stelly explained that the pre-certification letter's requirements "must actually be expended" and "actual amount expended by the project" meant that "state law required that the money actually be spent.  It just couldn't be a promise to spend or anything like that.  It had to actually be spent.  And that was a statutory provision that we wanted to reflect . . . to repeat in the particular letter."  Stelly Tr. 205-06.  When the prosecutor showed Stelly the 807 Esplanade film equipment (Departure Studios) and construction (Leo Duvernay) transactions, Stelly said his office would not have approved these if Departure and Duvernay had not received payment, "if the money wasn't actually spent."  Stelly Tr. 217.
        During cross-examination, when confronted with evidence that the State agencies administering the Act accepted non-cash expenditures (such as a note in the Stage West Project) as qualifying expenditures, Stelly admitted that the film office "accepted expenditures in forms other than cash."  Stelly Tr. 291.  Stelly admitted that the law never defined expenditure; the words "cash" or "spend", Stelly's definition of expenditure, were nowhere in the pre-certification form prepared by the State.  Stelly Tr. 265.  Stelly was also "aware that the Louisiana legislature unanimously passed a resolution [in 2008] which indicated that tax credits for infrastructure projects should include property acquired by means of cash, bonds, exchange or by loans from a lender, regardless of who holds the promissory note."  Stelly Tr.

administrators allowed applicants to amend and even withdraw cost reports.

### D.   The 807 Esplanade Infrastructure Project

Peter Hoffman, a tax attorney, was the Chief Executive Officer of Seven Arts Entertainment, Inc., a company involved in the motion picture and entertainment industry in Los Angeles, California.  He also owned, operated, and controlled other companies affiliated with Seven Arts Entertainment, Inc., including Seven Arts Pictures, Inc., Seven Arts Pictures Louisiana, LLC, Seven Arts Filmed Entertainment Louisiana, LLC, and Seven Arts Post, LLC.

Michael Arata, a Louisiana businessman, attorney, and actor, was one of a small circle of lawyers who worked on film applications in Louisiana.[9]  He also owned and operated companies involved in the movie and entertainment industry, including Voodoo Production Services, LLC, Voodoo Studios, LLC, Seven Arts Pictures Louisiana, LLC, and LEAP Film Fund II, LLC.

Susan Hoffman, a Louisiana businesswoman, is Peter Hoffman's wife.  Though they are legally separated, they have remained best friends and business partners.  Mrs. Hoffman owned and operated several companies including Leeway Properties, New Moon Pictures,

---

285; Arata Ex. 231.
    Other witnesses, like Rebecca Hammond, confirmed that more than the typical cash sale was considered an expenditure under the program.  Hammond Tr. 62.

    [9] So much work he did on film tax credit applications that even the government concedes he was an expert in this niche field.

LLC, and Seven Arts Pictures Louisiana, LLC.

Through their respective companies, Peter and Susan Hoffman and Michael Arata were partners in several movie-related ventures. Renovating 807 Esplanade Avenue into a post-production film studio was one of them.  807 Esplanade was a dilapidated mansion that the defendants through their companies purchased in early October 2007 so that they could renovate it into a post-production film studio. Financing came from different sources.  The initial investment in the property, through a loan from Advantage Capital, was $3.7 million; $1.7 million of which was the purchase price of the property and the remaining $2 million was placed in escrow to be drawn down for construction costs.[10]  Seeking another source of funding, applications for film infrastructure tax credits were submitted.[11]

Seven Arts' pre-certification letter laid out deadlines and

---

[10] At a later date, when the project was at a stand-still due to dwindling funds, another lender called Palm Finance took over from Advantage Capital.

[11] During a meeting with his board of directors in September 2007, Mr. Hoffman suggested a plan to build 807 Esplanade "with government tax credits" and "with no cash cost to the company." Gov't Ex. 426.  According to the government, this demonstrates Mr. Hoffman's intention to inflate the costs of the project: given that the State program only permitted a return on 40% in tax credits on legitimate expenditures, the remaining 60% would have to be fabricated by inflating costs.
  It was not disputed at trial, however, that the project sought and obtained other government tax credits known as historic rehabilitation tax credits, which are not at issue in this criminal case.

spending threshold limits. If the project failed to spend $4,500,000 by December 31, 2008, any spending after that date would be ineligible for tax credits. No tax credits would be released until the project spent $2,250,000 on infrastructure. Purchase of real estate did not qualify towards the $2,250,000 requirement.

An applicant such as Seven Arts first submits to the State an application (with supporting documents) for film infrastructure tax credits. Arata Exhibit 234 is the application for the 807 project, submitted by Mr. Arata, both an attorney and investor in the project. The application included such things as estimates, act of sale, business plan, contractor's agreement; the application also indicates that Seven Arts joined forces with Departure Studios to bring its expertise to New Orleans. The Act required that the State issue an initial certification letter upon receipt of a qualifying project application; one that the State considered had met certain minimum standards. Once the pre-certification letter is issued, the project goes forward; once it meets the minimum expenditure threshold, the applicant presents an audit to the State, which reviews the cost report to certify the credits.

On May 29, 2008, the State of Louisiana, Department of Economic Development, mailed to Michael Arata, as agent for Seven Arts Post, an Infrastructure Project Pre-Certification Letter concerning the 807 Esplanade film infrastructure project. The pre-certification letter states:

13

The purpose of this letter is to provide you with general guidelines based upon an initial application received from you for ultimate certification of expenses and receipt of tax credits, when earned, in accordance with statutory law. It does not constitute an assessment of the viability of the project nor does it constitute a belief that the amount claimed for the credit in your submittal ($9,000,000) will be spent in a manner resulting in receipt of tax credits as provided by law.

In the opinion of the Department of Economic Development (DED) and the Office of Entertainment Industries Development (OEID), as approved by the Louisiana Division of Administration (DOA), certain descriptions of the project outlined in your submission, dated October 10, 2007, referenced above as supplemented by additional information provided by you, appear to meet the criteria of an infrastructure project under the Louisiana Motion Picture Incentive Act. You may proceed as a "State-Certified Infrastructure Project" in the meaning of R.S. 47:6007(B)(12) as of the effective-date of the statute, July 1, 2005, provided that expenditures are made for "infrastructure" as provided by law and determined by the State.

Although your project appears to meet the criteria of a State-Certified Infrastructure Project, you should be aware that *the administrative rules implementing the procedures and guidelines on the tax credit program for state-certified infrastructure projects are in the process of promulgation in accordance with law.* Application of these rules will govern the expenditures that are qualifying "investment" and may ultimately limit or apportion the amount of your proposed investments that will qualify for the tax credits authorized by the Act. Subject to this limitation, to the extent that the actual expenditures are in conformance with the rules, then the expenditures for the infrastructure project you describe qualify for the following credits described in RS 47:6007C(2), as follows:

    (i) If the total base investment is greater than three hundred thousand dollars, each investor shall be allowed a tax credit of forty (40%) of the base investment made by that investor.

    (ii) Since the application was filed after August 1, 2007, the applicant shall have until December 31, 2008, to earn tax credits on this project, unless fifty (50%) percent of the total base investment provided for in this

pre-certification letter has been expended prior to December 31, 2008.   This project must expend at least $4,500,000 prior to December 31, 2008.

(iii) Before any tax credits can be certified and released, a minimum of twenty-five percent (25%) of the base investment shall be expended on infrastructure that is unique to film production.   $2,250,000 shall be expended on infrastructure that is unique to motion picture production or post production before any credits can be certified.   This does NOT include the purchase of land, pre-existing facilities or any other expenses that are not directly related to the creation of infrastructure specifically designed for motion picture production or post production.

(iv) No tax credits shall be earned on multiple-use facilities until the production or postproduction facility is complete.

As a general rule, "infrastructure" only includes the purchase, construction and use of tangible items in one location that are directly related to and utilized by motion picture production in Louisiana.   The burden of establishing the relationship between items that do not fit this definition will be on the project seeking certification of such items. . . .

In order to qualify for these credits, all funds invested must actually be expended on the state-certified infrastructure project with accounting certification in accordance with Departmental guidelines for the claimed expenditures included.   Again, as noted above, while your project indicates an anticipated total of $9,000,000, final certification and granting of tax credits under these provisions will be based on the following:   the actual amount expended by the project, verification in the form of an audit conducted by an independent Louisiana Certified Public Accountant that these expenditures were made and meet the requirements of applicable law, and approved by DED, OEID and DOA.

Additionally, the applicant hereby agrees to the following structured release of the credits.  *After the first disbursement (referenced in the chart as Year 1), the remaining credits will be eligible for release on or after the anniversary date of this pre-certification letter (as shown in the chart as Year's 2 et al):

15

| Project Costs | Credit Total | Building Renov/ Land (Credits) | Eqpt. (Credits) | Credit Spread | Year 1 | Year 2* | Year 3* | Year 4* |
|---|---|---|---|---|---|---|---|---|
| $9,000,000 | $3,600,000 | $3,800,000 ($1,520,000) | $5,200,000 ($2,080,000) | 4 years on bldg renov[.] and 2 years on equipment | $380,000 (b) $1,040,000 (e) TOTAL: $1,420,000 | $380,000(b) $1,040,000 (e) TOTAL: $1420,000 | $380,000 (b) TOTAL: $380,000 | $380,000 (b) TOTAL $380,000 |

   While the application in its present form appears to meet the statutory criteria of a film infrastructure project, the state of Louisiana has made no evaluation of the applicant's ability to successfully complete the project or actually make the proposed expenditures reflected in the application. As a result, this letter is not to be construed as an official endorsement of this project by the state of Louisiana.

   Upon receipt of the request for certification of expenditures and the audit, the Department of Economic Development, the Office of Entertainment Industry Development and the Louisiana Division of Administration reserves the right to request additional documentation to validate the claimed expenditures. This may include, without limitation, invoices, cancelled checks, bank records, etc.

   The authorized representatives of INF:0032 Seven Arts Post shall sign this letter where indicated below and return of the signed original to the Department of Economic Development, the Office of Entertainment Industry Development and the Louisiana Division of Administration.

   The terms of this letter apply exclusively to this infrastructure project numbered INF:0032.

Gov't Ex. 1. The pre-certification letter is signed by the Secretary of the Department of Economic Development, Stephen Moret; the Commissioner of the Division of Administration, Angele Davis; the Director of Film & TV Entertainment Industry Development; and accepted and agreed to by Michael Arata, agent for the project.

  Ultimately, three applications seeking tax credits were submitted by Seven Arts. Leading up to the first tax credit

16

application, Mr. Hoffman and Mr. Arata opened up bank accounts in the name of Damon Martin and Leo Duvernay. Damon Martin, a film post-production engineer who had worked with Mr. Hoffman previously doing post-production sound work for independent films, owned Departure Studios in Los Angeles where he owned and rented post-production equipment. Leo Duvernay, who had done contracting work for Mr. and Mrs. Hoffman, was the general contractor for the 807 Esplanade project. In early October 2008, money was circled in and out of the newly-opened accounts. To accomplish this, Mr. Arata took out a $400,000 loan through his business, LEAP Film Fund II, and placed it into the Seven Arts Pictures Louisiana (SAPLA) bank account. Seven Arts accountant Erik Smith was instructed to bounce the proceeds of this loan back and forth five times between the SAPLA account and the Damon Martin account, which made it appear as if Seven Arts had actually deposited $1,027,090 in Departure's account to pay for film equipment. With the same loan, a similar circling was done with the Duvernay account to make it appear as if Duvernay had been paid $1,499,257 for construction. The next day, the money was withdrawn to pay off Mr. Arata's loan. The government's theory is that this was accomplished to convince the auditors and the State that these independent Louisiana third-party vendors had actually been paid; the defense put on evidence that this was done for the purpose of (i) documenting a proper defeasance transaction as to Duvernay, or otherwise as part of a

17

prepay from the Advantage Capital escrow account set up for construction draws, and (ii) documenting a capital contribution of equipment as to Departure Studios/Damon Martin.

The SAPLA bank statement showed these transactions as both withdrawals and deposits. But the general ledger of SAPLA -- the building block of an audit -- reflected that the deposits were capital contributions from parent company Seven Arts Pictures, Inc. This made it appear to the auditors and the State that the parent company transferred money for equipment and construction into the SAPLA operating account that was then used to pay independent Louisiana third-party vendors.

In late October 2008, two months before the December 31, 2008 deadline to show $4,500,000 in expenditures pursuant to the pre-certification letter, Mr. Hoffman and Mr. Arata hired Katherine Dodge's auditing firm to conduct the audit as required by the pre-certification letter and the film tax credit law. Mr. Hoffman and Mr. Arata sent Ms. Dodge what they represented to be expenditures for film and construction, as well as confirmation of $7,415,000 in capital contributions from Seven Arts Pictures, Inc. to SAPLA. Ms. Dodge complained that she needed more information to do proper audit testing; Ms. Dodge requested bank confirmations showing the transfers from the parent company to SAPLA and then transfers from SAPLA to the equipment vendor and contractor. On December 8, 2008, Mr. Arata emailed Melissa Oelking at Regions Bank, copied Ms.

18

Dodge, and asked "[i]s there any chance of getting the original withdrawal slips and deposit slips for SAPL, LLC and Departure and Leo Duvernay? We got the copies you sent to us, but our auditor would like to see originals." The next day, the audit firm Ms. Dodge worked for withdrew from representing SAPLA.

The same day Dodge's firm withdrew, Mr. Hoffman and Mr. Arata contacted Katie Davis Kuchler of the Malcolm Dienes auditing firm. Mr. Hoffman and Mr. Arata sent Kuchler the SAPLA general ledger listing the same capital contributions, continued to represent that Martin and Duvernay had been paid as third parties from the capital contributions. They also sent her construction and equipment invoices and receipt confirmations of payment from Duvernay and Departure.

On February 26, 2009, Mr. Arata sent the first application to the State with the audited cost report. The audit listed $1,027,090 in equipment expenditures to Martin at Departure Studios and also listed $1,749,257 in construction expenditures to Leo Duvernay. The report also listed $3.7 million for the building, which was purchased for $1.7 million.[12] On June 19, 2009, the State paid out $1,132,480.80 in tax credits.

In July 2009, after being alerted that invoices were being fabricated by Mr. Hoffman, Mr. Arata decided to withdraw from his

---

[12] The remaining $2 million in the building cost was the construction loan provided on top of the purchase price by Advantage Capital. Kuchler was provided with the loan documents.

representation of Mr. Hoffman, and he terminated his relationship with Mr. Hoffman in connection with the 807 Esplanade project and others. Every witness that testified recalled that Mr. Arata left the project in 2009 and some could even pinpoint the summer of 2009. After consulting with an ethics attorney,[13] Mr. Arata sent Mr. Hoffman a letter on August 6, 2009 in which he officially resigned from the 807 Esplanade project; he also advised Mr. Hoffman as to the status of at least six other, ongoing matters.

Meanwhile, in November 2009, the project ran out of money and was boarded up for a few months. In preparation for the second tax credit submission, Mr. Hoffman decided to include as expenditures in the second Dienes audit various "wish list" items to see if they would be deemed acceptable expenditures. Mr. Hoffman sent an updated general ledger to Kuchler and also sent bank statements with corresponding invoices to justify expenditures for equipment from the United Kingdom, additional construction expenses, interest payments, legal fees, construction finance supervision, rent for office space provided to Duvernay, and management fees. The second cost report, audited by the Dienes firm, was submitted to the State on January 20, 2010 at Mr. Hoffman's direction.

---

[13] He was advised by an ethics attorney, Dane Ciolino, who testified at trial, that his professional obligations as an attorney allow that he may report "up but not out" any misconduct he learned during the course of a confidential relationship, and that Mr. Arata was ethically obliged to assist in the client's transition.

In late 2009 or early 2010, the State's forensic accountant, Michael Daigle, was asked by the State to audit 807 project submissions. After receiving some documents from Malcolm Dienes, Mr. Daigle, by letter to Mr. Hoffman dated January 29, 2010, requested additional documents. In response to Daigle's letter, on February 2, 2010, Mr. Hoffman FedEx'ed materials responsive to Mr. Daigle's inquiry, except that he did not include materials relating to the first audit, which Mr. Hoffman considered a closed matter that should not be reopened. In reviewing the first and second audited cost reports, Mr. Daigle found irregularities in claimed expenditures. This led the Malcolm Dienes firm to withdraw the first and second audit reports.

Seven Arts then retained a third auditor, Becky Hammond of Silva Gurtner & Abney, LLC, certified public accountants, to audit all expenditures originally claimed in the first and second audit reports and to generate a third audit report. The third audit report was sought to replace the two recalled Dienes audit reports (and, thus, to support previously issued certified tax credits), as well as to support additional tax credits earned by 807 Esplanade. In seeking additional tax credits by way of submissions to the third auditor, Mr. Hoffman continued to claim $7.4 million in capital contributions; that equipment had been purchased from a company in the United Kingdom; that Duvernay had been paid more than Ms. Hammond was able to confirm through payments Duvernay

actually received; that Susan Hoffman's company, Leeway Properties, received a $400,000 fee for her project management services; that Lou Sandoz received a $250,000 fee for construction finance supervision; that Duvernay was using certain office space rent-free; that interest had been paid on a $10 million inter-company loan; that he and Mr. Arata had been paid legal fees for work on the project; and that the project incurred 20 percent in developer's fees.

In performing the third audit, the Silva firm took what it considered to be a conservative approach in requiring strictly cash expenditures for inclusion in the cost report.[14]  After the Silva audit was issued in late June or early July 2012, the previously-issued tax credits were re-certified.  By letter dated August 13, 2012, Michael Daigle advised Chris Stelly of the Department of Economic Development and Lesia Warren of the Division of Administration:

> Based on a 40% tax credit provided by statute, the maximum allowable "qualifying expenditures" of $5,486,638.36 has earned tax credits of $2,194,655.34. I understand that LED previously issued tax credits of $1,232,480.80 related to these "qualifying expenditures", indicating that the applicant has earned $962,174.54 in additional tax credits.  However, LED has also issued tax credits to this applicant for film production credits based on other Dienes firm audit reports which have been recalled for material errors.  Unless and until the

---

[14] Although Mr. Silva's firm used this conservative approach, Mr. Silva himself described the program rules as "vague" and identified non-cash expenditures that would qualify for tax credits, such as the donation of property and interest expenses.

> applicant presents acceptable audit reports supporting
> these previously issued film production tax credit, I
> recommend that no action be taken to release any of the
> additional tax credits earned above.[15]

Gov't Ex. 453. Shortly thereafter on September 4, 2012, Stelly and

Warren wrote Peter Hoffman that, based on the replacement audit by

the Silva firm, "Please be advised that tax credits previously

disallowed for this project are hereby reinstated [and] are no

longer subject to . . . recapture."  Arata Ex. 147.

After being contacted by the FBI and State regulators, the

Silva firm withdrew its audit report, but later re-issued it; in

the re-issued audit, the Silva firm included a paragraph alerting

readers of the financial statement that accusations had been made,

but that those accusations regarding allowable costs were disputed

by management.  At trial, Michael Daigle testified that, based on

the most recent cost report he saw, his "best estimate of this

number right now is more like $4.2 million in qualifying

expenditures and tax credits of about $1.6 million" or "around $1.6

to $1.7 million in tax credits."  Daigle Tr. 131-32.  Thus, Mr.

Daigle agreed that, assuming the project had in effect an audited

cost report, the project had been issued less in tax credits than

the project ultimately had earned.

Meanwhile, the post-production film studio at 807 Esplanade

---

[15] Mr. Daigle concluded that sufficient work was ultimately
done and paid for, along with the $1.7 million purchase price of
the building, to certify the maximum amount of the cap at the time
he completed his review.

Avenue was completed in June 2012 and it is an up-and-running facility serving the film industry.

   E.   Criminal Charges and Trial

   In a second superseding indictment, the government charged Peter and Susan Hoffman and Michael Arata with participating in a tax credit fraud scheme; each was charged with wire fraud, mail fraud, conspiracy, aiding and abetting, and, Mr. Arata alone was also charged with making false statements to federal agents.  These charges stemmed from the film infrastructure tax credit project in which the defendants through a company called Seven Arts applied for and received film infrastructure tax credits[16] as part of their participation in what the trial revealed to be a murky (and haphazardly-administered) State infrastructure tax credit regime. Ultimately, the film infrastructure project, a dilapidated building at 807 Esplanade Avenue in New Orleans, was transformed into a post-production film studio.

   At the conclusion of an 11-day jury trial, Peter Hoffman was convicted on all 21 charges against him: conspiracy to commit mail

---

   [16] On June 19, 2009, the State paid out $1,132,480.80 in tax credits based on Seven Arts' February 26, 2009 application; this application included $1,027,090 for equipment from Departure Studios and $1,749,257 for payments for construction to Leo Duvernay.  That application represented that Seven Arts had over $4,500,000 in expenditures by the December 31, 2008 deadline.  The email transmitting the first audit to the State represented: "As you can see, the project has exceeded the 50% requirement for spending, and has surpassed the 25% requirement related to 'film production infrastructure' expenditures."

and wire fraud, in violation of 18 U.S.C. § 371 (Count 1); wire fraud, in violation of 18 U.S.C. § 1343 (Counts 2 through 20); and mail fraud, in violation of 18 U.S.C. § 1341 (Count 21).  Michael Arata was convicted of a total of 13 charges:  conspiracy to commit mail and wire fraud (Count 1); seven substantive wire fraud counts (Counts 2, 3, 4, 5, 6, 7 and 13); mail fraud (Count 21); and false statements, in violation of 18 U.S.C. § 1001 (Counts 22, 23, 24, and 25).  Michael Arata was acquitted of 12 wire fraud charges in Counts 8, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, and 20.  Finally, Susan Hoffman was convicted of conspiracy (Count 1), wire fraud (Count 11), and mail fraud (Count 21), but she was acquitted of 14 wire fraud charges in Counts 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, and 20.  Each of the defendants now challenge the guilty verdicts on the ground that the evidence was insufficient to convict; in the alternative, each defendant urges the Court to grant a new trial due to prosecutorial misconduct or because the evidence preponderates heavily against the guilty verdicts.

I.

A.

Rule 29 of the Federal Rules of Criminal Procedure governs motions for judgment of acquittal.  Such motions "challenge the sufficiency of the evidence to convict."  United States v. Hope, 487 F.3d 224, 227 (5th Cir. 2007)(quoting United States v. Lucio, 428 F.3d 519, 522 (5th Cir. 2005)).  Rule 29 obliges the Court to "enter a judgment of acquittal of any offense for which the

25

evidence is insufficient to sustain a conviction" either on its own, or on the defendant's motion at the close of the government's evidence; the Court may reserve decision on the defendant's motion after the jury returns a verdict.  Fed. R. Crim. P. 29(a), (b). After the jury verdict, a defendant may move for, or renew, a motion for judgment of acquittal.  Fed. R. Crim. P. 29(c).  If the Court enters a judgment of acquittal, the Court "must also conditionally determine whether any motion for new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29(d)(1).[17]

Rule 29 relief actualizes the Due Process Clause of the Fourteenth Amendment, which forbids conviction "'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged.'"  See Jackson v. Virginia, 443 U.S. 307, 315 (1979)(citation omitted); see also In re Winship, 397 U.S. 358, 363 (1970)("The [reasonable doubt] standard provides concrete substance for the presumption of innocence -- that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'").  Jackson v. Virginia fashioned the standard applicable to a defendant's challenge to the sufficiency of the

---

[17] If a judgment of acquittal is entered, the Court applies Rule 33's more expansive "interest of justice" standard -- summarized infra -- in conditionally determining whether a new trial should be granted.

evidence:

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

443 U.S. 307, 318-19 and 319 n.13 (1979)(noting that "this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilty beyond a reasonable doubt'"; importantly, this "standard . . . does not permit a court to make its own subjective determination of guilt or innocence"; this "criterion . . . impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law.")(citation omitted, emphasis in original); <u>see also</u> <u>United States v. Vargas-Ocampo</u>, 747 F.3d 299, 301 (5th Cir. 2014)(*en banc*)(citing <u>Jackson</u>, 443 U.S. at 319);[18] <u>see also</u> <u>United</u>

---

[18] In <u>Vargas-Ocampo</u>, the Fifth Circuit abandoned as "ambiguous" the equipoise rule in favor of <u>Jackson</u>'s "deferential" and "straightforward" rule. <u>Id.</u> at 301-02. The equipoise rule stated that the Court "must reverse a conviction if the evidence construed in favor of the verdict 'gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged.'" <u>Id.</u> (citing <u>United States v. Jaramillo</u>, 42 F.3d 920, 923 (5th Cir. 1995)(citations omitted)). In abandoning the equipoise formulation, the Fifth Circuit underscored that:

> [W]e do not render the <u>Jackson</u> standard toothless. On the contrary, courts remain empowered to consider, for instance, whether the inferences drawn by a jury were rational, as opposed to being speculative or insupportable, and whether the evidence is sufficient to establish every element of the crime.

<u>Id.</u> at 302 (citation omitted). That the equipoise formula was abandoned is of some consequence in this case, where the evidence on the defendants' intent as to certain fraud charges gives equal

States v. Uvalle-Patricio, 478 F.3d 699, 701 (5th Cir. 2007)("the evidence presented must allow the jury 'to find every element of the offense beyond a reasonable doubt.'")(citation omitted).  The Court determines "only whether the jury made a rational decision, not whether its verdict was correct on the issue of guilt or innocence."  See United States v. Dean, 59 F.3d 1479, 1484 (5th Cir. 1995)(citation omitted); see also United States v. Isgar, 739 F.3d 829, 835 (5th Cir. 2014)(citation omitted).  In assessing rationality, the Court considers all evidence, all reasonable inferences drawn therefrom, and all credibility determinations in the light most favorable to the prosecution.  United States v. Ramos-Cardenas, 524 F.3d 600, 605 (5th Cir. 2008); United States v. Loe, 262 F.3d 427, 432 (5th Cir. 2001)(The jury "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of witnesses.").[19]

Notwithstanding this deferential, insulating standard, the Fifth Circuit instructs the Court to "consider the countervailing evidence as well as the evidence that supports the verdict" and credit "only 'reasonable inferences from the evidence[.]'"  See United States v. Moreland, 665 F.3d 137, 149 (5th Cir. 2011) (The

_____

or nearly equal circumstantial support to a theory of guilt and a theory of innocence.

[19] The same test applies whether the government's case depends on direct or circumstantial evidence.  United States v. Thomas, 627 F.3d 146, 151 (5th Cir. 2010)(citation omitted).

28

Court "cannot 'credit inferences within the realm of possibility when those inferences are unreasonable[.]'")(citations omitted); but see United States v. Mendoza, 522 F.3d 482, 488 (5th Cir. 2008)("The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence."). The Court also scrutinizes the verdict to ensure that it is not based "on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." Moreland, 665 F.3d at 149 (quoting United States v. Rojas Alvarez, 451 F.3d 320, 333 (5th Cir. 2006)). Nevertheless, "[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." United States v. Vasquez, 677 F.3d 685, 692 (5th Cir. 2012)(citations, emphasis omitted). Simply put, although not so simply applied in a case like this, the "verdict must be upheld . . . if the fact finder was presented with sufficient evidence to support the verdict reached." Lucio, 428 F.3d at 522.

*B.*

Whether the evidence was sufficient to convict is assessed by reference to the substantive elements of the applicable criminal offenses. Moreland, 665 F.3d at 149 (citing Jackson, 443 U.S. at

29

324 n.16)).  To place the defendants' sufficiency-of-the-evidence challenges in context, the Court here summarizes, but does not reproduce in full, the essential elements of each count of conviction as it did in its instructions to the jury.[20]

1.  Conspiracy, 18 U.S.C. § 371

To find the defendants guilty of Count 1, conspiracy in violation of 18 U.S.C. § 371, the government had to prove the following beyond a reasonable doubt:

> *First*:  that the defendant and at least one other person made an agreement to commit the crimes of mail fraud and wire fraud, as charged in the indictment;
> *Second*:  that the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and
> *Third*:  that one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy.
> One may become a member of a conspiracy without knowing all the details of the unlawful scheme or the identities of all the other alleged conspirators.  If a defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to convict him or her for conspiracy even though the defendant had not participated before and even though the defendant played only a minor part.
> The government need not prove that the alleged conspirators entered into any formal agreement, nor that they directly stated between themselves all the details of the scheme.  Similarly, the government need not prove that all of the details of the scheme alleged in the indictment were actually agreed upon or carried out.  Nor

_____

[20] The Court does not now reproduce in their entirety the jury instructions, but, rather, merely references the essential elements.  The Court assumes familiarity with the intricacies of the law as articulated in the complete jury instructions of record.

must it prove that all of the persons alleged to have been members of the conspiracy were such, or that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.[21]


2.  Wire Fraud, 18 U.S.C. § 1343

Section 1343 makes it a crime for anyone to use interstate or foreign wire communications in carrying out a scheme to defraud. For [the jury] to find one or more of the defendants guilty of this crime, [the jury] must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First*:  that a defendant knowingly devised or intended to devise any scheme to defraud, that is by submitting and causing to be submitted materially false, misleading and fraudulent information to the auditors or to the state of Louisiana for the purpose of obtaining film infrastructure tax credits relative to 807 Esplanade;

*Second*:  that the scheme to defraud employed false material representations;

*Third*:  that a defendant transmitted or caused to be transmitted by way of wire communications, in interstate or foreign commerce, any writing or picture for the purpose of executing such scheme; and

---

[21]  The Court also instructed the jury on a conspirator's liability for substantive counts:

A conspirator is responsible for offenses committed by another conspirator if the conspirator was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of, or as a foreseeable consequence of, the conspiracy.

Therefore, if you have first found a defendant guilty of the conspiracy charged in Count 1 and if you find beyond a reasonable doubt that during the time a defendant was a member of the conspiracy, other conspirators committed the offenses in Counts 2 through 21 in furtherance of and as a foreseeable consequence of that conspiracy, then you may find that defendant guilty of Counts 2 through 21, even though the defendant may not have participated in any of the acts which constitute the offenses described in Counts 2 through 21.

*Fourth*:  that a defendant acted with a specific intent to defraud.

A "scheme to defraud" means any plan, pattern, or course of action intended to deprive another of money or property.

A "specific intent to defraud" means a conscious, knowing intent to deceive or cheat someone. A representation is "false" if it is known to be untrue or is made with reckless indifference as to its truth or falsity.  A representation would also be "false" if it constitutes a half truth, or effectively omits or conceals a material fact, provided it is made with intent to defraud.

A representation is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of the person or entity to which it is addressed.[22]

3.  Mail Fraud, 18 U.S.C. § 1341

Section 1341 makes it a crime for anyone to use the mails or any private or commercial interstate carrier in carrying out a scheme to defraud.  For you to find one or more of the defendants guilty of this crime, you must be

---

[22] The jury instructions continued:

...

It is also not necessary that the government prove that the material transmitted by wire communications was itself false or fraudulent, or that the use of the interstate or foreign wire communications facilities was intended as the specific or exclusive means of accomplishing the alleged fraud.  What must be proved beyond a reasonable doubt is that the use of the interstate or foreign wire communications facilities was closely related to the scheme because a defendant either wired something or caused it to be wired in interstate or foreign commerce in an attempt to execute or carry out the scheme.

The alleged scheme need not actually succeed in defrauding anyone.

Each separate use of the interstate or foreign wire communications facilities in furtherance of a scheme to defraud by means of false or fraudulent pretenses, representations, or promises constitutes a separate offense.

convinced beyond a reasonable doubt:

*First*:  that a defendant knowingly devised or intended to devise a scheme to defraud, that is by submitting and causing to be submitted materially false, misleading and fraudulent information to the auditors or to the state of Louisiana for the purpose of obtaining film infrastructure tax credits relative to 807 Esplanade;

*Second*:  that the scheme to defraud employed false material representations;

*Third*:  that a defendant mailed something or caused something to be sent through a private or commercial interstate carrier for the purpose of executing such scheme or attempting so to do; and

*Fourth*:  that a defendant acted with a specific intent to defraud.


4.  Aiding and Abetting, 18 U.S.C. § 2

Because Counts 2 through 21 charged the defendants with a violation of 18 U.S.C. § 2, the jury was also instructed on aiding and abetting:

This provision makes it a crime for anyone to "aid and abet" the commission of an offense against the United States.  Thus, in addition to being charged with actually committing the wire fraud and mail fraud violations in Counts 2 through 21, the defendants identified in those counts are also charged with aiding and abetting these violations.

The guilt of a defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged.  The law recognizes that, ordinarily, anything a person can do for himself may also be accomplished by him through the direction of another person as his or her agent, or by acting in concert with, or under the direction of, another person or persons in a joint effort or enterprise.

If another person is acting under the direction of the defendant or if the defendant joins another person and performs acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conduct of such other persons just as though the defendant had committed the acts or engaged in such

33

conduct.

Before any defendant may be held criminally responsible for the acts of others, it is necessary that the accused deliberately associate himself or herself in some way with the crime and participate in it with the intent to bring about the crime.

Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

In other words, you may not find any defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons, and that the defendant voluntarily participated in its commission with the intent to violate the law.

For you to find a defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

> *First*:    that some person committed the underlying offenses of wire or mail fraud charged in Counts 2 through 21;
>
> *Second*:    that the defendant associated with the criminal venture;
>
> *Third*:    that the defendant purposefully participated in the criminal venture; and
>
> *Fourth*:    that the defendant sought by action to make that venture successful.

5.  False Statements, 18 U.S.C. § 1001

Finally, the jury was instructed on the law to apply to the false statement charges against Michael Arata:

In Counts 22 through 25 of the indictment, Michael Arata only is charged with making false statements to a special agent of the FBI.  Title 18, United States Code, Section 1001, makes it a crime for anyone to knowingly and willfully make a false or fraudulent statement in any matter within the jurisdiction of the executive, legislative, or judicial branch of the government of the United States.

For you to find Mr. Arata guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

> *First*:      that the defendant made a false statement to the FBI regarding a matter within its jurisdiction;
>
> *Second*:   that the defendant made the statement intentionally, knowing that it was false;
>
> *Third*:     that the statement was material; and
>
> *Fourth*:    that the defendant made the false statement for the purpose of misleading the FBI.

...

A statement is material if it has a natural tendency to influence, or is capable of influencing, a decision of the FBI.

It is not necessary to show that the FBI was in fact misled.

The word "willfully" means that the defendant committed the act voluntarily and purposely, and with knowledge that his conduct was, in a general sense, unlawful. That is, the defendant must have acted with a bad purpose to disobey or disregard the law.

II.

Each defendant moved for a judgment of acquittal at the close of the government's evidence, after the close of all the evidence,[23] and, now, after the judgment. In the alternative to the Rule 29 post-judgment acquittal motions, each defendant also moves for a new trial pursuant to Rule 33.[24] The Court first takes up the post-verdict motions for judgments of acquittal.

---

[23] The Court reserved decision on the defendants' motions for judgment of acquittal advanced after the close of the government's evidence and, again, after the submission of all evidence.

[24] As previously noted, if the Court enters a judgment of acquittal, the Court "must also conditionally determine whether any motion for new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Civ. P. 29(d)(1). Rule 33 applies to the conditional new trial determination.

A.    *Interstate Commerce* (Counts 2, 4, and 7)

Mr. Hoffman and Mr. Arata contend that the government failed to prove beyond a reasonable doubt that emails forming the basis of certain wire fraud convictions crossed state lines.  To prove wire fraud, the government must prove: (1) a scheme or artifice to defraud; (2) material falsehoods; and (3) the use of interstate wires in furtherance of the scheme.  United States v. Brooks, 681 F.3d 678, 700 (5th Cir. 2012).  As to the interstate requirement, this Court instructed the jury, "If you conclude that the government has proven that emails sent or caused to be sent by the defendants crossed state lines during their transmissions, then you may also conclude that the defendants transmitted or caused to be transmitted wire communications in interstate commerce even if the sender and receiver of the emails were in the same state."

Count 2.  Count 2 of the second superseding indictment charges Mr. Arata and Mr. Hoffman with wire fraud for Mr. Arata's sending an email to Malcolm Dienes auditors Katie Kuchler Davis and Steve Turner that included a certification for $2,002,480 in construction costs.  Both Mr. Arata and the auditors were located in the State of Louisiana; thus, absent evidence beyond a reasonable doubt that the email in question traveled an interstate path to reach its intrastate destination, this wire communication cannot support federal wire fraud convictions.  In an attempt to show that Mr. Arata's email left the State, the government called a paralegal

employed by Yahoo!, Mr. Arata's email carrier.  Ms. Hoyt's unhelpful brief testimony on direct examination by the government is telling:

> Q: Good afternoon, Ms. Hoyt.  My name is Dall Kammer.  I would like just to ask you a couple questions.  Who do you work for?
>
> A: Yahoo.
>
> Q: How long have you worked for Yahoo?
>
> A: 3 ½ years
>
> Q: What does Yahoo do?
>
> A:  It's an Internet company that has products and services such as mail, messenger, search, and other kinds of products and services, like Flickr.
>
> Q: Email?
>
> A: Yes.
>
> Q: Between 2008 and the present, did Yahoo have any email servers in the State of Louisiana?
>
> A: No.
>
> Q: One other question or two more questions.  The domain name michaelarata.com, is that a Yahoo business address?
>
> A: It's a domain that Yahoo has hosted.
>
> Q: If somebody in Louisiana–if Yahoo does not have a server in the State of Louisiana during that time period we talked about, if there's a resident in Louisiana that sends an email–that's a Yahoo client, sends an email from their Yahoo account in Louisiana to somebody else in Louisiana, does that email have to go out of the state in order to be transmitted?
>
> A: Yes.
>
> Q: Can you explain why that is?

37

A: No, I can't explain it.

Q: Does it have to go through the server and back?

A: Yes.   It's just that I'm a paralegal custodian of records.   You are asking me some technical question that I can't provide.

Q: Yes ma'am I understand.   No further questions, Your Honor.

Hoyt Tr. 1-2.  On cross examination, Hoyt repeatedly stated that she did not know whether an email sent from a Yahoo user in Louisiana to a non-Yahoo user in Louisiana would have to travel through an out-of-state server.  Hoyt Tr. 3.  She stated that she did not know whether heavy Internet traffic would divert an email from an interstate route.  Hoyt Tr. 4.  She stated that she did not understand dynamic routing or other technical features of Internet communications.  Hoyt Tr. 6-7.  The evidence the government put forth was plainly insufficient to support a finding that the email traveled interstate.[25]

The single question from the jury during deliberations concerned the interstate commerce requirement.  They wrote to the

_____

[25] But see United States v. Siembida, 604 F. Supp. 2d 589, 596-97 (S.D.N.Y. 2008) aff'd sub nom. United States v. Price, 374 F. App'x 189 (2d Cir. 2010) (finding sufficient evidence that an email to and from persons in New York passed in interstate commerce where it was stipulated that a Time Warner Cable engineer who was familiar with the email system would testify that: (i) the servers were located in Pennsylvania; (ii) any email sent via the defendant's email address would have been routed through Pennsylvania; and (iii) the engineer examined an email sent by the defendant four days after the email at issue and concluded that the defendant had configured his email system to route through the Pennsylvania servers).

Court, "Have they every [sic] had a [sic] internet server in Louisiana?  Like Yahoo[?]  If so what year?"  The Court responded, "All the evidence that was admitted during trial is now before you for your consideration.  Your verdict must be based solely and only on the evidence and my instructions on the law, and nothing more. Thank you."  The jury, seemingly unsure whether any email necessarily had to leave the State, nonetheless found that the government offered evidence that proved beyond a reasonable doubt that the email from Mr. Arata in Louisiana to auditors in Louisiana crossed state lines.  The guilty verdicts on Count 2 cannot stand.

The government, in response to a challenge to its evidence, submits that the defendants knew Ms. Hoyt would be testifying on behalf of Yahoo, knew that she did not have technical expertise, and yet failed to offer a countervailing expert who could show that the email traveled through a server in Louisiana.  This incendiary and petulant suggestion as to how the defendants could have strengthened their case fundamentally perverts the American criminal justice system and would destroy the very foundation of constitutional due process.  This Court reminded the jury throughout the trial, and the government is reminded now, that the defense has no burden to disprove guilt; the burden rests entirely with the government to prove each element of each offense beyond a reasonable doubt.  That the government resorts to an attempt to shift the burden of proof to the defense further underscores the

insufficiency of their evidence as to Count 2.  A judgment of acquittal must be entered.

Counts 4 and 7.  Mr. Hoffman and Mr. Arata submit that Counts 4 and 7 fail to satisfy the interstate commerce requirement as well because they are emails from Mr. Arata in Louisiana to Stelly (and Kuchler in Count 7) in Louisiana, and, out-of-state, Mr. Hoffman is merely copied on the emails.  The parties stipulated at trial that the servers for @7artspictures.com, Mr. Hoffman's email domain, were located in California and the United Kingdom at all times. The only evidence that the government offered to support its charge that these emails sending materials to the State of Louisiana left the State was thus: (i) the testimony of Ms. Hoyt that emails from and to intrastate persons *may* leave the State; and (ii) the stipulation that the Seven Arts servers were located out of state. The jury was presented with no evidence as to the locations of the State's and Malcolm Dienes's servers and with no evidence as to how an email to two different email addresses on two different domains travels.  Does the email in its entirety travel to an out-of-state server to reach its intrastate and interstate destinations?  Or does the communication split to take two separate paths: one intrastate to Stelly (and Kuchler) in Louisiana and another interstate to Peter Hoffman in California?  Unfortunately, the law has not kept up with technology, and the Court has before it no instructive case literature on the subject at hand.  The Court,

much like the jury, is left only to guess whether the transmissions to Stelly and Kuchler left the State of Louisiana on their way to them.  To find that they did with the information available would require not just impermissibly "piling inference upon inference," but fabricating pivotal factual conclusions from whole cloth. Unbridled conjecture cannot support guilty verdicts.

The government, in an effort to save these counts from their jurisdictional defects, contends that Mr. Arata's communication to Mr. Hoffman was in and of itself in furtherance of the scheme to defraud.  But in Count 4, Mr. Arata and Mr. Hoffman are charged with sending to the State the first application for tax credits and the supporting documents.  The submission includes the Malcolm Dienes report and a letter from Mr. Hoffman himself.  In Count 7, they are charged with sending to the State invoices and vendor payment certifications for the $2 million in construction and $1 million in film equipment.  This Court cannot fathom how sending to Mr. Hoffman documents that he already had in his possession (and that he had helped to prepare) could somehow further the scheme, and no such evidence was presented at trial.  See United States v. Evans, 148 F.3d 477, 483 (5th Cir. 1998)(distinguishing communications that were "for the purpose of executing the scheme" from those that were "entirely incidental to the scheme").  The Court must enter judgments of acquittal on Counts 4 and 7.

 **_B._**    _In Furtherance of Scheme to Defraud?_ (Wire Fraud Count 3)

 Count 3.   In Count 3, Mr. Hoffman and Mr. Arata are charged
with wire fraud for an email on February 25, 2009, from Mr. Arata
to Mr. Hoffman, attaching the General Ledger of Seven Arts Pictures
Louisiana, LLC, a document that Mr. Hoffman already had (and
undoubtedly helped to prepare as it is SAPLA's General Ledger).
Mr. Arata writes, "Peter, This is what was sent to them [Malcolm
Dienes].  We should go through this carefully and make sure they
are capturing all of the expenses."  In an email several weeks
earlier, Mr. Arata had indeed sent the same General Ledger to
Kuchler and copied Mr. Hoffman.  See Gov't Ex. 88.  There is thus
no doubt that Mr. Hoffman already had the General Ledger before
this February 25, 2009, email and that he already knew that it had
been sent to the Malcolm Dienes firm.  By the time of the February
25 email, the audit was complete, and the first film infrastructure
tax credit application was submitted to the State the following
day.  The government offered no evidence as to how an email from
Mr. Arata to Mr. Hoffman sending for his review a document he
already had was sent for the purpose of furthering the scheme to
defraud.  In opposition to the motions for judgment of acquittal,
the government offers the conclusory statement that "[t]his wiring
was for the purpose of executing the scheme in that Arata provided
Hoffman a copy of the Seven Arts general ledger that Arata had
given Davis," adding that the General Ledger contained the

42

Departure and Duvernay payments that form the basis of several wire fraud counts. But Mr. Hoffman already had the ledger and was no doubt familiar with its purpose and thus sending it to him again in no way sought to further the scheme. No rational juror could have found that there was sufficient evidence to support guilty verdicts on Count 3.

### _C._   _Legal Fees_ (Wire Fraud Counts 5 and 13; False Statement Counts 22 and 23)

It is clear from the evidence at trial that Mr. Arata, an attorney, spent many hours working on the 807 Esplanade project. Likewise, Mr. Hoffman, a tax attorney, spent many hours on the project. Mr. Hoffman's inclusion of legal fees for this work resulted in two guilty verdicts for himself and four guilty verdicts for Mr. Arata: (i) in Count 5, Mr. Arata and Mr. Hoffman are found guilty of wire fraud for Mr. Arata's sending to Kuchler and Mr. Hoffman, copying Jerry Daigle, an amended SAFELA Operating Agreement that was allegedly sent to justify the inclusion of fabricated legal fees; (ii) in Count 13, Mr. Arata and Mr. Hoffman are found guilty of wire fraud for an email sent by Seven Arts employee Marcia Matthew to Kuchler, copying Mr. Hoffman, in which she attaches invoices for legal work provided by Mr. Hoffman and Mr. Arata; (iii) in Count 23, Mr. Arata is found guilty of giving a false statement to the FBI when he said that he "was not aware" that the legal fees were submitted to the State in the 2010 tax

credit application; and (iv) in Count 22, Mr. Arata is found guilty of giving a false statement to the FBI when he said that he "terminated his relationship with defendant Peter Hoffman in or about July 2009" in large part because of the subsequent legal fees communications.

Counts 5 and 13. On December 21, 2009, Marcia Matthew sent Kuchler an email with several attachments, including invoices for legal work performed by Mr. Hoffman and Mr. Arata.[26] This email is the subject of Count 13. An invoice dated November 25, 2008 stated that Mr. Arata worked 425 hours and Mr. Hoffman worked 177.8 hours; a second dated April 20, 2009 stated that Mr. Arata worked 75.5 hours and Mr. Hoffman worked 34.97 hours; and a third dated June 30, 2009 stated that Mr. Arata worked 240 hours and Mr. Hoffman worked 212.8 hours totaling, among the three, just over $350,000: 740.5 hours at a rate of $275 per hour, or $203,637.50, for Mr. Arata; and 425.57 hours at a rate of $350 per hour, or $148,949.50, for Mr. Hoffman.[27] The invoices were from SAFELA billing SAPLA. That same day, December 21, Stephanie Dillon, who worked at Seven

_____

[26] Also attached to this email is a Seven Arts Filmed Entertainment Louisiana LLC Limited Liability Operating Agreement, a Loan and Security Agreement between New Moon Pictures, LLC (as lender) Seven Arts Pictures Louisiana LLC (as debtor), and as Exhibit A to the Loan and Security Agreement a spreadsheet entitled SAFE LOUISIANA Interest calculation based on actual draws.

[27] Count 23 charging Mr. Arata for giving a false statement to the FBI about the legal fees states the relevant figure as $350,000. Agent Blythe testified that he was confused about the dollar amount.

Arts Pictures in Los Angeles, emailed to Mr. Arata an invoice for 807 Esplanade legal fees. Arata Ex. 121.   Six minutes after receiving the invoice, Mr. Arata forwarded it to Jerry Daigle and wrote, "He wants to submit this for tax credits. Ha!"  Arata Ex. 121.   Daigle joked back, "It's a nice round number ... like all legal fees!"  Arata Ex. 123.  Mr. Arata responded, "And since I was not his lawyer for the deal, it makes it even better.   What he could submit and what is actual are the bills he got from Guy Smith, even the Jones Walker bills.  But instead, he claims to he [sic] a Louisiana lawyer and puts me down as receiving $150K in fees!  Love it.   Is there any way that I let this go through?" Daigle suggested, "Maybe you should respond with the suggestion of including Guy Smith and Jones Walker rather than you?"   And finally, Mr. Arata wrote, "Good call!"  Arata Ex. 123.

In the course of auditing these invoices, Kuchler emailed Mr. Hoffman and Ms. Matthew on December 28, 2009, seeking "third party verification" and asked whether Mr. Hoffman and Mr. Arata were paid the hours billed.  Mr. Hoffman answered that "[t]he company was paid, not us. We both have equity in the company."  Gov't Ex. 123. Kuchler then reached out to Mr. Arata to corroborate that Mr. Arata worked the hours reflected on the invoices; she emailed Mr. Arata a copy of the invoices on December 28, 2010, asking whether he "approve[s] the hours on those invoices for Seven Arts?"   In response, Mr. Arata jokes about how the invoices contain a city

45

called New Orleans, California.  Gov't. Ex. 121.

Kuchler testified that she called Mr. Arata at some point, and he told her that he did provide many more than 740.5 hours of legal work on the 807 Esplanade project, but that he was never paid for that work.  Her billing entries confirm that on January 6, she "met with Michael to go over attorney fees."  Arata Ex. 1.  Kuchler then wrote to Mr. Hoffman the next day on January 7, 2010: "Michael stated that he did not receive the money for which you are billing a company he has no interest in, so I am taking out his hours and fees of $203,637.50."[28]  Gov't Ex. 135.  Mr. Hoffman responds to her email:

> Michael did not receive this money because he is an equity owner as I thought he proved to you.  He acknowledges that the value for his services is the increase in value of his equity in the project, which is what he told me he told you.  He will confirm that and this also can be included in the rep letter.  Please reconsider.

Kuchler testified that *Mr. Hoffman* told her that cash was paid to SAFELA for the fees.  She stated at trial, "So the cash was paid to a related entity that first Michael said he didn't have an equity interest in and then I got a document that showed he did have an

---

[28] Through its witnesses and evidence, the government offered two alternative theories as to how an alleged scheme to defraud regarding the legal fees was accomplished.  Kuchler gave two versions of how Mr. Arata was supposedly paid for his work: either cash was paid to SAFELA, and Mr. Arata had an interest in that company, and thus it was as if he himself had been paid; or, no cash was paid to anyone, and Mr. Arata was granted an interest in SAFELA in exchange for the work he had done.  The government presented no evidence as to the payment scheme.

equity interest in, and he confirmed that he did have an equity interest in that company." Kuchler Tr. 62.

On January 8, 2010, Mr. Hoffman, in response to Kuchler's statement that she would be removing the $203,637.50 in legal fees paid to Mr. Arata, wrote, "Michael will be here momentarily. He told me he had sent you a note as well as a copy of the SAFELA operating agreement reflecting Voodoo's interest."[29] Gov't Ex. 137. Kuchler responded:

> Michael did not send me a note.  He send [sic] me the operating agreement for the company he does have interest in, not in the company that was invoiced.  I told you what he said.  He does NOT agree with the invoices produced by Marcia from the company that he stated he has no equity in.

Mr. Hoffman replied,

> Michael told me the exact opposite yesterday.  We will call and write to you together to eliminate the confusion caused by him.  We had four conversations yesterday, confirmed with Jerry Daigle and made me revise the SAFELA operating agreement twice to their benefit, just so you understand my dizziness.

Kuchler responds, "I understand your dizziness all right!  I don't understand why he would tell me one thing and you another.  I did not receive those docs.  Once, [sic] I get, that is fine.  We will include the legal fees."  The conversation then shifts to other topics.

Five days later on January 12, 2010, Kuchler had a

---

[29] To be clear, there are two email chains between Kuchler and Mr. Hoffman that begin with her saying she will exclude the legal fees because Mr. Arata said he did not receive payment.

conversation with Mr. Arata, his Voodoo Studios business partner Jerry Daigle, and Mr. Hoffman "concerning SAFELA's amended operating agreement and members of the company." Arata Ex. 1. Mr. Arata then emails her that amended operating agreement, which is amended to add Voodoo's ownership interest, writing, "As we mentioned on the phone, attached is the executed SAFELA Operating Agreement evidencing Voodoo's 40% interest in this entity. We hope this helps you and Peter wrap up the SAPL audit." This email is the subject of Count 5. Jerry Daigle, Mr. Arata's partner in Voodoo, was copied on this email. He testified at trial as to why Kuchler was sent the SAFELA operating agreement: Voodoo Studios already had a 40% interest in SAPLA, but SAFELA was to be the entity that would operate the facility, so "for Voodoo to get the same economics it had been promised by Seven Arts, it needed to have the same ownership interest in SAFELA as it had in SAPLA." Daigle Tr. 30. He testified that that was the subject matter of the January 12, 2010, phone call with Kuchler; legal fees were never mentioned. Mr. Daigle explained that "Ms. Kuchler was trying to determine who were all the related parties in the Seven Arts Pictures Louisiana transaction. And she just wanted to know the ownership of the companies and the structure." Daigle Tr. 16. Notably, it is undisputed that the auditor needs to be advised as to related parties and must include, in the Notes to the Cost Report, a description of all related party transactions.

48

The government contends that, contrary to Jerry Daigle's testimony, which is supported by other record evidence,[30] Mr. Arata

_____

[30] Jerry Daigle's explanation as to why Kuchler was sent the *amended* SAFELA operating agreement is corroborated by other evidence at trial.  Mr. Arata transmitted operating agreements to auditors, and was consulted in his capacity as a member of Voodoo, which had an ownership interest in the project, on more than one occasion.  For example, during this same time period on December 31, 2009, Mr. Arata, by email, sent the SAPLA operating agreement to Kuchler, copying Jerry Daigle,  stating:

> I am attaching the following:
>
> Copy of the Operating Agreement of Seven Arts Pictures Louisiana showing the ownership of Voodoo Studios, LLC as 40% of that entity.
>
> Certificate of Ownership setting forth evidence of the various ownership interests in Voodoo Studios, LLC.

Arata Ex. 164.  Mr. Daigle testified that he was not aware that transmission of this operating agreement had anything to do with legal fees; rather, it was Daigle's understanding that Kuchler needed both the SAPLA operating agreement as well as the amended SAFELA operating agreement "[s]o that she could have that information for related parties." Daigle Tr. 20.  Also around this same time, on January 7, 2010, Mr. Hoffman sent Mr. Arata (in his capacity as member of Voodoo) a request that he "countersign for Voodoo and send this on to Katie Kuchler" apparently relating to work other attorneys were performing in order to structure the project to qualify for a different type of tax credits, historical tax credits.  Mr. Arata replied that he would sign a corrected version once his suggested changes are made to the circulated agreement and once Mr. Hoffman explains the structure of the proposed transaction.  Mr. Hoffman responded to Mr. Arata:

> Linda is sending it back now.  SAPLA will enter into a lease agreement with a new LLC call 807 Esplanade Avenue MT LLC in which the tax credit investors will invest. That LLC will enter into an operating lease with SAFE LA for the operation of the facility.  Nixon Peabody has drafted the first lease and Claire Durio is drafting the operating lease (which may not yet be circulated). I'll have Claire send copies of both to you.

sent the SAFELA operating agreement to support Mr. Hoffman's claim that he was paid in some way for his legal work.  In support, the government relies on two pieces of evidence: Kuchler's testimony that she believes that is why she received the operating agreement, and an email from Mr. Hoffman to Mr. Arata on January 12, 2010, in which he says, "I just talked to Jerry who said everything is ok. Please send the email to Katie ASAP so that she doesn't get any more suspicious than she already is.  Calhouns?"  Gov't Ex. 143. On direct examination, Kuchler was asked what the "suspicious" email had to do with.  She answered, "I can only **speculate** the legal fees."  Kuchler Tr. 74 (emphasis added).  Kuchler then explained her understanding that when Mr. Arata sent her the amended SAFELA operating agreement, "[t]his corroborated that he got an equity interest in exchange for the legal fees, a cash equivalent, which was the equity interest."  Kuchler Tr. 75.

But lacking from Kuchler's testimony and the evidence is any mention that it was *Mr. Arata's* belief or intention, or that *Mr. Arata* told her that the change in equity interest corroborated, or had any connection with, purported legal fees.  Her speculation based on inferences she drew from statements made by Mr. Hoffman does not trump the absence of evidence implicating Mr. Arata.  The

Mr. Arata then emailed Mr. Hoffman's response to Jerry Daigle, stating "I need your help with this. Over my head."  To which Jerry Daigle responded: "Yes, but the good thing is that these are real parties who are drafting real documents for the purpose of the Historic Tax Credits."  Arata Ex. 276.

government suggests that sufficient evidence supports a finding
that Mr. Arata "relented" on the legal fees submission, but that
suggestion is based entirely on prosecutorial advocacy anchored
only by Kuchler's speculation.

Moreover, and critical to sustaining Mr. Hoffman's conviction
on the legal fees expenditure, the government produces no evidence
that submission of legal fees was in fact improper.  It offers only
the statement by Mr. Arata that he did not believe the fees should
have been submitted,[31] though he did confirm that he worked the
hours, and there was no evidence disputing that the hours were not
worked.  In fact, Kuchler ended up including the legal fees because
she confirmed that the hours were worked and the rate charged was
in accordance with market standards.  Another auditor witness, Mr.
Craig Silva, also testified that legal services qualify for tax

_____

[31] Jerry Daigle testified that he "agreed with [Mr. Arata's]
suggestion that [Seven Arts] would be better off submitting third-
party legal fees rather than related-party legal fees."  Daigle Tr.
29.  In other words, in the opinion of some, although perhaps legal
fees of principals who are also attorneys were not the purest legal
fees expenditure to submit, legal fees were proper expenditures if
the hours were worked and the market rate was charged.  No witness
testified that such legal fees did not qualify.
     Although the government would have the Court uphold Mr.
Arata's conviction on the legal fees expenditures, in part on the
ground that Mr. Arata stated his belief that his and Mr. Hoffman's
fees should not have been submitted, the government acknowledges as
it must that Mr. Arata had already contemplated legal fees on the
807 Esplanade project being submitted for tax credits.  Gov't Ex.
198 (Arata discussing how law firm should be paid "to properly
document expenses for tax credit purposes.").  And the government
concedes that Arata and Hoffman both had law degrees "which made
claiming their own legal work an obvious expenditure to submit."

credits.  Silva Tr. 29.  Given that the only support for Count 5 is speculation and inferences, the convictions on that count cannot stand.

Likewise, considering in isolation the legal fees expenditure of Count 13, the Court finds insufficient evidence supporting guilty verdicts.  As to Mr. Arata, the evidence presented at trial failed to even suggest that he was aware that legal fee invoices, which were transmitted to Kuchler on December 21, 2009 in Count 13, had been created, until they were sent to him after they had been sent to Kuchler.  Up to and including post-trial briefing, Mr. Arata maintains that there is insufficient evidence proving the government's theory that he ultimately acquiesced in providing support for legal fees.  The Court agrees.

Additionally, viewing the evidence in the light most favorable to the government, there is insufficient evidence to support a wire fraud conviction of Mr. Hoffman for submission of legal fee invoices.  There was no dispute in the testimony at trial that legal services performed for the project could qualify as expenditures under the infrastructure tax credit program. Witnesses like Kuchler and Silva agreed that, so long as the hours were worked and the market rate was applied, attorney expenses qualified as an expenditure.  Although the government insists that the evidence suggested that Kuchler had reason to be suspicious of accepting the legal fees invoices in support of tax credits, that

52

falls short of proving the elements of wire fraud beyond a reasonable doubt, as opposed to repeated resort to speculation and inference.   The Court finds that there was insufficient <u>evidence</u> that submission of legal fees as expenditures constituted a scheme to defraud, involved false, material misrepresentations, or that the defendants had the specific intent to defraud; accordingly, a judgment of acquittal is warranted.

Mr. Hoffman is not entitled to a judgment of acquittal as to Count 13, however.   This is so because, regardless of the legal fees expenditure, the Court finds that a rational juror could have concluded that Mr. Hoffman committed wire fraud when he caused to be submitted by Seven Arts employee, Marcia Matthew, the $10 million New Moon loan document and accompanying spreadsheet detailing the "interest calculation based on actual draws"; other documents sent by Matthew on December 21, 2009 in Government Exhibit 13 (Count 13).[32]   That is, viewing the evidence in the light most favorable to the government, the evidence supports a finding that Mr. Hoffman created or caused to be created a document styled as a $10 million loan from Susan Hoffman's company, New Moon; Mr. Hoffman signed the document and purportedly signed for Mrs. Hoffman; Mr. Hoffman then created draws on the $10 million loan to claim interest expenditures.   Gov't Ex. 145.   A rational juror

---

[32] This inter-company loan agreement is also addressed in Count 19.

could have concluded based on the evidence at trial that the interest expenditures were circular transactions in which no real draws were made and that no $10 million loan ever existed. Accordingly, Mr. Hoffman has not carried his burden to show that a judgment of acquittal is warranted as to him on Count 13.

Even though Mr. Arata was found guilty of conspiracy, and the Court finds that sufficient evidence supported the guilty verdict on Count 1 (see the analysis addressing conspiracy at the conclusion of Part II), Mr. Arata is nevertheless entitled to a judgment of acquittal on Count 13.[33]   This is so because the evidence at trial shows that, in August 2009, he withdrew from representing Mr. Hoffman and from being Seven Arts' point person on the 807 Esplanade infrastructure project.   He consulted with an ethics attorney and communicated his withdrawal to everyone involved in the infrastructure project.   The loan and other documents sent by Matthew on December 21, 2009 occurred months after Mr. Arata withdrew from the conspiracy.   Thus, he is not liable for the post-withdrawal acts of Peter Hoffman.

Accordingly, Mr. Arata is entitled to a judgment of acquittal on Counts 5 and 13, and Mr. Hoffman is entitled to a judgment of acquittal on Count 5 but not Count 13.

---

[33] The issue of conspiracy, withdrawal, and liability for post-withdrawal acts of coconspirators is more completely addressed at the conclusion of Part II.

Count 23.  Does the evidence support a guilty verdict on Count 23, charging Mr. Arata with giving a false statement to the FBI when he said that he "was not aware" that his legal fees were submitted to the State in the 2010 tax credit application?  The evidence supporting this count is the same that underlies Counts 5 and 13 -- namely, Kuchler's speculation as to Mr. Arata's understanding of the inclusion of the fees...and nothing more.  On cross examination, FBI Agent Blythe gave the following testimony:

> Q:  [Y]ou don't have any evidence that Michael ever saw that cost report before it was submitted to the state, do you?
>
> A:  No.  I have that he was discussing these legal fees with the auditor who was working on the audit to submit this cost report to the state.
>
> Q:  But you don't have any evidence that he saw the cost report, correct?
>
> A:  I can't put it in his hand.

Blythe Tr. 57-58.

Thus, the evidence that the government has is Mr. Arata telling Kuchler that he did not get paid for legal services.  In fact, this Court noted in a prior Order and Reasons, in which it found that the government failed to prove the other false statement counts even by a preponderance of the evidence, that whether "Mr. Arata saw the tax credit application . . . will certainly be a factor for the government to contend with when it is tasked with proving guilt beyond a reasonable doubt."  Order and Reasons, United States of America v. Michael P. Arata, No. 14-022, p. 26

55

n.16 (Mar. 6, 2015).  Not only did the government fail to prove at trial that Mr. Arata saw the application, the case agent, Special Agent Bobby Blythe, testified under oath that he had no evidence at all that Mr. Arata did in fact see the application.  The jury seemed to agree; they acquitted Mr. Arata of Count 17, which charged him with wire fraud for submitting that same 2010 tax credit application.  That the jury also found that Mr. Arata *knew* at his proffer session with the FBI that these fees had been submitted is simply not rational and is not supported, at all, by the evidence.  Moreover, given the absence of evidence as to the impropriety of the legal fees themselves, whether Mr. Arata knew that they had been submitted to the State may well be immaterial; at the least, their materiality was never proven -- or even mentioned -- at trial.

<u>Count 22.</u>  The legal fees issue plays an integral role in Count 22 as well.  The government charged Mr. Arata for giving a false statement when he said in his proffer session that he terminated his relationship with Mr. Hoffman in summer 2009.[34]

Every trial witness who knew any details about Mr. Arata's

_____

[34] To be precise, the government charged in Count 22:

MICHAEL ARATA stated that he terminated his relationship with defendant PETER HOFFMAN in or about July 2009, when in truth and in fact, as he then well knew, he had continued working with PETER HOFFMAN including reviewing and preparing information for the January 20, 2010 application for tax credits and other tax credit related business ventures.

participation with the 807 Esplanade project testified that Mr. Arata left the project at some point, and several were able to pinpoint summer 2009, even more specifically August of that year. Agent Blythe also confirmed that people who did not testify but were part of his investigation confirmed that Mr. Arata left the project in summer 2009. That Mr. Arata "was no longer involved in the day-to-day operations of that venture," as Agent Blythe testified, was not enough. He testified, "The one key issue that I've considered was this legal fees issue with the audit." Blythe Tr. 63, 28. That was it.

Nonetheless, the government tried to create a cloud of mischief surrounding the termination, showing: emails from Mr. Hoffman to Mr. Arata after summer 2009 (which, it turns out, remain unresponded to to this day), Gov't Exs. 428, 451; an email about old business, Gov't Ex. 449; an email from Mr. Hoffman in which Mr. Arata responds regarding the uneven treatment the State is doling out, Gov't Ex. 450. Agent Blythe testified that these emails were part of his determination that Mr. Arata lied to him about terminating his relationship with Mr. Hoffman.

The question of Mr. Arata's termination of his relationship with Mr. Hoffman is complicated by the fact that Mr. Arata was Mr. Hoffman's local attorney on several ongoing projects. Thus, as legal ethics professor Dane Ciolino testified, Mr. Arata was not able to turn his back completely on Mr. Hoffman. He could not

wholly disassociate, ethically.  There was no dispute in the evidence offered at trial that Mr. Arata had an ethical obligation to help Mr. Hoffman wrap up issues related to his representation and to communicate with him when necessary.

On cross-examination, defense counsel asked Agent Blythe whether he knew, based on the advice of Dane Ciolino, that Mr. Arata had obligations as a lawyer to provide information and respond to some requests from Mr. Hoffman and 807 Esplanade.  Agent Blythe answered, "I understand he was given that advice.  I mean, my understanding is he's a business partner to him.  But beyond that, I'm not – I don't know what exactly his obligations would be as an attorney."  Blythe Tr. 63.  A few minutes later the agent testified, after being asked about Mr. Arata's obligation to maintain communication with Mr. Hoffman and not about Mr. Arata's reporting restrictions,

> I know he talked to an attorney about it to get their advice.  I don't remember exactly what, you know, he was – I know he was supposed to report up the chain.  He told me that, that he had to report up the chain, not out. But that – I don't – beyond that, I don't know what his attorney's advice was to him about dealing with Peter Hoffman.

Blythe Tr. 67.  And therein lies the problem.  Agent Blythe had no idea what ethical obligation Mr. Arata owed Mr. Hoffman as an attorney, and he did not find out before Mr. Arata was charged with making a false statement.

The government's incomprehension of the nuance surrounding Mr.

Arata's termination with Mr. Hoffman is only amplified by the fact that the government had in its hands at the January 2014 proffer session with Mr. Arata a termination letter that he wrote to Mr. Hoffman on August 6, 2009.  Although Agent Blythe testified that he "didn't know" about the attorney/client relationship between Mr. Arata and Mr. Hoffman, the termination letter in Agent Blythe's possession very clearly pertains to legal representation:  it is entitled "Termination of Representation," and it states in the opening paragraph, "I believe that it is appropriate for you to find new representation in Louisiana for your endeavors."  Arata Ex. 113.  The letter then lists six ongoing projects and their status.  Regarding 807 Esplanade, he specifically writes,

> I will assist with the renovation and completion of 807 Esplanade as my time permits.  However, I cannot in good faith retain any title with the company, as I do not have the time to dedicate to this matter properly.  Therefore, I resign from any official capacity I have with Seven Arts Pictures Louisiana, LLC.  Since I have an ownership interest in the property by virtue of my membership in Voodoo Studios, LLC, I will continue to assist maximizing the value of the property and the project.

Despite the clear contours of the termination of representation, the government quite oddly points to unanswered emails, responses to questions about old or ongoing projects (including other tax credit projects), and Mr. Arata's statement to Kuchler that he was not paid for legal services in support of its charge that he lied to Agent Blythe when he stated that he terminated his relationship with Mr. Hoffman in summer 2009.  The government's black-and-white

59

understanding of "termination", which is utterly divorced from the context of evidence, has no place in the factual complexion of this case.[35]  More troubling than Mr. Arata's conviction of Count 22 not being supported by adequate evidence, there is no evidence supporting a conviction on a charge that he lied about terminating his relationship with Peter Hoffman; the evidence at trial (the same evidence the government relies on to suggest that Mr. Arata lied about terminating his relationship) showed that Mr. Arata

---

[35] The government argues in its post-verdict briefing that "the evidence at trial showed that after Arata and Hoffman had a falling out in August of 2009, they reconciled."  The government offers its Exhibit 446 in support of this reconciliation.  Government Exhibit 446 is an email string starting on November 11, 2009 and continuing through November 12, 2009 among, first, Jerry Daigle and Michael Arata, and then adding Peter Hoffman concerning the "debt schedule for the NOTD tax credit deal."  NOTD, or Night of the Demons, was a film production deal unrelated to the 807 Esplanade project. NOTD was on Mr. Arata's "list of ongoing matters and their status" in his August 6, 2009 termination letter to Peter Hoffman.

By framing this email exchange as a "reconciliation," the government ostensibly concedes that Mr. Arata and Mr. Hoffman parted ways, a concession that there is no evidence to support government's false statement count that Mr. Arata lied about terminating the relationship.  To participate in the government's exercise of semantics, if Mr. Arata lied about terminating his relationship with Mr. Hoffman, then, one wonders, how could there be a reconciliation? (A "reconciliation" that is not supported by evidence.)  More than semantics is at stake, here.  The government would do better to focus on professional advocacy rather than isolating from context (and evidence!) -- to the point of distortion -- statements made to it in a proffer session to achieve conviction.  It is troubling that the government charges that Mr. Arata lied and in identifying the fact or manner of that "lie," the government charges "in truth and in fact" Mr. Arata had continued working with Mr. Hoffman.  The evidence at trial showed that Mr. Arata did not lie to the FBI about the parameters of the termination of his representation of Mr. Hoffman.  No rational juror could have found otherwise.

conducted himself within the parameters of the advice of ethics counsel and consistent with the August 6, 2009 termination letter. No rational juror could have concluded that the government proved beyond a reasonable doubt that Mr. Arata lied when he stated he terminated his relationship with Peter Hoffman in July 2009.

Thus, as to the legal fees used to support convictions on two counts as to both Mr. Hoffman and Mr. Arata (Counts 5 and 13) as well as two additional convictions for Mr. Arata (Counts 22 and 23), none is supported by sufficient evidence; no rational juror could have convicted Mr. Arata or Mr. Hoffman on these counts. However, because there was sufficient evidence to support a jury verdict against Mr. Hoffman on Count 13 due to the loan documents being transmitted, he is not entitled to acquittal on that count. Thus, the Court will enter judgments of acquittal for Mr. Arata on Counts 5, 13, 22, and 23 and as to Mr. Hoffman on Count 5.


### D.    *Duvernay/Departure Expenditures, Circular Transactions*
(Wire Fraud Count 6 and False Statement Counts 24 and 25)

Count 6.   The wire fraud of Count 6 focuses an April 7, 2009 email from Mark Halvorson of *Seven Arts* to Chris Stelly in which Halvorson sends invoices for construction and film equipment.  The invoices attached to the email are (a) a five-page invoice (invoice # SAE210100) dated October 2, 2008 directed to Seven Arts Filmed Entertainment Louisiana, LLC from Departure Studios NOLA, for film equipment listed on the invoice totaling $1,027,090.00; and (b) a

three-page invoice (invoice # 2345) dated July 12, 2008 "billed to" Seven Arts Pictures Louisiana, LLC from Leo Duvernay, LLC, for construction expenses totaling $2,002,480.00.[36] Government Exhibit 7 is an email dated May 14, 2009 from Michael Arata to Chris Stelly, copying Ms. Kuchler and Mr. Hoffman in which Mr. Arata writes:

> Following are the items you requested for the SAPL project.
>
> 1. Independent verification we received from the contractor and equipment vendor for Malcolm Dienes. These set [sic] for the payments received and items paid for (a separate email will follow with the contractor). The equipment vendor is a Louisiana company (see attached), but they DID NOT charge tax on the items sold.
>
> If this needs to be addressed, please let me know and I will have Seven Arts and Departure resolve this matter.

Attached to this May 14, 2009 email is a payment confirmation dated February 4, 2009 in which Departure Studios NOLA through Damon Martin signs to "confirm that the following invoice has been paid." The invoice referenced in the payment confirmation is the same five-page invoice (also included as an attachment to this email) attached to the email that is the subject of Count 6, invoice #SAE210100 for $1,027,090.00 in equipment; also attached to the email of Exhibit 7 is the same payment confirmation from Leo

---

[36] Government Exhibit 2 is an email from Mr. Arata to Kuchler attaching a payment confirmation signed by Leo Duvernay in which Duvernay "confirm[s] that the following invoice has been paid." The invoice listed is invoice # 2345, dated July 12, 2008 for the amount of $2,002,480.00.

Duvernay that is included in Government Exhibit 2 and the same three-page Duvernay invoice numbered 2345 for $2,002,480.00.

Peter Hoffman and Michael Arata were convicted of the wire fraud charged in Count 6; Susan Hoffman was acquitted. Count 6 questions the propriety of the Leo Duvernay and Departure Studios expenditures.[37] Mr. Hoffman's and Mr. Arata's motions for judgment of acquittal focus on whether there was sufficient evidence on the specific intent to defraud element.[38] Critical to determining

_____

[37] Similarly, Count 2 involves the Duvernay payment confirmation and Count 7 involves both the Duvernay and Departure invoices and payment confirmations.
    In addition to its argument that its Exhibit 6 email "helped induce Stelly to accept the grossly-inflated Duvernay expenditure and the fictitious Departure expenditure listed in the first cost report," in response to Mr. Hoffman's motion, the government submits that the evidence shows that, in Exhibit 6 Stelly was asking questions about the first audit, and Mr. Hoffman and Mr. Arata concealed information from him regarding the purchase price of the property, related parties, and the equipment. The Court need not reach the government's arguments on these other aspects of Mr. Hoffman's and Mr. Arata's purported concealment.

[38] Mr. Arata first submits that, because he is not copied on the email, there is no evidence that he caused that email to be transmitted, or that he even knew that it had been sent. However, if the invoices were part of a scheme to defraud, there was sufficient evidence for a rational juror to conclude that Mr. Arata is guilty of Count 6 because he "caused" the email to be sent: in government exhibit 422, Mr. Arata sent Mr. Hoffman an email suggesting that he provide the invoices to Stelly; and Mr. Arata forwarded that email to Halvorson. As for Mr. Hoffman, he likewise caused the email to be sent by his employee, Halvorson, and, indeed, Mr. Hoffman intended to attach the invoices by his email (an email which does copy Mr. Arata), but the attachments were not transmitted. (Mr. Hoffman wrote Stelly: "We have attached a detailed list of the items purchased [from Departure] as well as pictures of the equipment" and "Attached is the detail of each item of construction cost incurred by the Company prior to the completion of the audit."). Mr. Arata had previously sent the

whether the jury irrationally rendered guilty verdicts on these counts dealing with the Departure and Duvernay transactions necessarily mandates an understanding of the substance of these transactions, placed in context by the parties' contentions and the trial evidence.

The government's account is that the Departure Studio film equipment was a mere fiction and the construction payments to Duvernay were grossly inflated.  According to the government, Mr. Arata's and Mr. Hoffman's scheme focused on presenting $1,027,000 in fictitious film equipment purchases from Damon Martin of Departure Studios and by inflating construction spending to Leo Duvernay by approximately $1.5 million.  This was accomplished by circling money, concealing the source, and presenting the auditors with confirmation that money was in fact spent to obtain equipment from a third-party vendor and to pay a contractor's invoice; the government presents its theory of the evidence in detail:

> In . . . October 2008, just days after opening the bank accounts for Martin and Duvernay, Arata took out a $400,000 loan through his business, LEAP Film Fund II, and placed it into Seven Arts Pictures Louisiana (SAPLA) bank account.  The defendants then instructed in-house accountant Erik Smith and Regions Bank employee Melissa Oelking to bounce proceeds of this loan back and forth five times ($250,000 x 4 and $27,090 x 1) between the SAPLA account and defendant-controlled Martin account to make it appear as if Martin had been paid $1,027,090 for film equipment.  The same day, with the same loaned cash, the defendants conducted a similar transaction with the

---

Duvernay confirmation to Kuchler on February 9, 2009; the wire that is the subject of Count 2.

> Duvernay account to make it appear that Duvernay had been
> paid $1,499,257 for construction ($250,000 x 4 and
> $499,257 x 1).  The very next day . . ., the money was
> immediately withdrawn to pay off Arata's loan.  The net
> result: $2,526,347 in outgoing transfers with $0 in real
> expenditures.
>
> After the transactions were completed, the SAPLA
> bank statement showed these transactions as both
> "withdrawals" and "deposits" . . . .  [T]o conceal this,
> the defendants altered the General Ledger of SAPLA to
> show that the "deposits" were capital contributions from
> parent company Seven Arts Pictures, Inc.  By doing this,
> the defendants intended to trick the auditors and the
> State into believing that the parent company transferred
> money for equipment and construction into the SAPLA
> operating account that was then used to pay independent
> Louisiana third party vendors.

Then, the government submits, the defendants sent the auditors the SAPLA general ledger indicating that there were capital contributions, and represented that Martin and Duvernay were paid as independent third parties funded by those capital contributions. Mr. Hoffman and Mr. Arata sent the auditor invoices as well as vendor confirmations "to make it appear that Martin and Duvernay had been paid millions of dollars – a fact that both Martin and Duvernay testified at trial was false."

As indicative of Mr. Arata's and Mr. Hoffman's knowledge that these sorts of advance payments do not qualify for infrastructure expenditures under the State tax credit regime, the government points to its Exhibit 283.  In it, on February 2, 2009, Mr. Arata writes Mr. Hoffman about a conversation he had with Chris Stelly after Stelly had toured the progress at 807 Esplanade:

65

I spoke with Chris. . . .

He informed me that the division has hired a "certified
fraud accountant" who provides them an independent review
of all applications.  He suggested that they had problems
with applications where payments were not "final
payments", and then volunteered that if we had made
advance payments to the contractor or equipment seller,
to make sure that the payments were final payments, in
his account, not escrow and that "the money is in his
pocket and not controlled by you."  This suggests that
they have taken issue with payments to vendors for
"advance payments."

He also elaborated on what the State considers a "multi-
use facility and the "allowable" costs for a multi-use
facility. . . . He claimed that the State has made a hard
rule that any facility that is not "from the ground up"
is a multi-use facility.  Seems impossible to me. . . .
I argued that our building is a shell and that all
construction is, in fact, film specific.  He agreed, but
said the State's approach on this issue is not his doing
and he was reflecting what the DOA and legal teams have
stated.

As for costs, he again suggested that he would try to get
us as many credits now for items that we have paid for
and help us with the DOA on the "multi-use" issue.

I think we need to order a public record request on a few
infrastructure projects and see what the practice is.[39]

---

[39] The government cherry-picks only the portion of the email
indicating that Mr. Arata and Mr. Hoffman were on notice that a
State administrator said the State had "taken issue" with "advance
payments," whereas Mr. Arata submits, as he and others testified at
trial and as confirmed by the last sentence of Mr. Arata's email,
that applicants did not just take as gospel oral statements or
explanations from a state administrator as to what was a
permissible expenditure, but, rather, looked to the evidence of
past projects to determine what the State had actually accepted.
Researching other projects was key precedent, stray statements by
an administrator were not binding.
    Indeed, the evidence confirmed that that is what he did.  It
was not disputed that Mr. Arata spent significant time and effort
researching past projects and trying to instill clarity into a
disorderly State program.  One that was, to be polite,

This email is emblematic of a troubling feature of this federal criminal case, the fact of an inconsistently managed State program where applicants are given piecemeal information and left with little guidance to determine for themselves what the State might accept as qualified expenditures; the evidence at trial showed that Mr. Arata reviewed past projects in an effort to learn what the State had previously accepted.

Mr. Arata and Mr. Hoffman submit that the government's theory of the case concerning the Duvernay and Departure transactions (that they submitted fake and inflated expenditures for construction costs and equipment, disguised by circular transactions that were hidden from the auditors in order to defraud the State of a million dollars in tax credits) was not proven. Instead, Mr. Arata and Mr. Hoffman submit, the evidence at trial showed that the construction and equipment expenses were incurred and properly documented, the circular transactions were disclosed, and the tax credits were lawfully earned.

Mr. Arata's and Mr. Hoffman's narrative is supported by trial evidence including their own testimony as well as custom and practice evidence.  Where the government argues that the defendants failed to disclose the Duvernay and Departure transactions, Mr. Arata points out that documents submitted to the auditors disclosed

-------

inconsistently administered.

the transactions.[40]   Regarding the Leo Duvernay construction expenditure, Mr. Arata and Mr. Hoffman submit that the construction costs included in the first audit report were a properly documented expenditure into an escrow account.   Countering the government's presentation -- that Mr. Arata and Mr. Hoffman chose to present purported expenditures as cash purchases from unrelated vendors -- the defendants point out that the evidence at trial showed that Seven Arts and Leo Duvernay had a binding contract for $2,002,480.00; that Advantage Capital had funded an escrow account with $2,000,000 that was to be used for construction; that all the line items Duvernay submitted were accurate; that before Duvernay

---

[40] For example, as to the Duvernay transaction, Mr. Arata testified on cross-examination:

> [I]f [Katie Kuchler] had read the documentation [provided], she would have seen in the loan document there was an escrow agreement.   The loan document referred to a contractor's agreement.   We gave her the contractor's agreement.   The loan document also referred to the Capital One account where the money was. . . .
>     My obligation was to provide her everything that I had for this transaction.   I believe it was a valid transaction. . . .
> [W]hat we're doing here is essentially arguing over whether you believe it was a valid transaction or I believe it was a valid transaction. . . . And reasonable people can have a debate about whether this is a qualified expense or not. . . . And I believe in good faith that it qualified under the Louisiana tax credit program.   So I gave her the documentation that I had.   If she would have asked for one more single piece of paper, I would have given it to her. . . .   I gave them the documentation, which was exactly what I had done on every other project.

Arata Tr. 93-95.

was paid, he had to submit a draw signed by an architect and then he would be paid out of the Advantage Capital escrow account; and that pre-payment into an escrow account was an accepted form of expenditure for the Louisiana film tax credit program.[41]  Mr. Arata and Mr. Hoffman submit that the government failed to prove that either of them had a specific intent to defraud the State of tax credits by submitting construction costs that were pre-paid into escrow, were disclosed to the State and the auditors, and were for work that was actually performed.[42]

Under the industry's custom and practice and Louisiana law,

---

[41] Notably, Mr. Arata testified that he reviewed several projects that allowed pre-payment into an escrow account to qualify as tax credit expenditures.  Arata Tr. 54, 92.  Mr. House testified that an escrow account could count as an expenditure under the custom and practice.  House Tr. 28.  Mr. Arata further testified:

[I]f you provide the bank documents [to the auditors]; and you provide the contract, which we did; and you provide the escrow agreement, which we did, there is really nothing else to look at. . . .

Arata Tr. 108.

[42] The government notes that the funding source for the Duvernay transaction was presented as operating profits from Seven Arts Pictures, not the AdCap escrow account set up to fund construction.  Likewise for the Departure transaction, the defendants identified Seven Arts Pictures' operational income as the funding source for the transaction in the first cost report, suggesting a cash disbursement for California equipment.  Thus, the government submits, a rational juror could have rejected the defendants' arguments regarding escrow and pre-payments and could have found that the government proved that Mr. Hoffman and Mr. Arata failed to disclose the true nature of the transactions by characterizing the Departure transaction as a purchase of equipment from a third-party vendor and by characterizing the Duvernay transaction as a payment to a general contractor.

the defendants submit that Seven Arts earned tax credits by making the $2,000,000 escrow payment.  In the course of reviewing public records on other infrastructure projects approved by the State, Mr. Arata relied on the Second Line Stages project, in which Louisiana Economic Development sent an initial certification letter, dated December 19, 2008, certifying the project and allowing it to proceed.  In its initial certification letter, the State noted:

> The project must expend at least $16,000,000.00 prior to December 31, 2008.  A portion of this amount will be a pre-payment to the contractor.  The payment will be placed in an irrevocable escrow account of which the contractor has the sole authority to draw from and the applicant maintains no control over this account.  LED, OEID & the DOA will not certify credits for this portion of the payment until the contractor draws down the entire amount in escrow and it is actually used in the construction of the facility.  The terms of this agreement are as follows. . . .

Arata Ex. 226.  Mr. Arata submits that the evidence supports a finding that his review of submissions like Second Line Stages supported his good faith belief that pre-payment of construction costs into an escrow account was acceptable for a tax credit submission.[43]

---

[43] Mr. Hoffman and Mr. Arata also describe the Duvernay transaction as a proper accounting method called a defeasance.
    The government counters that the fact that the Duvernay submission to the auditors and the State failed to match up to the Second Line Stages submission undermines the defendants' good faith defense.  The Second Line Stages project disclosed the protected escrow as an advanced payment.  Second Line Stages had express written permission from the State and the restrictions on the escrow were spelled out and strict.  Not so, here, the government argues.

As for the Departure Studios venture, the evidence showed that it was Mr. Hoffman who had a prior business relationship with Damon Martin, who did post-production work on independent films. Mr. Hoffman spearheaded the contemplated partnership arrangement, which the defendants and Mr. Martin testified consistently about: Departure Studios' owner, Damon Martin, would contribute equipment in return for a 25% share in the 807 Esplanade project. This contemplated co-venture arrangement was documented by the project's business plan, emails from Departure Studios, and a sworn declaration by Peter Hoffman; all of which were disclosed to the auditors. Likewise, Mr. Martin testified that his agreement with Peter Hoffman was to contribute about $1,000,000 in equipment in return for a 25% share in the project and management responsibilities. Martin further testified that he or his staff prepared the invoices submitted and that no one asked him to fabricate anything. Mr. Arata, with his uncontroverted experience in the film tax credit program, testified that he submitted the Departure Studios materials to the auditors and the State in accordance with his understanding of the partnership (equipment would be contributed to the project by Martin/Departure as a business partner) and in accordance with the custom and practice of the tax credit process, which allowed as an appropriate expenditure the contribution of equipment so long as the equipment was properly

71

valued.[44]

_____

[44] When asked why "money [was] mov[ed] around" for the contribution of equipment, Mr. Arata testified on cross-examination:

> Under the program, in order to obtain tax credit certification, you need to have proof of payment.  And so the custom and practice, as developed over many years – and we did on the Sylvester Stallone example.  We did it on a number of examples.  I didn't create this methodology, but this is how they created it and this is how I found it.
>
> If I sell myself something or if a related party sells themself something or if joint venturer sells themselves something, there has to be some document, some form of paper – because the state wants paper and auditors want paper – that show that the value of that thing that was transferred, whether it was by exchange, conveyance, acquisition, sale – however it was – must be documented in some form of paper.
>
> So people have done this.  They've taken their own money, put it into a bank account for a new LLC which they call the vendor LLC, and then paid themselves from that vendor LLC.  That completes a paper transaction which documents the underlying substantive transaction.  [T]hat is the custom and practice of the state of Louisiana....
>
> We told the auditors exactly what the documentation showed, that Damon Martin was a business partner, a joint venturer.  We disclosed him in the business plan.  We disclosed him in the application thoroughly. . . .  And we disclosed the payment to Damon Martin by virtue of showing the bank statements. . . .
>
> The contribution . . . to this vendor LLC does not have to be in the form of cash.  I think that's been established. Mr. Stelly said that. [T]here's no dispute that the state did not require a cash transaction.
>
> [I]f you are contributing your equipment to yourself, you still need to show fair market value. [The state] needed to see some form of payment and so they created a mechanism [from] the documents I saw[,] a payment was made from the purchaser to the contributor.  It was called a sale or an acquisition or a conveyance.  And then that money was paid right back to that other party. Why it was paid back to that other party is part of a transaction that goes over my head from an accounting standpoint.  But I'm telling you what I saw, but I saw it constantly and continually from 2003 and -04 all the way

With regard to circular transactions, there is no dispute that circular bank transactions are not intrinsically unlawful so long as they are properly documented and disclosed.[45]  Mr. Arata submits that he disclosed the circular transactions to the auditors by providing them with bank deposit and withdrawal tickets; that there was insufficient evidence to sustain the government's "illegible" bank ticket theory given that each auditor testified that Mr. Arata never withheld any access, and gave them what they requested.  It

---

through 2011 and -12 as well.

Arata Tr. 96-100.

[45]  Explaining the difference between auditing the value of a simple cash transaction, a T-shirt purchased from Wal-Mart versus auditing film production and infrastructure expenditures, Mr. Arata stated:

> [F]ilm production and infrastructure is wholly different, because you're not dealing with simple transactions. People don't go buy a building with cash.  People don't buy a million dollar's worth of equipment with cash in their pockets. . . .   In these significant types of transactions when these deals are real deals, you have to have significant debt obligations, you have to have a financing mechanism that really works.  And so the state wasn't . . . naive about this. . . . Auditors know what to do with significant transactions.  This was a detailed, significant, complex transaction. We gave them all the documentation for the significant, detailed, complex transaction.  [But Ms. Kuchler] didn't look at the documents. . . .  I presented her all the documents I felt were relevant to the transaction, and I expected that she was going to look at all those documents, take into consideration what the law allowed, and provide us with her reasoned, professional interpretation of those documents.

Arata Tr. 109-12.

was undisputed that Kuchler failed to review all documents provided to her. (Without judging her credibility, the propriety of her lapse in doing so perhaps accounts for parts of her testimony as a government witness).

To summarize, Mr. Hoffman and Mr. Arata contend that no rational juror could have found sufficient evidence to convict them of Count 6 because the Departure and Duvernay invoices were part of legitimate tax credit transactions involving the contribution of equipment and the pre-payment into an escrow account; submissions made in good faith in accordance with the custom and practice of the State of Louisiana. If any rational juror could have determined that these transactions were part of a scheme to defraud and that Mr. Hoffman and Mr. Arata had the specific intent to defraud, then the Court must defer to the jury verdict.

The Court finds that Mr. Hoffman's and Mr. Arata's motions for judgment of acquittal as to Count 6 must be denied. There was, indeed, a critical fact issue presented to the jury on the issue of Mr. Arata's and Mr. Hoffman's specific intent to defraud; and, there was also evidence in the trial record that would have supported a jury finding that the defendants lacked the specific intent to defraud the State when they submitted the Duvernay and Departure documents in accordance with their claim of a good faith understanding of the custom and practice of the indisputably murky

74

film tax credit regime.[46]  Nevertheless, notwithstanding the
evidence that one could say supported their good faith defenses,
viewing the evidence in the light most favorable to the government,
and constrained by the Fifth Circuit, a rational jury could have
concluded that the defendants presented to the auditors and to the
State bank transactions along with invoices and payment
verifications from Martin and Duvernay -- as opposed to presenting
these transactions as they were, contemplated contribution of
equipment and pre-payment into an escrow -- as part of a scheme to
defraud.[47]  In other words, the Court finds, under the Fifth Circuit
case literature that binds this Court, that a rational jury could
have rejected Mr. Arata's and Mr. Hoffman's good faith defenses
and, instead, accepted the government's evidence that the
transactions as styled were misleading and intended to mislead in
order to obtain tax credits.  This discussion highlights the jury's

_____

[46]  Singling out Mr. Arata's evidence of good faith, it was not
just limited to what the government would describe as his "self-
serving" testimony.  That Mr. Arata believed that the equipment and
construction transactions complied with the law and custom and
practice was corroborated by other evidence that he sought to do
things by the book in: (a) not wanting his legal fees to be
included, but instead preferred that outside counsel's legal fees
be included as expenditures; and (b) not wanting to be affiliated
with the submission of fabricated invoices.

[47]  A rational jury could have found that Mr. Hoffman and Mr.
Arata did not present the transactions consistent with their
characterization of what was acceptable in the industry: although
they argued that equipment was being contributed and the advance
payments to Duvernay were akin to prepayment into an escrow
account, those transactions were presented to auditors and the
State as payments to an equipment vendor and contractor.

power to make credibility calls.

The Court now considers the two false statement convictions concerning the Departure Studios equipment and circular transactions generally.

Count 24.  Does the evidence support a guilty verdict on Count 24, charging Mr. Arata with giving a false statement to the FBI when he said that "the film equipment had been 'acquired' in that the equipment would be contributed to 807 Esplanade by the vendor as a business partner, when in truth and in fact, as he then well knew, the equipment had not been acquired or contributed and that he had repeatedly advised the auditors and the State that the equipment had been purchased and paid for"?  No.

Putting aside this inartfully worded charge, the issue is simply whether there was sufficient evidence to support a finding that Mr. Arata lied when he told the FBI that the equipment "would be" contributed to the project by Departure Studios as a business partner.  Other than the fact that the equipment partnership deal ultimately fell through after Departure Studios' owner Damon Martin lost his business, which was months after this February 2009 tax credit submission,[48] there was no evidence presented at trial that

_____

[48] There was no evidence submitted at trial that would tend to suggest that Mr. Arata should have had any reason to believe that there was any problem with the Seven Arts-Departure deal, as it had been explained to him, at the time the first cost report was sent to the State in February 2009.  It is undisputed that the deal was not officially dead until months later.

would support a finding that Mr. Arata lied to the FBI when he characterized his understanding of the Departure Studios equipment deal.

There was insufficient evidence offered by the government to prove that Mr. Arata made the statement to mislead the FBI or that he made the statement knowing that it was false. The business arrangement described by Mr. Arata to the FBI is the one borne out by the evidence at trial.[49] Peter Hoffman and Damon Martin both testified that they contemplated a partnership in which Departure Studios would contribute equipment and Martin (or Departure Studios New Orleans) would be a managerial partner, that he would manage the post-production facility in return for a 25% share in 807 Esplanade. The 807 Esplanade business plan dated May 2007 listed certain equipment to be provided by Departure. Arata Ex. 38. Emails from Departure Studios to Seven Arts provided lists of equipment valued at $1,027,090 to be provided by Departure. Arata Ex. 213. Peter Hoffman signed a sworn declaration in November 2008 in which he stated:

> 1. ... Attached hereto are photographs of the various items of post-production sound equipment acquired by Seven Arts for use in its facility at 807 Esplanade in New Orleans, Louisiana, which equipment will be delivered to 807 Esplanade upon completion of construction of the

---

[49] The government offered no evidence that Mr. Arata knew that the equipment would not be contributed; rather, Mr. Arata's understanding of the Departure deal was consistent with the business venture described by the project's business plan, as well as government and defense witnesses alike.

facilities at that location.

2. Departure Studios will act an [sic] agent and co-venturer with Seven Arts in the operation of a post-production sound facility at 807 Esplanade, and it has confirmed the existence of this equipment, its location at 6121 Sunset Blvd., Third Floor, in Los Angeles, California.

Arata Ex. 119.

Notwithstanding this evidence, the government argues, "[g]iven the impossibility of Martin contributing substantial equipment and his merely tentative (and eventually non-existent) relationship to the project, Arata could not have somehow found himself under the wildly inaccurate impression that Martin was contributing over $1 million in equipment." Mr. Arata's statement was false, the government suggests, "because Arata never believed the equipment was being obtained at all and certainly not by contribution." But the government offered no evidence to prove that Mr. Arata did not believe that the equipment would be contributed, let alone that he knew his statement and characterization of the contemplated partnership and equipment deal was false. Speculation and argument are not evidence. Trying another angle, the government submits that Martin himself did not contemplate contributing equipment.[50] Putting aside that the government submitted no evidence that Mr.

---

[50] The government points to Martin's direct examination in which he stated that he never finalized a partnership with the defendants and never made a formal oral agreement to provide the equipment. To suggest that "Damon Martin did not even contemplate contributing equipment" is betrayed by his testimony and other evidence.

Arata could have known whether or not Mr. Martin actually contemplated contributing equipment, in fact, Mr. Martin testified that he did.   On cross-examination, Mr. Martin was asked about discussions he had with Mr. Hoffman[51] about being a partner in 807 Esplanade, discussions which Martin stated took place in 2007 and 2008 "over an extended period of time."

> Q:   And you believed that equipment that was going to be delivered to 807 Esplanade was going to be delivered through your company, Departure, and that Departure was going to be paid for that; correct?
>
> A:   My understanding was that as far as Departure New Orleans is concerned that that equipment would be paid for and delivered to Departure in New Orleans, yes.

Martin Tr. 46-47.   Later on, Mr. Martin also suggested that Departure had discussions with Seven Arts about Seven Arts taking over Departure in Los Angeles and acquiring the equipment that Departure had in Los Angeles.[52]   Yet again, this time in response

---

[51] Mr. Martin could not recall having discussions with Mr. Arata concerning the details of the equipment and partnership deal, although there was evidence that he gave Mr. Arata the authority to start Departure Studios' Louisiana company.

[52] Mr. Martin explained that he recalled telling the FBI that there was a time when it was discussed that one of his roles in the project was to bring expertise and equipment to the building, that "there was a time that there was potentially equipment that was from Departure in Los Angeles that might travel to New Orleans." Martin Tr. 61.   Mr. Martin explained that the FBI showed him an invoice and asked if that was meant to be the equipment that was going to New Orleans, to which Martin responded, "Yes.   That was the idea, that the list that was created to have equipment come into New Orleans that would have it to be a world-class facility." Martin Tr. 61-62.

to the Court's question, Mr. Martin testified consistently with this contemplated agreement, an agreement that he told the FBI about during its investigation; the contemplated arrangement that, when explained by Mr. Arata to the FBI, the government charged as a false statement.

> Q:   Did you tell Agent Blythe during your interview that you were  ... expected to get paid for this equipment?
>
> A:   [Y]es.  If Seven Arts took over the facility in Los Angeles, they would have paid for the equipment that was -- not what was on the lease, they would have taken over the lease.  They would have paid for the equipment that was in the facility.

Martin Tr. 62-63.  Ostensibly seeking to identify a fact issue regarding whether Mr. Arata may have known that it was (in the government's words) "physically impossible" for Departure to contribute one million dollars worth of equipment, the government submits that "Martin did not have anything resembling the more than one million dollars in equipment at issue."  But the government failed to offer any evidence suggesting that *Mr. Arata* had any knowledge regarding the actual value of the film equipment reflected in the photos and invoices with which Mr. Arata was provided; photos and invoices indicating a value at over one million dollars.  A guilty verdict cannot be based on the government's conjecture.

Like the government's termination false statement charge, in which the government ignored the fact of Mr. Arata's apparent

ethical obligation and had in its possession a detailed letter spelling out the parameters of the termination, the government again seeks to divorce its charge from the factual context giving rise to it, and to deny business and factual realities:  the government charged Mr. Arata with making a false statement about his understanding of a business deal (a contemplated business arrangement developed by his business partner and shared by the co-venturer)[53] and, after that business deal fell through, which incidentally fell through after the tax credit submission that included the film equipment, the government charged him with lying about the dead deal.[54]  Viewing the evidence in the light most favorable to the government, no rational juror could have found that Mr. Arata lied when he explained to the FBI that the Departure "equipment *would be* contributed to 807 Esplanade by the vendor [Departure Studios] as a business partner." (emphasis added).  The government failed to prove that Mr. Arata could not have believed that the equipment was going to be contributed.

The Court is compelled to make one final observation regarding this false statement charge.  In its zeal to get this false

---

[53] Even the government concedes that there was some sort of contemplated deal, characterizing as "tentative" Mr. Martin's relationship to the project.

[54] Like its false statement charge regarding termination of representation, this false statement charge defies reason from a business and timing perspective.  It is no surprise that there was absolutely no evidence to prove it.

statement conviction upheld, the government once again resorts to mean-spirited hype that wishfully suggests that this financial fraud case is black-and-white.  This particular argument is all the more alarming in the revelation that, from a charging perspective, the government isolates semantics from context in its effort to win a conviction:

> Arata fails to confront the catch-22 his conflicting representations put him in.  If one believes Arata was truthful to the FBI when he stated that he believed Departure was going to contribute the equipment ("acquired, not purchased," Blythe Tr. 39), then one must also conclude that Arata lied to the auditors when he claimed Seven Arts had "purchased" and paid for the equipment.  Conversely, if one believes Arata truthfully told the auditors and the state that Seven Arts purchased and paid for the equipment, then one must conclude that Arata lied to the FBI when he claimed he believed Departure was going to contribute the equipment.  Arata could not deal with this dilemma at trial and he cannot now—it is impossible: there is no plausible, logically-sound theory where Arata could be both innocent of fraud and innocent of making a false statement.  [B]y convicting on fraud counts and the false statement charge, the jury agreed with the government's position: both representations were false.  The truth, which Arata would never admit to the auditors or the FBI, was that he knew the equipment was not being provided in any manner: Arata sought tax credits on equipment that did not even exist.

One of many problems with this argument is that the government did not prove that Mr. Arata knew that "the equipment did not exist." It is the government that makes a questionable statement when it says that "Arata sought tax credits on equipment that did not even

exist."[55]   There is no dispute that Departure Studios was a real company with real owned and leased equipment. Simply put, it was irrational for the jury to find Mr. Arata guilty of lying to the FBI when he explained his understanding that the Departure equipment would be contributed.   (To whom "payments" went to, as discussed in full, is another matter).   In truth and in fact, Mr. Arata's statement explaining his understanding of the intended deal was supported by the evidence at trial.

Count 25.   Does the evidence support a guilty verdict on Count 25, charging Mr. Arata with giving a false statement to the FBI when he said that "he thought he fully disclosed both sides of the transactions for construction and equipment expenditures to the auditors, when in truth and in fact, as he then well knew, he had purposefully concealed the circular transactions from the auditors"?[56]   No.

Mr. Arata submits that not only did he think he fully

---

[55] More about these tactics must await the Court's opinion addressing whether a new trial should be granted.

[56] The government's arguments in support of how it proved the falsity of this statement vary to the point of bewilderment.   The government argues that "he went through great lengths to conceal them," but then vacillates between arguing that Mr. Arata provided bank transfer slips that were illegible "or at least difficult to read;" to suggesting that Mr. Arata accidently provided slips corresponding to the return of funds; to arguing that, even though both sides of the circular transactions appear in the auditor's file, "the evidence did not show that Arata ... provided this document" to the auditor; to arguing that what was disclosed did not "necessarily tell the viewer of the document that the outgoing funds were returned to the primary Seven Arts account."

disclosed both sides of the transactions, he did indeed disclose them to the auditors.  The government submits that this statement was false because, not only did he fail to disclose the return of funds, he went through great lengths to conceal the return of funds.

Foremost, the Court must note that the government concedes that Mr. Arata gave Ms. Dodge a bank ticket showing both sides of the circular transaction between Seven Arts and Departure Studios. Gov't Ex. 74, p. 2.  The government also does not dispute that in an email on December 8, 2008, copying then-auditor, Ms. Dodge, and Mr. Hoffman, Mr. Arata wrote to Seven Arts' banker, Melissa Oelking:

> Is there any chance of us getting the original withdrawal slips and deposit slips for SAPL, LLC and Departure, and Leo Duvernay? We got the copies you sent to us, but our auditor would like to see originals. Please let me know. I apologize for the inconvenience and appreciate your help.

Arata Ex. 73.  Ms. Oelking agreed that Mr. Arata was "saying give me everything for Departure, Leo, and SAPL wire transfers"; she went on to testify that Mr. Arata never told her "don't disclose all of the transactions" and never told her "don't talk to any accountants if they call." Oelking Tr. 27-28.  The government nevertheless submits that the jury could reasonably conclude that Mr. Arata sent this email to "cover his tracks," arguing that Mr. Arata knew that Ms. Dodge's auditing firm was going to withdraw the next day, December 9, 2008.  The government's theory finds no

84

support in the trial record.  There was no evidence that supports a finding that Mr. Arata knew that the auditor was going to terminate the relationship before it happened.[57]  Nor was there evidence that Mr. Arata intended to disguise the transactions by providing only illegible copies, or that he purposefully concealed from Ms. Dodge legible copies of the transactions.[58]

As for whether or not the government submitted sufficient evidence in support of its theory that Mr. Arata lied when he said he thought he disclosed both sides of the Duvernay/Departure transactions to the only other auditor Mr. Arata dealt with before leaving the project, Kuchler testified that whenever she "asked Michael for anything, he would give [her] what [she] asked for," that he "never withheld any type of access," and that he would respond when she had questions.  Kuchler Tr. 121-122.  On December 29, 2008, Mr. Arata personally delivered documents to Kuchler in

---

[57]  In any event, Ms. Dodge's firm did withdraw and never completed an audit report that was submitted to the State.  Mr. Arata submits that, in addition to truthfully stating that the thought he disclosed both sides of the transactions to Ms. Dodge, Mr. Arata responds that his statements relative to Ms. Dodge are not material.

[58]  The government concedes in its papers that "[t]here are the illegible (or at least difficult to read) bank transfer slips provided to the auditors."  The government goes on to accept for the sake of argument that an illegible deposit slip qualifies as a disclosure, but argues that "it becomes obvious that Arata accidently provided slips that corresponded to the return of funds."  Common sense dictates that if an auditor needs information and the papers submitted are illegible, any responsible auditor would insist upon a legible copy.  That did not happen here.

file folders separated by topic and asked her to "take a few days
to review these documents and present us with questions/issues."
Gov't Ex. 91. Bank tickets showing both sides of the Departure and
Duvernay transactions appear throughout Kuchler's Malcolm Dienes
file. Arata Ex. 157, p. 8 (showing return of $1,027,090 from
Departure Studios to Seven Arts); Arata Ex. 159, p. 2 (showing
return of $499,257.21 from Duvernay to Seven Arts); Arata Ex. 160,
p. 2 (showing return of $499,257.21 from Duvernay to Seven Arts);
Arata Ex. 165, p. 2 (showing return of $1,499,257.21 from Duvernay
to Seven Arts).[59]

There was insufficient evidence to support the government's
theory that Mr. Arata intentionally concealed from the auditors
both sides of the Duvernay/Departure circular transactions. Thus,

_____

[59] The government essentially argues that Mr. Arata did not
prove that he sent this bank computer printout, Arata Exhibit 165,
which Malcolm Dienes indisputably had in its file, showing the
Duvernay circular transaction. The government suggests, without
record citation, maybe Marcia Matthew supplied it to Malcolm
Dienes. The government further suggests that it was not proved
*when* this came into Malcolm Dienes custody. All the Court can do
is remind the government that it had the burden of proof beyond a
reasonable doubt at trial, and it had the burden of proving that Mr.
Arata purposefully concealed from the auditors circular bank
transactions when it charged that he lied when he said he *thought*
he disclosed both sides of the transactions.
    Finally, the government complains that this document "does not
necessarily tell the viewer of the document that the outgoing funds
were returned to the primary Seven Arts account." The Court refers
the government to the testimony of its witness, Kuchler, when asked
about Arata 165. Asked whether it shows that a million dollars
went into the Duvernay account and came out the same day and that
$499,000 went in and out of the Seven Arts Filmed Entertainment
account on the same day, Kuchler responded "That's what it looks
like." Kuchler Tr. 121.

it was irrational for the jury to find that the evidence showed that Mr. Arata lied when he said he *thought* he disclosed both sides of the transactions.   A judgment of acquittal must be entered on Count 25.

> E.   *Mistaken Submissions, Withdrawn* (Counts 8, 10, and 12)

Only Peter Hoffman was convicted of the wire fraud charges in Counts 8, 10, and 12.  He seeks a judgment of acquittal due to insufficient evidence.

Count 8.  The wire fraud of Count 8 is an October 27, 2009 email from Seven Arts employee Marcia Matthew to auditor Kuchler in which Matthew sends the auditor inter-bank transfer requests, bank statements, invoices, and debit slips.[60]

Count 10.  The wire fraud of Count 10 is a December 1, 2009 fax from Marcia Matthews of Seven Arts to the auditors of a 11/24/09 contractor payment certification, signed by general contractor Leo Duvernay, for $3,410,932.91 in interest payments, legal fees, construction, auditor fees, and overhead.

Count 12.  The wire fraud of Count 12 is a December 19, 2009 email from Mr. Hoffman to auditor Kuchler regarding equipment purchases, legal fees, audit fees, interest expenditures, office rent for contractor, and invoices.

Mr. Hoffman submits that Counts 8, 10, and 12 all involve

---

[60] One of the bank transfer requests by Mr. Hoffman/Ms. Matthew includes invoices from Duvernay for "legal fees & services" and invoices from Duvernay for "auditors."

submissions to the auditors that were withdrawn because they were obviously incorrect and submitted by mistake.  He so testified at trial.[61]   There is no dispute that Seven Arts' financial records were in "disarray."  It is not fanciful to say -- whether it was Mr. Hoffman's or Ms. Matthew's mistake, or both -- that these papers were mistakenly submitted.  Nevertheless, the government contends that acquittal is not warranted because Mr. Hoffman merely focuses a factual dispute that any rational juror could have resolved in favor of the government.  The Court finds that one reasonable conclusion from the evidence submitted on these counts

---

[61]   The possibility that these submissions were mistakenly submitted was raised in Peter Hoffman's email to Kuchler on December 19, 2009 (one of the emails that is the subject of Count 12):

> Thank you for your consideration of our position. Needless to say Susan and I are very embarrassed by Marcia's mistake which I should have caught.  The summary of the transactions I prepared and reviewed was correct and the payments were in fact made to the correct affiliate that provided the financing and retained me and Michael for the extensive legal work on the project.... We of course will revise and obtain execution of the correct confirms and I will personally guarantee the rep letter.   I am particularly embarrassed because Leo thought the confirm was too high but Susan told me that I said Marcia had checked the numbers.  This will not happen again.  Marcia is now on probation after six months and we'll see if she makes it....
> On the interest all funds ultimately derive from investments by our public company, Seven Arts Pictures plc to its La affiliate and the interest is a market level for those advances.  Obviously Leo did not advance these monies (indeed he received a lot of them) any more than he performed legal services when he is not a lawyer....

is that these obviously incorrect submissions (indicating, for example, that the general contractor was paid for legal advice) were submitted by mistake; and mistake negates intent.  That Peter Hoffman thought he could dupe the auditors into putting Leo Duvernay's (the contractor's) _legal_ fees in a cost report seems a fiction.  But the Court is constrained by the Rule 29 standard. The jury was charged with resolving all factual disputes and, here, the jury could have disbelieved Mr. Hoffman's explanation for these submissions in favor of the evidence that the government submitted which supported a factual finding that Mr. Hoffman had attempted to inflate expenditures to qualify for additional tax credits.  This Court cannot make credibility choices for the jury.

   _F._   _More Equipment_ (Wire Fraud Count 9)

   Only Peter Hoffman was convicted of wire fraud in Count 9.

   Count 9.  The wire fraud of Count 9 is a November 30, 2009 email from auditor Kuchler to Mr. Hoffman copying Marcia Matthew regarding confirmation letters and equipment purchase information being provided to the auditors.  Kuchler writes:

> Steve is waiting for Marcia to give him the Audio Equipment invoices and support.  These invoices displayed a UK purchase address.  She is working on clearing that item up.
> We are also waiting on confirmations from certain vendors.

This email was in response to Mr. Hoffman's email to Kuchler, in which he stated he was "confused as to where we stand" and inquired as to whether the auditors needed anything more than "the

confirmation letters from Susan [Hoffman] and Leo [Duvernay]." Mr. Hoffman also had this to say about equipment invoices:

> The invoices that we have sent to you showing the equipment purchased were the invoices that we had obtained from our third party vendor, which is our partner in the property. The equipment itself was sold from a company owned by me to Seven Arts Pictures Louisiana as reflected in the bank transfers, and we of course can provide the appropriate documentation for that if necessary. I understand that Steve is going to discuss that with you and I would like to make sure that that issue is resolved as we did it the last time we dealt with this issue.[62]

Mr. Hoffman submits that this communication to the auditors was part of the normal "give and take" of an audit and that there were no material falsehoods. And that this was not a step in the plot, but, rather a communication incidental to (and not in furtherance of) any scheme to defraud. Again, the Court finds that Mr. Hoffman focuses a factual dispute that the jury was entitled to resolve in the government's favor. Because a rational juror could have found that, by this wire, Mr. Hoffman employed false representations in his efforts to have the auditors include the UK equipment on the January 20, 2010 audit report as part of a scheme to defraud -- equipment that Messrs. Conway and Ellson testified

---

[62] Although confusing, it appears that this email apparently refers not to the dead Departure deal, but, rather, to the nascent or potential UK equipment deal. Later, on December 17, 2009, in part of the email chain which is the subject of Count 12, Matthew explains to Kuchler that "[t]he equipment we first acquired was inadequate and we were required to incur substantial additional equipment costs to meet top professional standards as suggested by our partner, Molinare." Gov't Ex. 12.

was never purchased or sold to Mr. Hoffman -- the Court must uphold the jury's guilty verdict on this count. Whether a UK arrangement ever truly existed was the important subject of part of the government's case.

G. *$700,000 Leeway Payment Confirmation* (Wire Fraud Count 11)

Count 11. The wire fraud of Count 11 is a December 1, 2009 fax of a 11/24/09 payment confirmation signed by Susan Hoffman as President of Leeway Properties,[63] which was faxed by Marcia Matthew to the auditors. The payment confirmation is to "confirm that the following invoices," totaling $700,000, "have been paid." The confirmation lists invoices, dates, amounts, and description of services indicating that on June 30, 2009, $400,000 project management invoice was paid; on March 30, 2009, $150,000 office space invoice was paid; and on March 30, 2009, $150,000.00 invoice for "Richard Conway, Consultant" was paid.[64] Mrs. Hoffman and the government stipulated that her signature appeared after this sentence: "Our records indicate that the invoices detailed above in the amount of $700,000 for services to Seven Arts Pictures Louisiana, LLC were paid to our company, as itemized in the attachments."

The jury rendered verdicts of guilty as to Peter and Susan

---

[63] Susan Hoffman owned 100% of Leeway Properties, a company that Seven Arts worked with on film business.

[64] A notation by Kuchler indicates that, as of January 11, 2010, the $150,000 consultant fee was "excluded cost-per client."

Hoffman, but acquitted Michael Arata as to Count 11.  Peter and Susan Hoffman seek judgments of acquittal.  The government contends that acquittal is not warranted because the $400,000 fee for Mrs. Hoffman's project management services "was a complete fiction."[65] In support of the guilty verdicts against Mr. and Mrs. Hoffman, the government submits that this evidence met the government's burden of proof:

- Mrs. Hoffman signed and caused to be faxed in interstate commerce a false certification that she was paid $400,000 for fees relating to being project manager.
- Mrs. Hoffman convinced Leo Duvernay to sign payment confirmations, telling him they were "just for [Peter Hoffman's] records."
- Seven Arts submitted to the auditors a Leeway Properties declaration signed in Mrs. Hoffman's name (the government and Mrs. Hoffman did not agree that she signed the declaration) in which it was represented that Mrs. Hoffman had "spent in excess of 1000 hours supervising the construction project located at 807 Esplanade."  Gov't Ex. 160.  Mrs. Hoffman sent Leo Duvernay an email outlining how many hours she and Peter had given to the project and this suggested significant involvement in the project.  Gov't Ex. 160.
- Mrs. Hoffman was a sophisticated business woman, who had a close relationship with her husband, best friend, and business partner, Mr. Hoffman.
- Mrs. Hoffman owned 100% of Leeway Properties, a company that Seven Arts worked with on film business.
- Mr. Hoffman minimized Mrs. Hoffman's involvement with the Leeway project management fee, denied that Mrs. Hoffman was paid $400,000 (Hoffman Tr. 81), and denied that Mrs. Hoffman was "involved in any of the financial transactions with this project."  Hoffman Tr. 169.

---

[65] The government submits that the Leeway Properties invoice did not match any of the wire transfers provided to Kuchler by Marcia Matthew, "calling into question whether the defendants even bothered to circle the money prior to claiming it as an expenditure."  Gov't Ex. 8, p. 33.  Daigle Tr. 166.  Kuchler Tr. 11-13.

Mrs. Hoffman and the government stipulated that Mrs. Hoffman's signature appears on the $700,000 confirmation. Nevertheless, she submits that there is no evidence that she read the document before signing it or understood its significance. Merely that she signed the document because Mr. Hoffman asked her to and she trusted him. Although there was scarcely any mention of Mrs. Hoffman during the trial, Mr. Hoffman confirmed that his wife trusted him, that he would periodically give her documents to sign, which she would sign without question, and that Mrs. Hoffman knew nothing of the finances of the project. Other witnesses confirmed that, to their knowledge, Mrs. Hoffman had nothing to do with the finances of the project. The auditors testified that they did not know Mrs. Hoffman. Mr. Duvernay testified that he trusted Mrs. Hoffman, who trusted Mr. Hoffman, and that he called her when Mr. Hoffman wanted him to sign papers that he did not agree with and she told him they were for Mr. Hoffman's records.

The only evidence as to how many hours Susan Hoffman may have spent on the project was from an email sent by Mrs. Hoffman to Leo Duvernay, in which she defended a suggestion that she and Mr. Hoffman spent 1,000 hours of their time on the project, as well as tidbits of evidence that Mrs. Hoffman was integral to selecting the building, design, and ensuring historical accuracy of its renovation. In other words, whether Mrs. Hoffman's contribution to the project could have earned a $400,000 fee was not something the

government directly addressed.[66]  Government witness Michael Daigle opined that he did not think Mrs. Hoffman had the knowledge that a project manager should have.[67]  But that was about it.

Nevertheless, the government contends that a rational juror could have found sufficient evidence to convict Peter and Susan Hoffman for submitting this payment confirmation.  That Susan and Peter Hoffman were best friends, and that Mrs. Hoffman had a more-than close relationship with Leo Duvernay, who used a room in Mrs. Hoffman's house rent-free prior to working on 807 Esplanade.  The government submits that the jury could have easily inferred that Mrs. Hoffman (a) "could understand the plain meaning of the terms on the sheet of paper confirming paid invoices for work that she knew was not complete on the project" and for which she did not get paid; and (b) was not oblivious of attempts to get tax credit money from the State of Louisiana by submission of materially false documents.  The government also relies on its Exhibit 160, which

---

[66] Persisting in its mistake to shift the burden of proof, the government submits in its supplemental papers in support of its position that Mrs. Hoffman did not earn a $400,000 fee that "it appeared from the outset of the trial that Susan Hoffman's defense of ignorance inherently conceded that she was no project manager."

[67] Counsel for Susan Hoffman asked Michael Daigle:

[I]f you went [to see Mrs. Hoffman] with questions and suspicions and looking for explanations, why didn't you just ask her if she got $400,000; if she was the project manager; if she thought that was a fair lease amount; if she received the rentals on the lease?

Mr. Daigle admitted he did not ask those questions of Mrs. Hoffman.

purports to bear Mrs. Hoffman's signature (although she did not stipulate to this at trial) and attests to the fact that Mrs. Hoffman worked 1,000 hours on the project by December 2009.[68]

Viewing the evidence in the light most favorable to the government, the Court finds that a rational jury could have found that sufficient evidence supported a finding that submitting or causing to submit the $700,000 payment confirmation amounted to wire fraud.  Mr. and Mrs. Hoffman represented to the auditors that this amount had been paid to Leeway Properties for project management and office space (and the excluded Conway fee), and that this was an expenditure for film tax credits.  The jury was presented with an issue of fact, which it resolved in favor of the government.  Although there was limited evidence tending to show Mrs. Hoffman's intent to defraud, and it would have been rational for the jury to conclude that Mrs. Hoffman signed the document because she trusted her husband and not because she had the specific intent to defraud, the Court must defer to the jury's

---

[68] Mrs. Hoffman counters that the government failed to prove that Mrs. Hoffman's signature appears on the 1000 hour affidavit and notes that Ms. Matthew testified that she did not believe it contained Mrs. Hoffman's true signature including because it includes her middle initial, which Mrs. Hoffman typically did not use when signing documents.  The government insists that it did in fact prove that she signed the 1000 hour affidavit, pointing to the email from Mrs. Hoffman to Leo Duvernay in June 2011, in which she confirms that she and Mr. Hoffman had spent 1000 hours over a two or three year period working on the project.  Mrs. Hoffman argues in her papers that nowhere in the email is there any reference to the affidavit, nor does she say anything about telling the auditors or the film tax administrators that she alone worked 1000 hours.

verdict when one cannot say it was irrational to conclude that Mrs. Hoffman read the document and understood what she was signing. As for Mr. Hoffman, he testified to his involvement in the $700,000 payment confirmation,[69] and there was sufficient evidence for a rational juror to find him guilty of wire fraud.

### H.  *Wire Fraud Counts 14-20*

The jury found only Peter Hoffman guilty of committing wire fraud Counts 14, 15, 16, 17, 18, 19, and 20. He submits that the guilty verdicts were irrational.

It is difficult to discern precisely what the reason was for conviction on each of these counts, none of which involve a singular topic or expenditure; all involve responses or materials relative to the second or final submission to the auditors or the State.[70] Complicating matters, neither Mr. Hoffman nor the government separately brief the sufficiency of the evidence on these counts. Nevertheless, the Court finds that as to each of these convictions, Mr. Hoffman's arguments advance nothing more than factual disputes that the jury was entitled to resolve in the

---

[69] And, a fact that could have gone either way as to Mr. Hoffman's intent to defraud, Mr. Hoffman researched whether $400,000 would be a reasonable fee for a project manager for a project like 807. But see, Jackson, supra note 18.

[70] Although the government argues, correctly, that the material sent by wire need not itself be fraudulent to amount to wire fraud, it is equally true in this case that submitting applications seeking state tax credits is not per se fraudulent. In other words, 807 Esplanade was a real infrastructure project with real expenditures...and was completed.

government's favor.

Count 14 and Count 15.  The wires of Count 14 and 15 are lengthy email communications among Mr. Hoffman and Kuchler. Exhibit 14 is an email chain among Mr. Hoffman and Ms. Matthew and Ms. Kuchler, a total of 10 email exchanges spanning four printed pages, starting on December 28, 2009 and continuing on December 29, 2009.  Mr. Hoffman provides information to Kuchler regarding equipment purchases, equipment consultant fees, legal fees, office rent for contractor, and supervisory fees.  Exhibit 15 includes emails among Mr. Hoffman and Kuchler on December 30 and 31, 2009 regarding supervisory fees, lease agreements, interest payments, and office rent for contractor.

The email exchanges are lengthy and are not reproduced here. Kuchler seems to be frustrated at the task of getting the proper support for her audit, stating "The problem I am having with all of these are proper paper documentation and quotes from third parties to determine fair market value.  Invoices from your own company is not good enough when the companies are related."  Gov't Ex. 14. And relating to the $400,000 project management fee, Kuchler says:

> Thank you for the information from Lou but he said $400,000 was fair but you all paid $400,000 to numerous companies, not just to Leeway.  You paid the contractor $400,000 and Seven Arts another $883,240 for essentially the same services.  It seems like we are double-dipping here.

Gov't Ex. 15.  In both exhibits, there is back-and-forth between Kuchler and Mr. Hoffman, Kuchler seeking to independently verify

whether expenditures being claimed by Mr. Hoffman are supported by documents, or otherwise constitute fair market value representations. In defense of the numbers he provides, Mr. Hoffman says "[t]hese fees represent 3 years of work and more than 10 different transactions ... on a project which will have expenses in excess of $17,000,000." Gov't Ex. 15.

Viewing the evidence in the light most favorable to the government, the Court finds sufficient evidence to support the wire fraud convictions in Counts 14 and 15.[71]

Count 16. The wire of Count 16 is a January 7, 2010 email from Kuchler to Mr. Hoffman and his same-day reply. Kuchler tells Mr. Hoffman that Malcolm Dienes is "disallowing the following costs due to lack of supporting documentation":

> 1) $250,000 - in Audit Fees paid to Seven Arts Film Entertainment, Louisiana - no official back-up received to support what this is for.
> 2) $150,000 in Office Rent to Leeway for Leo - do you have anything in Leo's contract stating his office is on Royal Street and he will be taking free rent in lieu of a fee in the GC section of his contract?
> 3) Seven Arts Pictures, LA - did this company receive $122,048.62? No explanation or calculation or documentation has been provided.
> 4) Michael stated that he did not receive the money for which you are billing a company he has no interest in, so

---

[71] The Court understands Mr. Hoffman's argument to be that simple exchanges between him and the auditor should not be grounds for a wire fraud conviction. But once there is sufficient evidence to support a scheme to defraud and intent, the government need only prove that certain wires were sent in furtherance of executing the scheme to defraud. There was sufficient evidence to support a finding that Mr. Hoffman furthered the scheme in these communications with Kuchler.

I am taking out his hours and fees of $203,637.50.
5) We will remove the $150,000 fee to Richard Conway as
an equipment consultant due to lack of documentation
provided.
6) We will remove the $58,072.47 in operational fees paid
to Leo for water, sewage, and power.
7) Another question about the interest amount, it seems
as though we are not comparing the interest rate to the
going market rate.  If the project had to borrow money
from a bank, what would the interest rate be?

Mr. Hoffman replies:

1. I was not aware of an issue regarding audit fees....
I will revert to you this am after reviewing this item
with Marcia.
2. I believe this charge is entirely appropriate and it
is not in lieu of his fee but in effect an addition to
his fee because of providing this benefit.  Leo will
confirm and we can put in the rep letter that Leo's sole
office (including this job) for all periods is at 900
Royal St. Please reconsider.
3. I don't know what this item refers to and will discuss
with Marcia this am.
4.  Michael did not receive this money because he is an
equity owner as I thought he proved to you. He
acknowledges that the value for his services is the
increase in the vale [sic] of his equity in the project,
which is what he told me he told you. He will confirm
that and this can be included in the rep letter. Please
reconsider.
5. Agreed.
6. Agreed.
7. We provided two other loan agreements from private
lenders for recent projects of our [sic] with interest
rates higher than charged here - 15% and 18%. Bank
financing of such projects is not available and private
lenders insist on these types of interest rates. I can
confirm in the rep letter that Seven Arts could only
borrow at rates in excess of 12% for such projects in the
market today. Michael also told me the state's policy is
to accept interest rates up to 15%, which is more than we
have charged.
I will call you after checking out these two new (to me)
items this am.

The government submits in its briefing, without more, that this was

Mr. Hoffman's second attempt at claiming fraudulent construction finance supervision fees for Lou Sandoz.[72]  Mr. Hoffman counters that Seven Arts did not in the second or third application claim construction supervision for payments to Lou Sandoz; rather, Mr. Hoffman points to Note 6 to the second audit report, which states that the fee was for finance supervision and *Mr. Hoffman's* services: "Seven Arts Filmed Entertainment Louisiana LLC also received $250,000 in construction finance supervision costs for additional time spent by Peter Hoffman in negotiating deals, etc." Gov't Ex. 17, p. 9.  It is unclear from the face of the emails that the alleged Sandoz fee, or construction finance supervision fee, was claimed or represented as part of "audit fees."   Other evidence must be examined in order to determine whether the jury irrationally found Mr. Hoffman guilty of this wire fraud count.

Later on January 7, 2010, Mr. Hoffman writes Kuchler "[t]he 'audit fees' – a bad description – are the fees paid to SAFELA on account of financial supervision of the project and particularly the services of Lou Sandoz, as Marcia had mentioned in her email of the 18th." Gov't Ex. 135.  The day after this email was sent, on January 8, 2010, Mr. Hoffman writes to Kuchler explaining that the

---

[72] Advantage Capital had hired construction finance expert Lou Sandoz (an independent consultant engaged through Gurtler Bros.) in September 2009 after construction progress at 807 Esplanade had halted due to lack of funds; AdCap wanted an expert to resolve "confusion as to where the project was and how the money was being spent."

construction finance fee is indeed justified as part of a developer's fee. Gov't Ex. 137. Seven Arts sent an updated general ledger to Kuchler in preparation for the second audit; Seven Arts also sent Kuchler on November 9, 2009 invoices to justify expenditures for various expenses including a construction finance supervision fee for Lou Sandoz, described in the invoice as "Auditors Lou Sandoz Payment per Advantage Capital Agreement." Gov't Ex. 107. Seven Arts also submitted to Becky Hammond as late as March 18, 2011 the same SAPLA-SAFELA consulting agreement used to support the Sandoz fee. Gov't Ex. 248. Sandoz testified that he knew nothing of this $250,000 fee being claimed for his supervision, that he was unfamiliar with the invoice listing his "payment," and that he/Gurtler Bros. was paid by AdCap approximately $20,000 to $30,000 for the services he performed.[73] Sandoz Tr. 34-35.

---

[73] In his reply papers, Mr. Hoffman submits that the only invoice mentioning Mr. Sandoz was a related party expenditure mistakenly prepared by Ms. Matthew in which Sandoz was referred to as an "auditor," but that mistaken invoice was withdrawn with an apology from both Ms. Matthew and Mr. Hoffman before the second audit report was completed and was never used in connection with the third audit report. Mr. Hoffman submits that the government produced no evidence that any claim was made to the auditors or the State based on the contract prepared by Mr. Hoffman for Mr. Sandoz's services (a contract that was never completed or provided to the auditors as the basis for any claimed payments relating to Mr. Sandoz); any claim to the auditors would have required production of an invoice and proof of payment, which the government never produced.

Whether or not Mr. Hoffman improperly sought to claim as an expenditure for tax credits the construction finance supervision fee was clearly a fact issue to be resolved by the jury.

Viewing this evidence offered at trial in the light most favorable to the government, the Court finds that a rational juror could have concluded that sufficient evidence supports a wire fraud conviction for Mr. Hoffman relative to the construction finance supervision fee.

Count 17.  The wire of Count 17 is a January 20, 2010 email from Stephanie Dillon of Seven Arts to State administrator Chris Stelly, attaching the January 20, 2010 application (the second tax credit application) and supporting documents for infrastructure tax credits relative to the 807 Esplanade project.  This submission totaled $5,980,838 in infrastructure expenditures, including developers' fees; interest payments to SAFELA at 12.5%; $350,000 in legal fees; $807,202 in audio equipment; $2,302,860 in construction; financing fees; $250,000 in construction finance supervision; office space for Leo Duvernay; $400,000 project management fee paid to Leeway; and audit fees paid to Malcolm Dienes.  The government submits that most if not all of these expenditures were fraudulent.

*Equipment.*  The government submits that Mr. Hoffman fraudulently claimed an additional $807,202 in equipment allegedly purchased by Richard Conway and Simon Ellson from the United Kingdom; both Conway and Ellson pointedly testified that no equipment was ever purchased or sold to Mr. Hoffman.  The government submits that the evidence at trial showed that Mr.

Hoffman was informed on January 4, 2010 (two weeks before the second audit report was released) that the equipment would not be purchased by Conway's company, Molinare, and that Conway would no longer work with Mr. Hoffman.  But the $807,202 in equipment was nevertheless included in the second audited cost report.

*Construction Payments.*  Mr. Hoffman submitted $2,302,860 in payments to Leo Duvernay in the second application; this was in addition to the $1,749,257 in construction payments included in the first application.  By January 2010, however, the government submits that the evidence at trial (including Government Exhibit 162,[74] Duvernay's testimony,[75] and Michael Daigle's testimony[76]) showed that Duvernay had received just over $1,000,000 in payments for construction.

*Interest Payments.*  See the Court's comments regarding Count 13.

---

[74] Government Exhibit 162 is an email from Leo Duvernay or his assistant to Stephanie Dillon at Seven Arts dated June 3, 2011 in which Duvernay confirms that he has been paid a total of $1,266,496.50 from October 2008 through October 2009; the email includes copies of four out of six checks.

[75] Duvernay testified consistent with Government Exhibit 162 that he had not been paid even $2,000,000 by 2010.  Duvernay Tr. 28, 31-32.

[76] Michael Daigle testified that "almost $1.4 million of this amount [the $2.3 million in construction expenditures in the second audit] was based on what I believe to be fabricated circular transactions involving Mr. Duvernay.  And there appears to be only about a million dollars of hard costs spent at this time [at the time of the second audit report]."  Daigle Tr. 116.

*Legal Fees.*  See the Court's comments regarding Counts 5 and 13.

*Construction Finance Supervision Fee.*  See the Court's comments regarding Count 16.

*$400,000 Project Management Fee.*  See the Court's comments regarding Count 11.

*Office Rent Payments.*  In the second application for tax credits, Mr. Hoffman claimed a $150,000 expenditure for office space provided to Leo Duvernay over a three year period.  Mr. Hoffman claimed that the office space included three units, the courtyard in Susan Hoffman's building, and use of Susan Hoffman's bathroom.  Mr. Duvernay testified that he used an approximately 12x12 room with no bathroom, no running water, and no kitchen. That the room only had a desk and a few filing cabinets in it. When Michael Daigle met with Susan Hoffman to tour the site, Daigle asked to see the three units, but Mrs. Hoffman told him that the 12x12 room was all that Duvernay used.  The government submits that Duvernay testified that he did not receive use of the office in lieu of $150,000 in payment; that the space he used was worth no more than $400 per month; that he never would have paid $50,000 per year for the 12x12 room; and that he rented an apartment (that was twice the size of the office space and had a bathroom and kitchen) from Mrs. Hoffman in the very same building for $600 per month.

Viewing the evidence in the light most favorable to the

government, the Court finds that a rational juror could have concluded that Mr. Hoffman's submissions in the second application amounted to wire fraud.

<u>Count 18.</u>  The wire of Count 18 is an email dated January 20, 2010 in which Marcia Matthew sends to Kuchler, per Kuchler's request on January 19, the signed, revised management letter from Peter Hoffman in preparation for finalizing the January 20, 2010 second audit.

Mr. Hoffman submits that the management representation letter included no representations that could have influenced the State administrators, and that the government failed to prove that the letter included any representation regarding any of the transactions alleged by the government to be fraudulent. Although there are several representations made by Mr. Hoffman in the management rep letter relative to the second application,[77] in support of Mr. Hoffman's conviction the government focuses on Mr.

---

[77] These are representations made by Peter Hoffman relative to the same exact expenditures included in the second audit and addressed in the Analysis for Count 17.  Some examples:

13) ...
New Moon Pictures, LLC was reimbursed $807,202 for equipment purchases for the project.

Leeway Properties, Inc. also received $400,000 as a project management fee for Susan Hoffman's time involved in the project.
...
19) The audio equipment listed on the cost report was bought and is located in the United Kingdom. The appropriate state and local taxes will be paid once the equipment is put into use in Louisiana.

Hoffman's confirmation to the auditors with respect to the $150,000 expenditure for office space provided to Duvernay that "The contractor, Leo A. Duvernay, received free rent at 900 Royal Street in lieu of payments valued at $150,000." Mr. Duvernay testified at trial that there was "not really" any stated arrangement between him and Mrs. Hoffman as to why he could use the office space; he testified that he did not use that room instead of receiving payments for the work he did on 807 Esplanade (nor was that ever suggested to him). Duvernay Tr. 5, 49. By the signed management letter of Count 18, Mr. Hoffman represented the opposite.

Viewing the evidence in the light most favorable to the government,[78] the Court finds that a rational juror could have

---

[78] There were some facts disputed at trial as to precisely what Mr. Duvernay was using in terms of office space (that he also used the courtyard and had access to a bathroom in another part of the property) and as to what the fair market value of the claimed rent would have been (depending on how much space was being used by Duvernay). The jury was entitled to resolve those facts in the government's favor. And this Court must resolve any evidentiary conflict in favor of the verdict. United States v. Moreno-Gonzales, 662 F.3d 369, 372 (5th Cir. 2011)("[A]ny conflict in the evidence must be resolved in favor of the jury's verdict.").

Same with the issue of falsity or materiality of such statement. Applying the following jury instructions, and viewing the evidence in the light most favorable to the prosecution, a rational juror could have determined that the representation was false and material: A representation is "false" if it is known to be untrue or is made with reckless indifference as to its truth or falsity. A representation would also be "false" if it constitutes a half truth, or effectively omits or conceals a material fact, provided it is made with intent to defraud. A representation is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of the person or entity to which it is addressed.

concluded that Mr. Hoffman's representation to the auditors that
Duvernay received the rent-free office space in lieu of payment
amounted to wire fraud.

Count 19.  The wire of Count 19 is an email, subject line "807
Esplanade - Proof of Payments," dated June 29, 2012 from Kate
Hoffman to auditor Becky Hammond, copying Peter Hoffman, Seven Arts
employee Yuliya Yurchanka, and auditor Craig Silva.  Ms. Kate
Hoffman says:

> I hope this finds you well. Attached please find copies
> of the invoices and online payment confirmations from
> Seven Arts Pictures Louisiana LLC to New Moon (the
> managing member of Seven Arts Filmed Entertainment
> Louisiana) for the development fees and yearly interest
> payments.  As it is after banking hours, I could not
> access the final bank statement but hope these
> confirmations will suffice.

Attached to the email are the following:

- Invoice from SAFELA to SAPLA, 6/29/12, for "SAFELA Developer's
  Fee" of $300K
- Regions confirmation of transfer from SAPLA account to New
  Moon account for $300K on 6/29/2012
- Invoice from SAFELA to SAPLA, 6/29/12, for "SAFELA
  Interest-2008" of $20,324.72
- Regions confirmation of transfer from SAPLA account to New
  Moon account for $20,324.72 on 6/29/12
- Invoice from SAFELA to SAPLA, 6/29/12, for "SAFELA
  Interest-2009" of $128,103.31
- Regions confirmation of transfer from SAPLA account to New
  Moon account for $128.103.31 on 6/29/12
- Invoice from SAFELA to SAPLA, 6/29/12, for "SAFELA
  Interest-2010" of $318,060.16
- Regions confirmation of transfer from SAPLA account to New
  Moon account for $318,060.16 on 6/29/12
- Invoice from SAFELA to SAPLA, 6/29/12, for "SAFELA
  Interest-June 2012" of $178,483.00
- Regions confirmation of transfer from SAPLA account to New
  Moon account for $178,483.00 on 6/29/12
- Invoice from SAFELA to SAPLA, 6/29/12, for "SAFELA

107

Interest–2011" of $325,831.61
• Regions confirmation of transfer from SAPLA account to New
  Moon account for $325,831.61 on 6/29/12

At trial, Ms. Hammond explained that this email provided the payments at the end of the project in order to pay the accrued interest for the related-party loan and it was also the developer's fees. Hammond Tr. 23. The government submits that this was Mr. Hoffman's second attempt at claiming fraudulent interest payments. According to the government's evidence, Mr. Hoffman continued to represent that interest had been paid on what it insists is a non-existent $10 million loan. Gov't Ex. 255.[79] Hammond testified that she was only shown the outgoing wire transfers showing payment of interest. Gov't Ex. 19; Hammond Tr. 24. Had she known the payments were nothing but circular transfers, Hammond testified that it would have caused her concern in including those interest payments. Hammond Tr. 24-25.

Mr. Hoffman testified that the regulations are clear that financing costs are allowed for tax credit applications. Hoffman Tr. 261. No one told Mr. Hoffman that it was impermissible to make

---

[79] Page 64 of this exhibit (an email from Seven Arts to Becky Hammond) is a spreadsheet entitled SAFELA "interest calculation based on actual draws." Becky Hammond testified that this was the interest schedule provided to her auditing firm, that the interest rate being charged on this related-party loan (mostly 12.5%, but 9.75% and 9.25% in 2008 and 2007) was "a little on the high side." Hammond Tr. 22. When the prosecutor asked her "how did you confirm whether or not these draws had actually been made on this loan," Ms. Hammond responded that she "couldn't match up these draws specifically to transactions so we actually had to recalculate and redo the schedules." Hammond Tr. 22-23.

a claim for interest on a loan;[80] the only issue is whether the
interest is reasonable and "both the auditors and LED would have to
make a judgment that the interest rate was okay." Hoffman Tr. 262.
He explained:

> I emphasize that on the related-party payments and also
> the way the interest was calculated, these are areas of
> uncertainty. That is, it may be that LED, when it looks
> at it, says, you know, we're not going to allow that,
> we're going to allow less. This is just a claim. It's
> not something where we're saying, oh, definitely, you
> know, we're entitled to this no matter what. This is
> what the accountants thought was the best claim we could
> make. It might well be less. And if we got less from
> LED, we would still be happy. Right now, we would be
> happy with $6.5 million of certified base investment.

Hoffman Tr. 261. When asked by the prosecutor whether the interest
payments in Government Exhibit 19 "were just bounced back and forth
between the two bank accounts," Mr. Hoffman disagreed with that
characterization. He explained:

> What happened was there was a draw under the loan, which
> was the stand-in for all of the other real funding. And
> that money was advanced, which we showed the bank
> accounts, to SAPLA. And then SAPLA paid the interest.
> That was exactly what I described to Mr. Silva in
> response to the inquiries from the FBI. And it was right
> after that response that he reissued his statement.

Hoffman Tr. 240. The prosecutor continued to challenge Mr. Hoffman
as to "where are the bank records [showing] that the money actually
existed and actually was withdrawn on that [inter-company loan

---

[80] Indeed, the government does not question the permissibility
of claiming as infrastructure tax credit expenditures the interest
on the Advantage Capital or Palm Finance loans, which were included
in the Silva cost report along with the inter-company loan
interest.

between SAPLA and SAFELA]?"  Hoffman Tr. 241-42.  Mr. Hoffman
explained to the Court that page 64 of Government Exhibit 255 was
Seven Arts' work product, which Ms. Hammond rejected and then did
her own work product.  Hoffman Tr. 241-42.  The Court then asked:
"was there backup for the draws that are reflected in these papers?
And if so, was the back up available to Ms. Hammond?"  Mr. Hoffman
answered: "Whatever there was, was available to her."  Hoffman Tr.
244.

Viewing the evidence in the light most favorable to the
government, a rational juror could have resolved this factual
dispute -- concerning whether Mr. Hoffman attempted to claim
fraudulent interest payments as qualifying expenditures in
furtherance of a scheme to defraud the State -- in favor of the
government and could rationally have concluded that Mr. Hoffman's
conduct in doing so amounted to wire fraud.[81]

Count 20.  The wire of Count 20 is an email dated July 3, 2012
from Kate Hoffman to Chris Stelly, copying Peter Hoffman in which
Ms. Hoffman writes: "Please see attached which was also sent via
mail today."  Attached to the email are (1) a three-page letter to
Mr. Stelly from Peter Hoffman; and (2) the Silva audit report dated
July 3, 2012 indicating total infrastructure expenditures of
$11,785,934.  By his letter, Mr. Hoffman writes "[e]nclosed please

---

[81] The Court has also addressed interest payments on the $10
million loan previously in analyzing whether a rational juror could
have found Mr. Hoffman guilty of Count 13.

find the cost report and general ledger of Seven Arts Pictures Louisiana LLC, as well as the Independent Auditors Report submitted by Silva Gurtner & Abney LLC, dated June 30, 2012, all regarding the [807 Esplanade] infrastructure project." Mr. Hoffman states that the enclosures include "'qualified expenditures' on the Project from October 1, 2007 through June 29, 2012."

Neither party singles out Count 20 in their papers. Because the government argues that Mr. Hoffman made a second attempt at claiming certain expenditures (that Leeway Properties received $400,000 for Susan Hoffman's management services; construction finance supervision fees; office rent for Duvernay; interest payments on an inter-company loan; legal fees for Mr. Hoffman and Mr. Arata; and developer's fees)[82] it appears that the government argues that the jury rationally found that causing this final audit report to be emailed across state lines amounts to wire fraud for the same reasons that several of the prior charges constituted wire fraud. This final audit report includes, among other things, a $1.6 million developer's fee to SAFELA; interest on the SAFELA inter-company loan; the $350,000 in legal fees for Mr. Hoffman and Mr. Arata; the $400,000 consulting/supervisory fee for Leeway Properties; $250,000 construction finance supervision fee paid to

---

[82] Singling out developer's fees, the government submits that developer's fees are based on 20% of costs per industry practice. Thus, "[t]he logical conclusion is that if the costs are fraudulent, the addition of 20% of the fraudulent costs is also fraudulent."

111

SAFELA; and $157,450 for office space for Leo Duvernay.

When Mr. Hoffman was presented with Government Exhibit 20 during his redirect examination, Mr. Hoffman stated that he stands by the numbers in the Silva audit.  Hoffman Tr. 260-61.  During his cross-examination, the government accused Mr. Hoffman of glossing over the fact that Seven Arts submitted almost $12 million in expenditures (Gov't Ex. 20) for a property worth $5 million. Hoffman Tr. 259.  The jury, the government submits, could have rationally concluded that Mr. Hoffman -- consistent with his statements to the board before taking on this project that government tax credits would finance the project[83] -- attempted to claim millions of dollars in tax credits to which Seven Arts was not entitled.

Viewing the evidence in the light most favorable to the government, a rational juror could have determined that Mr. Hoffman's conduct in causing Exhibit 20 to be submitted to the

---

[83] When asked by the prosecutor about his statement from the minutes of the board of directors, where Mr. Hoffman suggested that the project would be "no cost to the company" and the project would be funded by "the government tax credits," Mr. Hoffman explained that all of the government tax credits included the federal and state historic rehabilitation credits and that "the largest single source of financing [was] the value of the building itself [and] the state and federal historic rehabilitation credits, which were far more secure, because we had a certainty about how that would work and in fact the infrastructure expenses were an uncertain source."  Hoffman Tr. 255.  Mr. Hoffman added: "If you're charging me with being too optimistic and misunderstanding what it would take, I stand guilty of that.  I wish...it was no where near sufficient to get the funding from tax credits."  Hoffman Tr. 256.

State amounted to a transmission for the purpose of executing a scheme to defraud.

    *I.*   *Mail Fraud* (Count 21)

    Count 21.  The mailing of Count 21 is a FedEx package from Peter Hoffman to State forensic auditor Michael Daigle dated February 3, 2010 in which Mr. Hoffman sends to Daigle materials in support of the January 2010 tax credit application.[84]  Although Mr. Daigle had requested materials from both prior applications, Mr. Hoffman only sent materials related to the second audit.[85]  In the memorandum accompanying the mailing, which was also apparently sent via email, Mr. Hoffman copies Katie Kuchler and Michael Arata.

    All three defendants were convicted of mail fraud.  All three seek acquittal.[86]

    The government submits that the mailing in Count 21 contained

---

[84] The attachments included within Mr. Hoffman's submission to Michael Daigle include Government Exhibit 11, as well as other documents which the government charged were misleading or fraudulent.  The Court notes that it is impossible to determine on which document or documents the jury relied in its finding of guilt.

[85] As to why he did not sent responsive information relating to the first audit report, Mr. Hoffman writes Daigle that the tax credits issued in connection with that first audit are not subject to recapture and that "Seven Arts feels that this matter should not be reopened at this time."  Gov't Ex. 21.

[86] The jury acquitted Mr. Arata and Mrs. Hoffman of Count 17, which involved the submission of the January 2010 application to the State.  But this Court may not enter a judgment of acquittal simply due to inconsistent verdicts, as such verdicts "may be the result of lenity" by the jury.  United States v. Powell, 469 U.S. 57, 66 (1984).

a litany of fraudulent records by which Mr. Hoffman intended to convince State forensic auditor Michael Daigle that the claimed expenditures in the audit reports were correct (including an affidavit signed by Mr. Hoffman that Conway was his agent and that equipment had been purchased).   Mr. Hoffman contends that this mailing occurred after delivery of the second audit report and, therefore, was incapable of influencing Daigle.   The government submits that it need not prove that Daigle himself was the intended victim or that he or anyone was defrauded; that Mr. Hoffman was charged with concealing the conspiracy in Overt Act 35; that a representation is false if it "conceals a material fact."

As to Mr. Arata and Mrs. Hoffman, the government submits that sufficient evidence supports the jury's guilty verdict because Mr. Arata and Mrs. Hoffman were members of the conspiracy at that time; it was foreseeable that Mr. Hoffman would make such a mailing; and the mailing obstructed the State's investigation of the fraudulent expenditures in the first cost report.   Although Mr. Hoffman refused to provide documentation regarding the Departure and Duvernay transactions that were submitted in support of the first application, Mr. Hoffman provided a general ledger listing expenditures that for Duvernay, Departure, and legal fees; Mr. Hoffman also provided Daigle the Leeway Properties payment confirmation (Gov't Exhibit 11).

As to Mr. Hoffman, viewing the evidence in the light most

114

favorable to the government, the Court finds that sufficient evidence supports a rational juror's guilty verdict as to mail fraud.  The jury could have resolved any factual dispute focused by Mr. Hoffman in favor of the government.

As to Mr. Arata, he argues that his participation in any conspiracy is limited to the first application because the jury acquitted him of wire fraud for submitting the second and third application.  Because the evidence at trial showed that Mr. Arata withdrew from any conspiracy in August 2009 (as detailed below), the Court agrees; he cannot be responsible for acts of his coconspirators after he withdraws from the conspiracy.

Finally, as to Mrs. Hoffman, because the Court finds that there was sufficient evidence to support a rational jury's guilty verdict as to conspiracy (as detailed below), viewing the evidence in the light most favorable to the government, the Court must defer to the jury's guilty verdict against Mrs. Hoffman on mail fraud in Count 21.

_J._   _Conspiracy_ (Count 1)

Count 1.  This is the conspiracy charge in which all three defendants were found guilty.  Each defendant likewise seeks a judgment of acquittal.

The jury was instructed on the law regarding conspiracy:

One may become a member of a conspiracy without knowing
all the details of the unlawful scheme or the identities
of all the other alleged conspirators. If a defendant
understands the unlawful nature of a plan or scheme and

115

knowingly and intentionally joins in that plan or scheme
on one occasion, that is sufficient to convict him or her
for conspiracy even though the defendant had not
participated before and even though the defendant played
only a minor part.

And, the Court also instructed the jury on <u>Pinkerton</u>,[87] that a

defendant may be convicted of substantive counts if found to be a

member of a conspiracy:

A conspirator is responsible for offenses committed by
another conspirator if the conspirator was a member of
the conspiracy when the offense was committed and if the
offense was committed in furtherance of, or as a
foreseeable consequence of, the conspiracy.
Therefore, if you have first found a defendant guilty of
the conspiracy charged in Count 1 and if you find beyond
a reasonable doubt that during the time a defendant was
a member of the conspiracy, other conspirators committed
the offense in Counts 2 through 21 in furtherance of and
as a foreseeable consequence of that conspiracy, then you
may find that defendant guilty of Counts 2 through 21,
eve though the defendant may not have participated in any
of the acts which constitute the offenses described in
Counts 2 through 21.

The government submits that it is "beyond dispute" that it

proved conspiracy because it proved that Mr. Arata and Mr. Hoffman

formed an agreement to obtain tax credits involving the

representations at issue. Presumably, the government intended to

argue that Mrs. Hoffman was part of that conspiracy. The

government also argues that proof of any substantive mail or wire

fraud count shows proof of intent and, therefore, supports the

jury's guilty verdicts on conspiracy. Because the conspiracy

statute and the case literature spawn the difficult question "what

---

[87] <u>Pinkerton v. United States</u>, 328 U.S. 640, 647 (1946).

isn't a conspiracy?", the Court must agree.

To prove a conspiracy to commit wire or mail fraud, the government had to prove beyond a reasonable doubt that (1) two or more persons made an agreement to commit wire or mail fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement wilfully, in other words, with the intent to further the unlawful purpose. United States v. Grant, 683 F.3d 639, 643 (5th Cir. 2012). The agreement need not be formal, or spoken. Id. "An agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." United States v. Stephens, 571 F.3d 401, 404 (5th Cir. 2009)(quoting United States v. Bieganowski, 313 F.3d 264, 276 (5th Cir. 2002)). Having determined that sufficient evidence supports substantive wire fraud convictions against each defendant, the Court likewise finds sufficient evidence supported guilty verdicts on the conspiracy charge as to each defendant. The jury could have inferred an agreement from the circumstantial evidence and concert of action.

There is, however, one oddity as to Mr. Arata's conspiratorial, or Pinkerton, liability. Mr. Arata submits that the evidence at trial proved that he withdrew from representing Mr. Hoffman and, thus, withdrew from any conspiracy such that he cannot be guilty of any post-withdrawal acts of his coconspirators. The

government insists that the evidence did not support a finding that Mr. Arata withdrew from the conspiracy and notes that Mr. Arata did not pursue a withdrawal defense or request a withdrawal jury instruction.

The preponderance of the evidence at trial proved that Mr. Arata terminated his relationship with Mr. Hoffman after suspecting him of fabricating invoices in July or August 2009.  That satisfies the mandate of <u>Pinkerton</u>.  The government would have the Court elevate form over substance, but the Court finds that because the evidence at trial showed that Mr. Arata did, in fact, withdraw from the conspiracy,[88] he cannot be responsible for post-withdrawal acts committed by his coconspirators.  "Upon joining a criminal conspiracy, a defendant's membership in the ongoing unlawful scheme continues until he withdraws."  <u>Smith v. United States</u>, 133 S. Ct. 714, 717 (2013).  "An untimely withdrawal does not negate liability on the *conspiracy charge,* but instead helps a defendant guard against post-withdrawal acts done by other co-conspirators and thereby serves to minimize his liability on subsequent crimes."

---

[88] The evidence supporting withdrawal, as previously mentioned: Mr. Arata sent a letter dated August 6, 2009 to Mr. Hoffman terminating their business relationship;  he notified other Seven Arts officers and others of his resignation;  he advised the State that he had withdrawn from his representation of Seven Arts and Peter Hoffman;  he met with government agents and lawyers, cooperated and provided them with documents and participated in interviews;  and he reminded the State film office that he had withdrawn from representing Seven Arts and that he was adverse to it.

_United States v. Salazar_, 751 F.3d 326, 330-31 (5th Cir. 2014) (citation omitted, emphasis in original).

                              ***

Accordingly, for the foregoing reasons, the Court finds that Mr. Hoffman's motion for judgment of acquittal is GRANTED in part (as to Counts 2, 3, 4, 5, and 7) and DENIED in part (as to Counts 1, 6, and 8 through 21); Mr. Arata's motion for judgment of acquittal is GRANTED in part (as to Counts 2, 3, 4, 5, 7, 13, and 21, as well as Counts 22 through 25) and DENIED in part (as to Counts 1 and 6); and Mrs. Hoffman's motion for judgment of acquittal is DENIED.

                             III.
                              _A._

Rule 33 of the Federal Rules of Criminal Procedure allows a trial court, upon a defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Disfavored, Rule 33 motions are viewed "with great caution." See _United States v. Infante_, 404 F.3d 376, 387 (5th Cir. 2005).

In the Fifth Circuit, "a new trial ordinarily should not be granted 'unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict.'" _United States v. Wright_, 634 F.3d 770, 775 (5th Cir. 2011)(citations omitted); _see also United States v. Robertson_, 110 F.3d 1113, 1120 n. 11 (5th Cir. 1997)("It has been said that on such a motion [for

                              119

new trial] the court sits as a thirteenth juror.   The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial  ... should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.").[89]   "A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant."  United States v. Wall, 389 F.3d 457, 466 (5th Cir. 2004)(citation omitted).   The Court lacks "authority to grant a motion for a new trial under Rule 33 on a basis not raised by the defendant."  United States v. Shoemaker, 746 F.3d 614, 631-32 (5th Cir. 2014)(citation omitted).

Unlike the cramped standard applicable to Rule 29 motions, during its consideration of a motion for a new trial, the Court has broad discretion to "carefully weigh the evidence and may assess the credibility of the witnesses during its consideration of the motion for new trial."  United States v. Herrera, 559 F.3d 296, 302 (5th Cir. 2009)(quoting United States v. Tarango, 396 F.3d 666, 672 (5th Cir. 2005)); United States v. Shoemaker, 746 F.3d 614, 631-32 (5th Cir. 2014)("The 'interest of justice' may take into account 'the trial judge's evaluation of witnesses and weighing of the evidence'", but the Court "may not reweigh the evidence and set

---

[89] But see United States v. O'Keefe, 128 F.3d 885, 898 (5th Cir. 1997)("The grant of a new trial is necessarily an extreme measure, because it is **not** the role of the judge to sit as a thirteenth member of the jury.")(emphasis added).

aside the verdict simply because it feels some other result would be more reasonable.")(citations omitted).  A new trial may be appropriate where the evidence "tangentially supports a guilty verdict, but in actuality, the evidence preponderates sufficiently heavily against the verdict such that a miscarriage of justice may have occurred."  <u>Tarango</u>, 396 F.3d at 672 (citations omitted). However, the Court still "must not entirely usurp the jury's function or simply set aside a jury's verdict because it runs counter to [the] result the district court believed was more appropriate."  <u>Id.</u> (citations omitted).  Rather, the Court should set aside a jury's guilty verdict in the interests of justice only when exceptional circumstances are present.  <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> <u>United States v. Poole</u>, 735 F.3d 269, 279 (5th Cir. 2013)("Rule 33 case law cannot be understood except through the lens of avoiding the injustice of a compromised verdict.").

<i>B.</i>

All three defendants seek a new trial insofar as the Court has denied their motions for judgment of acquittal.

Mr. Hoffman submits that a new trial is warranted because (a) the manifest weight of the evidence was that the government did not prove beyond a reasonable doubt either that the related party transactions were not proper claims of base investment, or the Duvernay/Departure confirmations were valid, or the auditors or the State assumed that final cash payments had been made to Duvernay or

121

Departure; and (b) prosecutorial misconduct caused prejudice.  Mr. Arata submits that a new trial is warranted based on prosecutorial misconduct, including disparaging comments made about Mr. Arata and his family; the government's strategy to vilify Mr. Arata as a connected, manipulating player; and the government's strategy to overstate evidence, engage in inappropriate questioning of witnesses on key issues.  Mrs. Hoffman submits that the weight of the evidence does not support the guilty verdicts.

<em>C.</em>

Because the Court orders that judgments of acquittal must be entered as to Mr. Hoffman and Mr. Arata on Counts 2, 3, 4, 5, and 7, as well as Counts 13, 21, and 22 through 25 for Mr. Arata, the Court must also decide whether a new trial should conditionally be granted if the Fifth Circuit reverses the judgment of acquittal. The Court applies the same Rule 33 standard to decide whether a new trial is warranted (if the Fifth Circuit reverses the judgments of acquittal) as it applies to decide whether the defendants are entitled to their alternate relief of new trial, which each urges insofar as the Court denies the motions for judgment of acquittal.

The Court finds that no new trial is warranted as to those counts that the Court denied motions for judgment of acquittal. Insofar as the defendants argue that the weight of the evidence preponderates heavily against the verdict, the Court disagrees. Even making credibility determinations in favor of the defendants

122

and against such government witnesses as Kuchler,[90] the Court finds
that the jury was nevertheless left with sufficient evidence to
reject the defendants' good faith theories of defense and find that
the defendants had engaged in a scheme to defraud and conspired to
do so.  Nor has any defendant shown that the hyperbole employed by
the government,[91] or its inappropriate questioning of witnesses,[92]
caused any prejudice.  Without more, the Court cannot grant a
judgment of acquittal *or* grant a new trial simply because the Court
disagrees with the jury's verdict or because the Court would have
resolved the case differently.

Likewise, as to Counts 2, 3, 4, 5, 7, and (as to Mr. Arata
only) Counts 13, 21, and 22 through 25, if the Fifth Circuit

---

[90]  Ms. Kuchler, the tax credits auditor, was a central
government witness.  She was argumentative, self-interested,
defensive, and rehearsed. She endlessly intoned repeatedly that one
can't "audit for fraud."  And yet, everything she needed for her
review was in a box of materials delivered to her in response to
her audit requirements.  Nevertheless, she either didn't examine
everything, and admittedly, some vital material was "illegible" but
she never asked for a legible copy.

[91] For example, in its opening statement, the government stated
that the defendants "utterly abused the Louisiana film tax credit
program, and in the process they took advantage of and exploited
every human being they could."  False theater.

[92] It was utterly inappropriate for the government to ask Jerry
Daigle "Did Michael Arata tell you that he later called Katie
[Kuchler] and told her that the operating agreement was
substantiation for the legal fees?" or "Did Michael Arata tell you
that he later, after your conversation with him, called Katie
[Kuchler] and told her that his equity interest was in support of
legal fees/tax credit submission?"  Jerry Daigle Tr. 32-33.  There
was no evidence that Mr. Arata ever called Kuchler to tell her that
he was relenting on the legal fees issue.

reverses this Court's judgment of acquittal on these counts, the Court does not find that a new trial is warranted.  There has been no demonstration of adverse effects on substantial rights of any defendant that would warrant the exceptional remedy of a new trial.

* * *

Accordingly, for the foregoing reasons, IT IS ORDERED: that Susan Hoffman's motion for judgment of acquittal and motion for new trial are DENIED; Michael Arata's motion for judgment of acquittal is GRANTED in part and DENIED in part, but his motion for new trial is DENIED; and Peter Hoffman's motion for judgment of acquittal is GRANTED in part and DENIED in part, but his motion for new trial is DENIED.  Finally, the Court conditionally determines that no new trial shall be granted if the judgments of acquittal are later reversed or vacated on appeal.[93]

New Orleans, Louisiana, December 9, 2015

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[93] Ever since the Supreme Court in 1979 in the Jackson case announced the "any rational trier of fact" standard of review, the case literature on Rule 29 review has resulted in little more than hollow slogans.  The Fifth Circuit contributed to that disarray when it adopted and sporadically applied, but then unwisely abandoned, the realistic equipoise formula.  It is this Court's hope that eventually this issue will be revisited by higher courts that will announce a brighter line test for district judges in Rule 29 settings.