UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA ACTION | CRIMINAL |
| v. | NO. 14-22 |
| PETER M. HOFFMAN, ET AL. | SECTION L |

### ORDER & REASONS

Before the Court is Defendant Peter Hoffman's ("Hoffman") Motion to Vacate Convictions for *Brady* Violations. R. Doc. 1052. The government opposes the motion. R. Doc. 1059. After a review of the record, briefings, and applicable law, the Court rules as follows.

I.  BACKGROUND

a.  Prior to Final Adjudication

This white-collar criminal case was transferred to this section on January 31, 2022 upon the death of Judge Feldman. The Court is familiar with this case's lengthy procedural history and will only summarize the background relevant for the instant motions.

In 2014, a grand jury returned a 25-count Second Superseding Indictment against defendants Peter Hoffman, Michael Arata, and Susan Hoffman. All three defendants were charged in Count 1 with conspiracy to commit mail and wire fraud by submitting false and misleading expenditure claims in applying for state tax credits under the Louisiana Motion Picture Incentive Act in relation to their company, Seven Arts Entertainment ("Seven Arts") and the company's mansion on Esplanade Avenue in New Orleans. Following an 11-day jury trial in April of 2015, the defendants were convicted of various charges including conspiracy to commit wire fraud, wire fraud, mail fraud, and, as to Mr. Arata, making false statements to federal agents. Each defendant

1

has engaged in motion practice and pursued appellate avenues as to various aspects of their trial and sentences, and the government also appealed because the District Court had set aside certain convictions following the jury verdict.

In 2018, the Fifth Circuit decided these various appeals and affirmed in part and reversed in part the sentences below. *United States v. Hoffman*, 901 F.3d 523 (2018). Relevant to the instant motion, the Fifth Circuit vacated Hoffman's sentence. The jury had found Hoffman guilty on 21 counts charged, including conspiracy, mail fraud, and wire fraud, and the sentencing guidelines indicated a sentence range of roughly 14-17 years' incarceration. *Id.* at 536. The District Court, Judge Feldman, had sentenced all defendants to only probation, with Hoffman receiving 5 years' probation. *Id.* The Fifth Circuit found that as to Hoffman's sentence, the downward variance was a bridge too far given the magnitude of the scheme, his role spearheading the scheme, and his abuse of his position as a lawyer to further the scheme. *Id.* at 555-56. On remand, Hoffman was re-sentenced to 20 months incarceration for each of counts 1 though 21, to be served concurrently, followed by a two-year term of supervised release. R. Doc. 912. Hoffman then appealed this sentence as well as the District Court's dismissal of his motion for reconsideration. *See* R. Doc. 946.

On January 4, 2020, just over a month before the District Court issued its resentencing order, Hoffman filed a Motion to Vacate Convictions based on *Brady* Violations "by reason of serial violations of the government's obligations to disclose exculpatory and impeaching evidence." R. Doc. 897. Decision on this motion was continued and this Court, upon receipt of the transferred case, issued an administrative stay on the case pending the outcome of Hoffman's appeal of the District Court's resentencing and dismissal of his motion for reconsideration. R. Doc.

1015. The *Brady* motion to vacate was thus terminated with leave to refile when the case is reopened, following a final adjudication on the appeal.

### b. Final Adjudication and Subsequent Events

On June 9, 2023, the Fifth Circuit issued its opinion on Hoffman's appeal, affirming the District Court with an equally divided opinion. *United States v. Hoffman*, 70 F.4th 805, 807 (5th Cir. 2023).[1] Following this decision, Hoffman sought and obtained leave to re-file his *Brady* Motion, as well as to continue his self-surrender date. The Court rejected his bids to continue his self-surrender date and Hoffman is presently serving his sentence. With all appeals exhausted, on September 23, 2023, Hoffman refiled his *Brady* Motion to Vacate Convictions. R. Doc. 1052.[2]

## II.     PRESENT MOTION

In the instant motion, Hoffman asks the Court to permit additional discovery and to conduct an evidentiary hearing on this additional discovery, following which he would urge the Court to vacate his convictions. He argues that he is entitled to the discovery, evidentiary hearing, and to have his convictions vacated on the basis that *Brady* materials were withheld prior to, during, and after trial. R. Doc. 1052. The crux of his argument is that he and his co-defendants complied with the state's requirements, that the state found the conduct they were accused of permissible in other contexts, and that no actual loss to the state resulted from their conduct. He argues that the government suppressed or withheld various pieces of evidence that would have helped him make these points to the jury. The alleged *Brady* materials in question are: (1) the Horizon Report; (2) Schott/Stelly Emails; (3) "suppressed witness testimony;" (4) LIFT litigation; and (5) Orleans

---

[1] Judge Jolly would have affirmed the District Court's judgment in its entirety. Chief Judge Richman would have dismissed the appeal as not timely on the basis that Congress abrogated the *Healy* doctrine in the sentencing context. Judge Dennis would have remanded for an evidentiary hearing and resentencing.

[2] In November, 2023, Susan Hoffman filed a motion asking the Court to set deadlines for her to file her own motions and/or reurge motions that had been previously terminated without resolution. R. Doc. 1065. In so granting, the Court agreed, per the parties' request, to defer ruling on the instant motion by Peter Hoffman. R. Doc. 1070. Susan filed her motion on February 15, 2024. R. Doc. 1071. The Court will address her motion in a separate order.

Studio Litigation. R. Doc. 1052-2 at 10-14. A brief description of each of these materials is in order.

### A. The Alleged *Brady* Materials

The Horizon Report is a report authored by the Louisiana Office of the Inspector General ("OIG") in 2016 concerning a company, Horizon Entertainment, which sought and obtained film tax credits relating to two film productions, *The Sean Payton Show* and *Saintsational*. *See* Horizon Report, R. Doc. 897-4 at 4. According to Hoffman, this report was not disclosed pursuant to subpoenas filed by co-defendant Arata nor other requests for discovery, and it should have been disclosed because it was responsive to discovery requests pertaining to whether the Louisiana Office of Economic Development ("LED") afforded tax credits on the basis of "circular transfers" of funds, and that it is *Brady* material because it refutes the testimony of several of the government's witnesses who testified that circular transfers were not approved. R. Doc. 1052-2 at 11-12.

The emails between Alex Schott and Christopher Stelly are several brief exchanges, discussing an unknown project. *See* R. Doc. 897-5 at 2-3. Schott's email signature indicates that he was the Executive Director of the Governor's Office of Film & Television and Stelly was one of the government's witnesses in this trial and worked at the LED. In these email exchanges, Stelly asks Schott why a sentence requiring that investments be expended in-state by a certain date was removed from a certification letter in the project they were discussing. *Id.* Schott responds that there is no statutory requirement that these investments be expended and that the requirement is simply that it must be invested, and then goes on to explain that in the specific case they were discussing, there were real estate and bank concerns with regard to construction schedules. *Id.* Stelly then responds that this "[m]akes perfect sense" and then goes on to discuss items relating to

4

the construction projects in that case. *Id.* Hoffman argues that these emails constitute *Brady* material because they impeach Stelly's trial testimony that he always required cash expenditures when approving tax credits. R. Doc. 1052-2 at 12. Peter excerpts portions of Stelly's testimony he claims is undermined by these emails, for example:

> Q: Can you explain to the jury why that [language in the precertification required that investment be 'actually expended'] was important enough to put in the letter?
>
> A: Well state law required that the money actually be spent. It couldn't just be a promise to spend or anything like that. It had to be actually spent. And that was a statutory provision that we wanted to reflect–we wanted to repeat in the [precertification].

*Id.* at 15. Hoffman argues this is proven false by these emails, as well as the other materials sought. *Id.* at 16.

The allegedly suppressed witness testimony refers to testimony by witnesses that Hoffman does not name out of concern that the government will seek *ex parte* communications with them and/or that the government will make "explicit or implicit threats of prosecution to these witnesses." *Id.* at 12-13. Hoffman alleges that these witnesses would refute government trial witness Michael Daigle's testimony as to the customs and practices of the LED in approving tax credits for non-cash and related party expenditures via circular transfers. *Id.*

The LIFT litigation materials refer to the filings from a lawsuit between the LED and the Louisiana Institute of Film Technology ("LIFT") where, according to Hoffman, the arbitration award held that LIFT's tax credits were not obtained through fraud despite being based on circular transfers. *Id.* at 13. Similarly, the Orleans Studio litigation materials refer to filings from a lawsuit between LED and Orleans Studios where, according to Hoffman, also show that LED had a history of approving projects that supported their tax credits with non-cash payments. *Id.* at 14.

**B. Hoffman's *Brady* Argument**

5

Hoffman argues that these materials constitute *Brady* materials, and that the existence of *Brady* materials requires an evidentiary hearing. *Id.* at 18-20. Further, when a *Brady* movant shows "independent indicia of the likely merits" of their motion, they are entitled to additional discovery and Hoffman argues he satisfies this requirement as well, pointing to the Horizon Report, emails, and other exhibits he puts forth. *Id.* (quoting *United States v. Reed*, 719 F.3d 369, 373-74 (5th Cir. 2913)). Hoffman believes there will be substantially more evidence uncovered than just these selected materials, but he does not state what such evidence would be. *Id.* at 20. He asks the Court to conduct an evidentiary hearing, and if the Court is disinclined, then to permit "full discovery in support of this *Brady* motion, including depositions of Thomas Boulton of OIG, Michael Daigle, Christopher Stelly, Horizon's auditors and Walter Becker, among others." *Id.* at 21.

**C. Government's Opposition**

The government opposes this motion, first outlining three "misleading factual themes" underpinning Hoffman's position. R. Doc. 1052 at 4-7. The government first notes that Hoffman's arguments on actual loss, as opposed to intended loss, is misguided because, as the Fifth Circuit has said in this case, "[t]he [Sentencing] Guidelines say to use intended loss when that is greater than actual loss, the reason being that a fraudster's intent reflects his culpability." *Id.* at 5 (quoting *Hoffman*, 901 F.3d at 558-59). Next, the government refutes Hoffman's characterization of its prosecution as rising and falling on the testimony of two witnesses, Stelly and Daigle, because "[t]his ignores the other 24 witnesses that were called by the government that provided incriminating evidence against Hoffman," such as Richard Conway and Lou Sandoz who both denied receiving six-digit sums as payment for services reported by Hoffman, as well as numerous auditors who withdrew from representing Hoffman and Seven Arts amid professional concerns. *Id.* at 5-6. Finally, the government rejects Hoffman's attempt to make relevant that he complied

6

with state law because this argument "ignores that it was the LED that reported Hoffman to [federal] law enforcement." *Id.* at 7. The government reiterates that Hoffman was not charged with violations of state law and that his attempts to paint his conduct as compliant with *state* law is irrelevant to whether he engaged in fraud in violation of *federal* law. *Id.* at 1-2.

The government has two central arguments against Hoffman's motion: (1) that these materials are not *Brady* materials because these exact materials and the accompanying arguments have been presented numerous times – to the jury and the Fifth Circuit – and they have been consistently rejected; and (2) that Hoffman is not entitled to further evidentiary development because these materials do not provide independent indicia of a likelihood on the merits. The Court will summarize each of these arguments in turn.

First, the government argues that these five categories of materials do not constitute *Brady* material. By way of example, the government offers fifteen discrete instances where Hoffman argued on appeal precisely what he puts forth in the instant *Brady* motion, only for the Fifth Circuit to reject these arguments. *Id.* at 12-14. In his opening appellate brief, Hoffman raised his gripes with the testimony of Stelly and Daigle, pointed to the LIFT project as an example of compliant conduct, argued that custom and practice in this industry permitted circular transfers, discussed his and Arata's testimony as to the tax credit program and its complexities, and claimed that he and the other defendants complied with state law, all arguments presented again at this juncture. *Id.* (citing Hoffman Opening Appellate Brief, Case No. 16-30104, Rec. Doc. 164-1). Further, Hoffman supplemented the record on appeal to include many of these same materials – the Horizon Report, the Schott/Stelly emails, and filings from the Orleans Studio litigation – and the Fifth Circuit did not find them to move the needle. *Id.* at 16 ("Although the Fifth Circuit took notice of these exhibits, none had any bearing on its Opinion which focused on Hoffman's violations of

*federal law* and on the facts and circumstances of Hoffman's misconduct *in this case*.") (referencing Hoffman Appellate Exhibits in Support of Motion for Judicial Notice, Case No. 16-30104, Rec. Doc. 241).

The government also recounts how, at trial, Hoffman testified at length about his understanding of the laws governing the tax credit program, including regarding circular transfers, the state infrastructure laws, tax credit issuance, the certification process, the meaning of the word "expenditure," whether the laws required cash be spent, and the differences between the 2007 and 2009 laws. *Id.* at 14 (citing Trial Transcript, R. Doc. 638). Because these arguments were thoroughly explored both at trial and on appeal, the government asserts that these materials cannot be *Brady* because they are "improperly cumulative and there is no reasonable probability that Hoffman's evidence would produce an acquittal – because it did not the first time around." *Id.* at 15.

The government goes on to provide reasons why these materials are not the smoking gun Hoffman claims they are and why they do not entitle him to further discovery. The Horizon Report, the government explains, examined Horizon Entertainment's conduct and found it decisively *not* a "role model of acceptable practice," as "the State's conclusion was that Horizon also committed fraud." *Id.* at 19. The OIG began its investigation after the trial in this matter and therefore did not have records relating to this Horizon investigation before trial. *Id.* at 20. In response to Hoffman's allegations that Boulton was a member of the prosecution team and therefore this brings OIG files under *Brady*, the government emphasizes "the federal government did not participate in the 2015 investigation" of Horizon which resulted in the 2016 Report, and therefore had no duty or ability to turn over these files. *Id.* ("Just because the federal government worked with the OIG on

8

Hoffman's case does not mean it is responsible in perpetuity for all investigations past and future that are handled by the Louisiana OIG.").

With regard to the LIFT litigation filings, the government points out that LIFT was not a subject of Arata's subpoena and therefore these materials are unresponsive. Additionally, any allegation that Hoffman did not know about this matter at the time of trial is false because Arata testified about it at trial, the government produced interview memoranda regarding LIFT (including with Arata), and Hoffman himself filed discovery requests regarding LIFT prior to trial and failed to pursue these requests when faced with the government's opposition. *Id.* at 22-23 ("The government objected to these requests, and informed Hoffman that he was not entitled to the government's investigative files of unrelated matters – which would include both LIFT and Horizon."). Further, the government notes that these filings are part of the public record and that a defendant is considered to have access to material if they can obtain via subpoena from an independent or neutral source. *Id.* at 23 n.33 (citing *United States v. Rodriquez*, 62 F.3d 948, 952 (7th Cir. 1995)). On the Orleans Studio materials, also a part of the public record, the government notes that Peter finds them important because they purport to show the "LED's full understanding of the meaning and import of Act 530, which the government successfully excluded from trial" and yet the government notes that Hoffman's very first exhibit was Act 530. *Id.* at 24 (quoting Hoffman's *Brady* Motion, R. Doc. 1052 at 31). Again, the government characterizes these materials as cumulative and not *Brady*.

The government next addresses Hoffman's request for additional discovery and a hearing, asserting that he is not entitled to relief under 28 U.S.C. § 2255. *Id.* at 24. The government argues first that claims previously raised and disposed of are not entitled to relief, and these issues were all thoroughly argued both at trial and on appeal. *Id.* Next, claims not raised on direct appeal are

9

also not entitled to relief, and the government asserts that these materials are not *Brady* and that the government was not required to show violation of state law, so these matters are not appropriate for § 2255 relief. *Id.* at 25. As to discovery, the government notes that habeas petitioners are not entitled to discovery absent good cause, and in this case, Hoffman's discovery attempts constitute a fishing expedition fraught with "wide ranging, speculative, and conclusory" requests. *Id.* at 25-27. Finally, the government urges the Court to reject Hoffman's bid for additional witness testimony, arguing that he cannot relitigate the Stelly and Daigle testimony by raising the same concerns he raised at trial and on appeal, and, further, that Hoffman should be required to provide some amount of detail about the proposed testimony of his unnamed "suppressed" witnesses before being granted relief. *Id.* at 29-30.

### III. APPLICABLE LAW

#### A. Post-Conviction Relief and Requests for Evidentiary Development

Pursuant to 28 U.S.C. § 2255, a prisoner who has been sentenced to custody challenging the constitutionality of their sentence may file a motion to "vacate, set aside or correct the sentence" with the sentencing court. 28 U.S.C. § 2255(a). A court in receipt of such motion is required to grant a prompt hearing unless the materials submitted "conclusively show that the prisoner is entitled to no relief," in which case no hearing is required. *Id.* at § 2255(b). In the Fifth Circuit, it is settled law that "issues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in § 2255 Motions." *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986) (citing *United States v. Jones*, 614 F.2d 80, 82 (5th Cir. 1980)).

Post-conviction requests for an evidentiary hearing require a movant to show "independent indicia of the likely merit of [their] allegations." *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998); *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006). If the allegations are

speculative or conclusory, a court will deny a request for an evidentiary hearing. *Edwards*, 442 F.3d at 268; *Cervantes*, 132 F.3d at 1110 ("If, however, the defendant's showing is inconsistent with the bulk of her conduct or otherwise fails to meet her burden of proof in light of the other evidence in the record, an evidentiary hearing is unnecessary."). In *United States v. Edwards*, the Fifth Circuit denied the defendants an evidentiary hearing on alleged *Brady* violations, reasoning that "[d]ue to the speculative and conclusory nature of the Edwardses' allegations with respect to both the suppression and materiality *Brady* prongs, such a hearing would serve as nothing more than a fishing expedition." *Edwards*, 442 F.3d at 268 n.10.

Similarly, a habeas petitioner is entitled to additional discovery only upon a showing "for good cause." *United States v. Field*, 761 F.3d 443, 478 (5th Cir. 2014). "A petitioner demonstrates 'good cause' under Rule 6(a) 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is … entitled to relief.'" *Id.* (quoting *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997)). Allegations that are conclusory cannot authorize discovery in this context and "Rule 6, which permits the district court to order discovery on good cause shown, does not authorize fishing expeditions." *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994).

### B. *Brady* Violations

A *Brady* violation occurs when the prosecution knowingly puts on false testimony or withholds evidence from the defense, regardless of whether the defendant makes a specific or general request for such evidence or no such request at all. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Agurs*, 427 U.S. 97, 103-07 (1976); *United States v. Bagley*, 473 U.S. 667, 678 (1985). To successfully establish a *Brady* violation, a defendant must show "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant because it was

either exculpatory or impeaching; and (3) the evidence was material." *Edwards*, 442 F.3d at 264. To satisfy the materiality prong, the evidence, when viewed cumulatively within the context of the entire record, must create a reasonable probability that had it been disclosed, the trial's result would have been different; the defendant need not show that the result would have been different by a preponderance of the evidence, only that the absence of the evidence undermines confidence in the trial's outcome. *Bagley*, 473 U.S. at 682-84 (opinion of Blackmun, J.); *Kyles v. Whitley*, 514 U.S. 419, 434-41 (1995).

The Supreme Court has developed a line of cases shaping the contours of a *Brady* analysis. For instance, the *Agurs* Court held that the nondisclosed evidence must be viewed in light of the whole record, not evaluated in a vacuum. *Agurs*, 427 U.S. at 112-13, n.21 ("If, for example, one of only two eyewitnesses to a crime had told the prosecutor that the defendant was definitely not its perpetrator and if this statement was not disclosed to the defense, no court would hesitate to reverse a conviction resting on the testimony of the other eyewitness. But if there were fifty eyewitnesses, forty-nine of whom identified the defendant, and the prosecution neglected to reveal that the other, who was without his badly needed classes on the misty evening of the crime, had said that the criminal looked something like the defendant but he could not be sure as he had only had a brief glimpse, the result might well be different.") (quoting Comment, Brady v. Maryland *and the Prosecutor's Duty to Disclose*, 40 U. Chi. L. Rev. 112, 125 (1972)). The standard of materiality is more than the harmless-error standard, the Court explains, and "if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." *Id.* at 112.

In *Kyles*, the Supreme Court further elaborated on four aspects of the materiality standard. *Kyles*, 514 U.S. at 434-41. First, the Court noted that the reasonable probability standard does not

12

require a showing of more likely than not. Rather, the "touchstone of materiality" is that the evidence undermines confidence in the trial's outcome, not that the evidence would have shown by a preponderance that the trial would have resulted in an acquittal. *Id.* at 434. Second, the Court distinguished *Brady* evidence from a "sufficiency of evidence test," explaining that a defendant is not required to show that "in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434-35. Rather, a defendant establishes a *Brady* violation "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. Third, the Court advises that once constitutional error is found, there is no need for a harmless-error review because the reasonable probability standard "necessarily entails" a finding that the error was not harmless. *Id.* at 435-36. Finally, the Court stresses that the evidence must be viewed "collectively, not item by item." *Id.* at 436-37.

## IV. DISCUSSION

The Court has extensively reviewed the record in this matter and concludes that the evidence at hand does not satisfy the *Brady* prongs. To successfully put forth a *Brady* violation, Hoffman must show that (1) the prosecution offered perjured testimony or suppressed evidence (2) that was favorable to him and (3) that was material to either guilt or punishment. The Court questions whether Hoffman has satisfied any of these prongs,[3] but analyzes the materiality

---

[3] For example, some of these materials could not be suppressed, since one did not exist at the time of trial (Horizon Report, 2016) and others were matters of public record (LIFT and Orleans Studio litigation materials). Hoffman does not make a contrary showing. Further, Hoffman puts forward no concrete evidence to support a claim of perjured testimony by Stelly and Daigle and instead merely offers the same arguments he put forth at trial and was rejected at trial: that they got the program wrong and he got it right. The Court also doubts the favorability of these materials to Hoffman since the Horizon Report indicates that Horizon's conduct was fraudulent, which does nothing to exculpate Hoffman of his federal fraud charges, and the Schott/Stelly emails and other unrelated projects' litigation appear irrelevant to the federal charges as well.

requirement below because, on this basis, alone the materials clearly do not satisfy *Brady*'s requirements.

Materiality in the *Brady* context requires a reasonable probability that, had this evidence been disclosed, the result of the trial would have been different. The touchstone of materiality is whether confidence in the outcome of the trial is undermined as a result of the evidence's absence. The Court cannot find this standard met here. Hoffman's motion relies on the premise that if only he had been permitted to offer at trial evidence that he and his co-defendants complied with state law, and that the state permitted their conduct in other film projects, then there is a reasonable probability the trial would have resulted in a different outcome. He argues that the testimony of Stelly and Daigle could have been impeached if he had access to these materials because he could have shown them that they and the LED approved similar behavior in other projects and thus their interpretation of the program's administration was incorrect as to Seven Arts.

However, this was exactly what Hoffman and his co-defendants argued at trial, and the jury rejected it. Judge Feldman, in a post-trial motion hearing, addressed the circular transfers and custom and practice arguments, stating "Well, the jury heard all that but obviously didn't buy it." R. Doc. 868 at 23. Judge Feldman went on to say "I recall vividly during the trial all of this came up. I may have even made an observation to the jury that there is an argument that those who administered this thing at the state level were incompetent. I believed that. The jury didn't." *Id.* at 25.

Then, Hoffman argued the same on appeal to the Fifth Circuit, and the Circuit rejected it. *See, e.g.*, *Hoffman*, 901 F.3d at 535 ("The defendants countered that in the face of a difficult-to-interpret statutory regime they had made efforts to comply with state custom and practice as established by the acceptance of prior tax credit applications. The jury did not buy that defense.");

14

*id.* at 553 ("Contrary to the Hoffmans' contention, the indictment did not charge them with violating state law. It charged them with making various misrepresentations–lies about the company's expenditures, the creation of purchase invoices, and the *purpose* of [their] circular transactions. Using such lies in furtherance of a scheme to defraud violates federal law regardless of whether they independently violate state law.") (emphasis added); *id.* at 554 ("They contend the testimony would have highlighted the confusing nature of the regulations and thus shed light on their intent to defraud (that is, their lack thereof). . . . But we need not determine whether the district court exceeded the bounds of its discretion in excluding the testimony because the byzantine nature of the tax credit program was otherwise conveyed to the jury. . . . Plenty of witnesses involved in the creation and evaluation of the cost reports – including Seven Arts employees, auditors, state officials, and business partners (actual and contemplated)–made this point that the Hoffmans contend undermines a finding of fraudulent intent. What is more, Peter, a self-professed tax lawyer, testified at length about his understanding of the statute's language and purposes.").

There is no reasonable probability that the Horizon Report, the emails between Stelly and Schott, or the litigation filings would have changed the result of the trial because all of the arguments Hoffman alleges they bolster were thoroughly explored at trial. These materials add nothing new, and Hoffman's motion represent no more than a recitation of the arguments and evidence already rejected by the jury and Fifth Circuit alike. As such, the materiality prong of *Brady* cannot be satisfied, and no *Brady* remedies are warranted in this case.

Turning to relief under § 2255, because these materials are not *Brady* and the arguments are the same as put forth and rejected both at trial and on appeal, the Court finds that Hoffman has

15

put forth no independent indicia of the likely merits of his allegations and is therefore not entitled to an evidentiary hearing nor further discovery.

Further, Hoffman provides speculative justifications for reopening discovery, such as "[t]he extensive materials included in Exhibits A through E strongly support the inference that there is even more such evidence, entirely refuting the trial testimony of Stelly and Daigle," "discovery will produce much more substantial verification of the exculpatory and impeaching materials contained in Exhibits A through E," and "defendants have reason to believe that OIG has engaged in other investigations than just those applicable to Seven Arts and Horizon, regarding the policies and directives of LED in connection with the Louisiana tax credit program, none of which have been disclosed and all of which are likely exculpatory." R. Doc. 1052-2 at 20, 22 (emphasis omitted). As has been explained, Hoffman has attempted to rebut Stelly and Daigle's testimony at every stage of this litigation and the LED's treatment of unrelated tax credit applications is irrelevant to whether Hoffman and his co-defendants committed fraud in violation of federal law. Hoffman has not shown that a rehashing of his trial and appellate arguments will, this time, yield a meritorious outcome. The Court cannot and will not enable a fishing expedition.

Accordingly, for the foregoing reasons, Hoffman's *Brady* Motion is **DENIED**.

New Orleans, Louisiana, this 7th day of March, 2024.

                                                            _____
                                                                  United States District Judge